

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2002 FEB -7 PH 5:00

FEB 0 7 2002
LORETTA G. WHYTE
CLERK

EASTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

| | | |
|---|---|---|
| JANE GALIANO, AND GIANNA, INC. *<br>*Plaintiffs* | CIVIL ACTION NO. 00-0071 | |

VERSUS                          *        SECTION " E" " (5)

                                *        JUDGE MARCEL LIVAUDAIS, JR.

HARRAH'S OPERATING CO., INC.,           *
        AND
HARRAH'S ENTERTAINMENT, INC.    *        MAGISTRATE: JUDGE ALMA CHASEZ
        *Defendants*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MOTION FOR SUMMARY JUDGMENT UNDER
## THE SETTLEMENT AGREEMENT
## PER NEW UNDISPUTED FACTS AND NEW LEGAL AUTHORITIES

Now come plaintiffs, Jane Galiano and Gianna Inc., who respectfully move this Honorable

Court for a Summary Judgment under the Settlement Agreement per new undisputed facts and new

legal authorities, for the reasons set forth in the annexed Statement of Undisputed Material Facts and

Memorandum of Law annexed hereto.

New Orleans, Louisiana, this 7th day of February, 2002



Respectfully submitted,


SIDNEY L. SHUSHAN, #12055
JONATHAN M. SHUSHAN, #21977
BRIAN L. GLORIOSO, # 27226
Guste, Barnett & Shushan & L.L.P.
639 Loyola Avenue, Suite 2500
New Orleans, Louisiana  70113
Telephone:  (504) 529-4141
Direct Line: (504) 681-4519
Attorney for Plaintiffs
Jane Galiano and Gianna, Inc.

2

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JANE GALIANO and GIANNA, INC. | * | CIVIL ACTION |
| *Plaintiffs* | * | |
| | * | NO. 00-0071 |
| VERSUS | * | |
| | * | SECTION "E" (5) |
| | * | |
| HARRAH'S OPERATING CO., INC. | * | JUDGE MARCEL LIVAUDAIS, JR. |
| and | * | |
| HARRAH'S ENTERTAINMENT, INC. | * | MAGISTRATE JUDGE ALMA CHASEZ |
| *Defendants* | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## <u>ORDER</u>

IT IS ORDERED by the Court that Plaintiffs' Motion for Summary Judgment Under the

Settlement Agreement Per New Undisputed Facts and New Legal Authorities be filed into the record

of the above captioned matter.

New Orleans, Louisiana this 7th day of February, 2002.

_____
**UNITED STATES DISTRICT JUDGE**

EASTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

| | | |
|---|---|---|
| JANE GALIANO, AND GIANNA, INC. | * | CIVIL ACTION NO. 00-0071 |
| *Plaintiffs* | * | |
| | * | |
| | * | |
| VERSUS | * | SECTION " E " " (5) |
| | * | |
| | * | JUDGE MARCEL LIVAUDAIS, JR. |
| | * | |
| HARRAH'S OPERATING CO., INC., | * | |
| AND | * | |
| HARRAH'S ENTERTAINMENT, INC. | * | |
| *Defendants* | * | |
| | * | MAGISTRATE ALMA CHASEZ |

* * * * * * * * * * * * * * * * * * * * * * * *

## NOTICE OF HEARING

To:  Mr. Joseph W. Looney, T.A.
     Ms. Melissa S. LaBauve
     Adams and Reese LLP
     4500 One Shell Square
     New Orleans, Louisiana 70139
     Attorney for Defendants,
     Harrah's Operating Co., Inc. and Harrah's Entertainment, Inc.

You are hereby notified that the **Motion for Summary Judgment Under The Settlement Agreement Per New Undisputed Facts and New Legal Authorities,** by Jane Galiano and Gianna, Inc. will be heard on *March 6* 2002, at *10:00* A. M., at the United States District Court for the Eastern District of Louisiana, 501 Magazine Street, New Orleans, Louisiana 70130.

New Orleans, Louisiana, this 7th day of February, 2002.

_____

**UNITED STATES DISTRICT JUDGE**

4

Respectfully submitted,

SIDNEY L. SHUSHAN, #12055
JONATHAN M. SHUSHAN, #21977
BRIAN L. GLORIOSO, # 27226
Guste, Barnett & Shushan & L.L.P.
639 Loyola Avenue, Suite 2500
New Orleans, Louisiana 70113
Telephone: (504) 529-4141
Direct Line: (504) 681-4519
Attorney for Plaintiffs
Jane Galiano and Gianna, Inc.

EASTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

| | | |
|---|---|---|
| JANE GALIANO, AND GIANNA, INC. | * | CIVIL ACTION NO. 00-0071 |
| *Plaintiffs* | * | |
| | * | |
| | * | |
| VERSUS | * | SECTION " E" " (5) |
| | * | |
| | * | JUDGE MARCEL LIVAUDAIS, JR. |
| | * | |
| HARRAH'S OPERATING CO., INC., | * | |
| AND | * | |
| HARRAH'S ENTERTAINMENT, INC. | * | MAGISTRATE JUDGE CHASEZ |
| *Defendants* | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * *

## STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT UNDER THE SETTLEMENT AGREEMENT PER NEW <u>UNDISPUTED FACTS AND NEW LEGAL AUTHORITIES</u>

The Court previously noted it is a disputed issue of fact whether Plaintiff's Vice President had authority to enter into the Settlement Agreement. New facts and authorities not previously considered by the Court make it clear that is not a disputed issue of fact.

1.      The Articles and Bylaws of the Plaintiff's corporation clearly and undisputedly gave the Vice President (Scott Buhrer) authority to sign the settlement agreement. (Annex 2, Articles and Bylaws).

2.      The Articles and Bylaws of the Plaintiff's corporation give the Vice President the authority to act in the absence of the president. (Annex 2).

3.      Jane Galiano left the meeting where the Settlement Agreement was reached, and literally left her Vice President in charge of the meeting and the Agreement. (Annex 1, Galiano

6

deposition, II, p. 209, Annex 3,  Buhrer Deposition, p. 102 ).

Under the Articles and Bylaws, the Vice President had authority to act in the absence of the president.  The President left him in charge of the meeting where the Settlement Agreement was reached. (Annex 2, Articles and Bylaws).

4.      The Vice President was a disclosed mandatary because he signed the Settlement Agreement as vice president.  (Annex 4, Settlement Agreement).

5.      The Vice President had negotiated and signed the previous [first] contract between the parties by exchange of letters. (Annex 5, Letter of August 28, 1995 Buhrer to Albright, and Letter of September 14, 1995, Albright to Buhrer, which constitutes the first contract).

6.       The Plaintiff's Vice President had spoken for the corporation in a long series of negotiations by letters both before and after the previous [first] contract between the parties.  He was the contact person for the corporation in all business matters between Defendants and Plaintiffs.  He spoke for the corporation in negotiations to try to work out a new design agreement.  After the Settlement Agreement was signed, Defendants asked him to sign an amendment to the Settlement Agreement.  When he was not available, another Vice President spoke for Plaintiffs.  (Annex 5, Preliminary Letters of July 21, 1995, and August 22, 1995, follow up letter of September 25, 1995. Letters of November 1, 1995, November 28, 1995, second letter of November 28, 1995 and others. Letter of December 10, 1995 Buhrer to Albright, letter of February 14, 1996, Albright to Buhrer, Letter of February 15, 1996, Buhrer to Albright, Letter of March 1, 1996, Buhrer to Albright, March 25, 1996, Letter of May 15, 1995, Albright to Buhrer,

7.      Harrah's letters after the Settlement Agreement show Harrah's believed Buhrer

had authority to act for plaintiffs. Harrah's insisted to the very end that the Settlement Agreement was valid, and refused to negotiate further. (Annex 5, Letters of June 25, 1996, De Young to Hudson, September 30, 1996, De Young to Hudson. Letters prior to the Settlement Agreement cited above. Compare the letter of June 4, 1996 written weeks after the negotiations and signing of the Settlement Agreement).

8.      There was no notification to Harrah's that Buhrer lacked authority until after he had negotiated and signed the Settlement Agreement. (Annex 5, Letters prior to the Settlement Agreement cited above. Compare the letter of June 4, 1996 written weeks after the negotiations and signing of the Settlement Agreement).

9.      At the time of the negotiation and signing of the Settlement Agreement, Buhrer believed he had authority to act for Plaintiffs. (Annex 3, Deposition of Buhrer, p. 23).

10.      The original claim in this case relies on the Settlement Agreement as the basis for the breach of contract claim. (Annex 4, See paragraphs 16 thru 18).

11.      Harrah's "used" plaintiffs' designs by putting them on the cover of its magazine without her permission. (Annex 7, Harrah's People's Magazine). The designs are literal copies of plaintiffs' designs. (Annex 8, Plaintiffs' designs).

12.      Harrah's "used" plaintiffs' designs because All-Bilt created patterns for Harrah's using literal copies of plaintiff's designs. (Annex 9, All-Bilt patterns which are literal copies of plaintiffs' designs annexed thereto).

13.      Harrah's "used" plaintiffs designs because All-Bilt manufactured for Harrah's designs which are almost literal copies of plaintiffs' designs. (Annex 10, Cover sheets of All-Bilt

patterns and production orders and invoices to Harrah's which are almost literal copies of plaintiffs'

14.    Harrah's has not paid one cent in royalties or markup to plaintiffs since the $7,500.00 check which it sent soon after the Settlement Agreement.

15.    Plaintiffs are impoverished and Harrah's is enriched because the All-Bilt documents show Harrah's has "used" her designs for almost literal copies of those designs produced by All-Bilt for Harrah's for years without paying her a cent. (Annex 7, Harrah's People's Magazine). (Annex 8, Plaintiffs' designs).

16.    There is an obvious connection between the enrichment and the impoverishment.

17.    There is no legal cause or justification for the use of plaintiffs' designs without paying any royalties or markup to plaintiffs because Harrah's insisted the Settlement Agreement was valid, and refused to renegotiate it or even discuss it, and then proceeded to "use" her designs in spite of the language of the Settlement Agreement, paragraph 5 which prohibits any "use" of her designs unless expressly permitted by that Agreement. (Annex 5, Letters of De Young, June 25, September 30, 1996).

18.    The $7,500.00 check does not provide cause or justification for the use of plaintiffs' designs thereafter. The letter tendering the check does not say that it is payment in full per the Settlement Agreement. The check does not say it is payment in full per the Settlement Agreement. Unjustified Enrichment in the Louisiana Jurisprudence.  In 1967 the Louisiana Supreme Court formally recognized a general action for unjustified enrichment in *Minyard v. Curtis Products, Inc*., 251 La. 624, 205 So. 2d 422 (1967).  In this opinion, the Supreme Court assimilated into Louisiana law the French judicially-created remedy known as the action de *in rem verso.*

9

EASTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

| | | |
|---|---|---|
| JANE GALIANO, AND GIANNA, INC.<br>*Plaintiffs* | * | CIVIL ACTION NO. 00-0071 |
| | * | |
| | * | |
| | * | |
| VERSUS | * | SECTION " E" " (5) |
| | * | |
| | * | |
| | * | JUDGE MARCEL LIVAUDAIS, JR. |
| | * | |
| HARRAH'S OPERATING CO., INC.,<br>AND | * | |
| | * | |
| HARRAH'S ENTERTAINMENT, INC.<br>*Defendants* | * | MAGISTRATE: JUDGE ALMA CHASEZ |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * *

*Memorandum in support of*  **MOTION FOR SUMMARY JUDGMENT UNDER
THE SETTLEMENT AGREEMENT
PER NEW UNDISPUTED FACTS AND NEW LEGAL AUTHORITIES**

INTRODUCTION

Plaintiffs submit herewith to the Court new undisputed facts and new legal authorities.  They

show why the issues of fact previously noted by the Court are not genuine issues of material fact.

**I.  THE COURT SHOULD GRANT THE MOTION FOR PARTIAL SUMMARY
JUDGMENT ON THE SECOND CONTRACT BECAUSE THE ISSUES OF FACT
PREVIOUSLY NOTED BY THE COURT ARISING FROM THE SETTLEMENT
AGREEMENT ARE NOT GENUINE ISSUES OF MATERIAL FACT.**

**A.  THE VICE PRESIDENT HAD AUTHORITY TO SIGN THE
SETTLEMENT AGREEMENT UNDER THE ARTICLES AND BYLAWS**

10

**OF THE CORPORATION.**

The Court previously noted it is a disputed issue of fact whether Plaintiff's Vice President had authority to enter into the Settlement Agreement. New facts and authorities not previously considered by the Court make it clear that is not a disputed issue of fact.

*The Articles and Bylaws of the Plaintiff's corporation clearly and undisputedly gave the Vice President (Scott Buhrer) authority to sign the settlement agreement. (Annex 2). [Undisputed fact No. 1].*

*The Articles and Bylaws of the Plaintiff's corporation give the Vice President the authority to act in the absence of the president. They provide as follows: [insert quotes] [Undisputed fact No. 2].*

*Jane Galiano left the meeting where the Settlement Agreement was reached, and literally left her Vice President in charge of the meeting and the Agreement. [Undisputed fact No. 3].*

Under the Articles and Bylaws, the Vice President had authority to act in the absence of the president. The President left him in charge of the meeting where the Settlement Agreement was reached.

*The Vice President was a disclosed mandatary because he signed the Settlement Agreement as vice president. [Undisputed fact No. 4].*

If the Vice President had authority under the corporate articles and bylaws, Defendants are bound to the Settlement Agreement under Civil Code Article 3022 because he was a disclosed

mandatary who had actual authority.[1]

## B. ALTERNATIVELY, THE VICE PRESIDENT HAD AN ACTUAL OR PUTATIVE MANDATE BY VIRTUE OF A LONG COURSE OF DEALINGS BETWEEN THE PARTIES.

*The Vice President had negotiated and signed the previous [first] contract between the parties by exchange of letters.[2] [Undisputed fact No. 5].*

*The Plaintiff's Vice President had spoken for the corporation in a long series of negotiations by letters both before and after the previous [first] contract between the parties.[3] He was the contact person for the corporation in all business matters between Defendants and Plaintiffs.[4] He spoke for the corporation in negotiations to try to work out a new design agreement.[5] After the Settlement Agreement was signed, Defendants asked him to sign an*

---

[1] *Oliver v. Central Bank*, 658 So. 2d 1316, 1321 (La. App. 2Cir. 1995).
*Martin Fuel Distr., Inc. v. Trans Gulf Inc.*, 496 So. 2d 473, 476 (La. App. 1Cir. 1986).
*Cartinez v. Reliable Amusement Co.*, 746 So. 2d 246, 250 (La. App. 3 Cir. 1999).

[2] [See letters of August 28, 1995 Buhrer to Albright, and letter of September 14, 1995, Albright to Buhrer, which constituted the first contract. Annex 5]

[3] See preliminary letters of July 21, 1995, and August 22, 1995. See Annex D. He wrote the followup letter of September 25, 1995. Annex 5.

[4] See the letters of November 1, 1995, November 28, 1995, second letter of November 28, 1995, and others Annex 5.

[5] See letter of December 10, 1995 Buhrer to Allbright, letter of February 14, 1996, Allbright to Buhrer, letter of February 15, 1996, Buhrer to Allbright, Letter of March 1, 1996, Buher to Allbright, March 25, 1996. See Annex 5.

12

amendment to the Settlement Agreement. [6] *When he was not available, another Vice President spoke for Plaintiffs.*[7]   *[Undisputed fact No. 6].*

The law is clear.  A course of dealings between the parties implies an actual mandate.[8]

*Harrah's letters after the Settlement Agreement show Harrah's believed Buhrer had authority to act for plaintiffs.  Harrah's insisted to the very end that the Settlement Agreement was valid, and refused to negotiate further.*[9] *[Undisputed fact No. 7].*

Even if there was no actual mandate, there was a putative mandate under LCC Article 3019 because Harrah's believed in good faith that Buhrer had authority to enter into the Settlement Agreement.

### C. THE VICE PRESIDENT HAD AN ACTUAL MANDATE HE BELIEVED HE HAD AUTHORITY TO ACT, AND BECAUSE NO ONE NOTIFIED HARRAH'S TO THE CONTRARY UNTIL AFTER THE SETTLEMENT

---

[6] Letter of May 15, 1996, Allbright to Buhrer, second letter of May 15, Allbright to Buhrer letter of May 16, 1996, Allbright to Buhrer [Annex 5].

[7] See letter of March 25, 1996, Wolff to Allbright [Annex 5].

[8] *Portier v. Faivaimoana Fishing Co.*, 2001 La. App. LEXIS 2069, at 4* (La. App. 1Cir. 09/28/01).
   *Waffle House, Inc. v. Corporate Props., LTD.*, 789 So. 2d 593, 596-597 (La. App. 1 Cir. 2001).
   *Tedesco v. Gentry Dev., Inc.*, 540 So. 2d 960, 963 (La. 1989).
   *J.D. Cadelra & Co. v. Louisiana Stadium & Exposition Dist.*, 750 So. 2d 284, 288-289 (La. App. 5 Cir. 1999).
   *Indep. Fire Ins. Co., v. Able Moving & Storage Co.*, 650 So. 2d 750, 752 (La. 1995).

[9] See letters of June 26, 1996, De Young to Hudson, September 30, 1996, De Young to Hudson. [Annex 5]

13

**AGREEMENT WAS SIGNED.**

*There was no notification to Harrah's that Buhrer lacked authority until after he had negotiated and signed the Settlement Agreement.*[10] *[Undisputed fact no. 8].*

*At the time of the negotiation and signing of the Settlement Agreement, Buhrer believed he had authority to act for Plaintiffs. [Undisputed fact no. 9].*

Louisiana Civil Code Article 3010 paragraph 1 provides that the mandate is in full force and effect "if at the tire of contracting the mandatary did not know that his mandate had been terminated." Under Article 3010 paragraph 1, Buhrer had an actual mandate.

### D. EVEN IF THE VICE PRESIDENT HAD NO ACTUAL OR PUTATIVE MANDATE, PLAINTIFFS RATIFIED THE SETTLEMENT AGREEMENT BY FILING THIS LAWSUIT.

Whether Buhrer had authority at the time is not a genuine issue of material fact because Plaintiffs ratified his acts by filing this lawsuit.

Plaintiffs ratified the Settlement Agreement by filing this lawsuit based on the Settlement Agreement.

*The original claim in this case relies on the Settlement Agreement as the basis for the breach of contract claim. [Undisputed fact no. 10].*

As a matter of law Plaintiff had every right to ratify the Settlement Agreement by filing this lawsuit. Louisiana Civil Code Articles 3010, paragraph 2, 3109. That for a long period of time Ms.

---

[10] [See all of the letters prior to the Settlement Agreement cited above. Compare the letter of June 4, 1996 written weeks after the negotiation and signing of the Settlement Agreement. Annex 5.]

14

Galiano has contested Mr. Buhrer's authority to confect the Settlement Agreement is *not* a hindrance to its enforcement; for as Harrah's itself admits in its "Opposition to Plaintiffs' Motion for Partial Summary Judgment," the actions of an unauthorized mandatory can be ratified by the principal at a later date, thereby making the actions of the putative mandatory fully enforceable as a valid juridical act done on behalf of the principal. *See* Opposition at 13 n.4 ("Nor do Plaintiff's Complaint and Plaintiffs' Motion for Summary Judgment provide clear evidence that Galiano is hereby ratifying the Settlement Agreement dated May 6, 1996. Ratification of an agreement is the adoption by one person of an act done on its behalf by another without authority. It amounts to a substitute for prior authority.").

Contrary to this argument by Harrah's, basic codal principles support the conclusion that ratification has already occurred here. In addition to articles 1843 and 1848 of the basic obligations articles, several articles on mandate in the Code of 1870 recognize the concept of ratification in regard to the acts of an unauthorized mandatory [2]. Articles 3010 and 3021 (West 1996) expressly provide that acts undertaken by the mandatory in excess of the mandate produce no effects vis-a-vis third persons.

In the next breath, however, these articles make an exception to the doctrine of "unenforceability for unauthorized actions" by pointing out that once ratified, these unauthorized actions are fully binding on both the principal and the third person. Article 3010 of the Code of 1870 declared, "The attorney can not go beyond the limits of his procuration; whatever he does exceeding his power is null and void with regard to the principal, *unless ratified by the latter...*" (emphasis added). And article 30121 stated, "The principal is bound to execute the engagements contracted by the attorney, conformably to the power confided in him. For anything further he is not bound, *except insofar as he*

15

*has expressly ratified it.*" (emphasis added). Thus, these articles expressly set forth the Code's general rule against the recognition of apparent authority, but then immediately provide the exception to this rule based on the principal's act of ratification. Hence, Mr. Buhrer's act of settlement is currently binding on his principal, Ms. Galiano, and on the party with whom he compromised, Harrah's, *if his act has been ratified by Ms. Galiano.*

Article 1843 (West 1996) defines and explains the concept of ratification: "Ratification is a declaration whereby a person gives his consent to an obligation incurred on his behalf by another without authority. An express act of ratification must evidence the intention to be bound by the ratified obligation. <u>Tacit ratification results when a person, with knowledge of an obligation incurred on his behalf by another, accepts the benefit of that obligation.</u>"

The last sentence of article 1843 indicates the fallacy of Harrah's statement – in footnote 4 of its Opposition and on p.2 of its "Response to Plaintiffs' Reply to Defendants' Opposition to Plaintiffs' Motion of SJ" – that Ms. Galiano has never ratified the Settlement Agreement, which is therefore unenforceable. <u>It is true, of course, that Ms. Galiano has never "expressly ratified" the agreement by a formal declaration or writing, but Ms. Galiano *did* tacitly ratify by effort, through this lawsuit, to avail herself of the benefits owed her under the Settlement Agreement.</u>

This factual conclusion is further buttressed by the fact <u>that there is another nominate contract whereunder the filing of a lawsuit is regarded as a tacit availment of the benefits of the contract – namely, the stipulation *pour autrui*.</u> See, e.g., <u>Twichel v. Andry</u>, 6 Rob. 407 (La. 1844) (holding that the filing of suit by the third-party beneficiary amounted to his availing himself of the benefit). Thus, under the <u>*Twichel*</u> doctrine, for a stipulation to be enforceable against the promisor, the beneficiary's

acceptance of the promised benefit - or his "avail;[ing] himself of the benefit," in the words of article

1978(2) - does not have to be express.

## E. PLAINTIFF'S RATIFICATION WAS RETROACTIVE TO THE TIME
## OF THE SIGNING OF THE SETTLEMENT AGREEMENT.

Louisiana Civil Code article 1843 (West 1996 explains that ratification is a declaration whereby

a person gives his consent to an obligation incurred on his behalf by another without authority.  In other

words, ratification substitutes for authority that was not given *before* the unauthorized person made a

juridical act on behalf of another act on behalf of another.  *See* Ledoux v. Old Republic Life Insurance

Company, 233 So. 2d 731 (La. App. 3d Cir. 1970), *writ refused*, 236 So. 2d 501 (1970).

In a sense, to ratify another person's act is to vest authority in that person after the act has been

carried out.  The "represented" party, when ratifying, is thus willing to acquire the benefits and incur the

burdens created by a juridical act by which he was not bound originally, but to which he now becomes

the principal party through ratification.  Ratification will, therefore, always have a retroactive effect in the

sense that a juridical act is fictionally given, effective back to the date of its formation, the legal

requirement which had been missing for its validity.

This is the clear sense of Louisiana Civil Code article 1844: "The effects of confirmation and

ratification are retroactive to the date of the confirmed or ratified obligation.  Neither confirmation nor

ratification may impair the rights of third persons."

Thus, a ratified juridical act is fictitiously considered to have been perfect and valid as of the

time it had been entered into, since it has been cured, retroactively, of its defect.  The only exception to

this retroactivity principle is that the act of ratification cannot impair the rights acquired, in the mean

time, by good faith third parties.  That obviously is not the situation in Galiano v. Harrah's, since the case involves the first and second parties to the contract of transaction, not third-party strangers to the transaction.

All of the principles detailed above are clearly derived from or contained in the language of the cited Civil Code articles.  See McCarty v. Panzico, 467 So. 2d 1228 (La. App. 2d Cir., 1985).  Panzico cited a U.S. 5th circuit "diversity" opinion to prior authority." Id. at 1234.

Professor Saul Litvinoff has also explained the retroactivity principle in his most recent Obligations Treatise.  It is clear by virtue of the article 1844 principle of retroactivity, he argues, that "a confirmed or ratified act is regarded as valid since its inception."  Saul Litvinoff, The Law of Obligations, volume 5 (2d ed., 2o001), at p. 350 (citing 6 Planiol et Ripert, Traite Pratique de Droit Civil Francais 392-93 (2d e., 1952)).

Hence, the Galiano settlement agreement is enforceable from the date it was made, namely, 6 May 1996.

See also Frazier v. Harper, 600 So. 2d. 59 (La. 1992).  In this Louisiana Supreme Court opinion, Justice Dennis points out that the plaintiff had by her pleadings indicated that she was giving her consent "to be bound by the obligations created by the transaction and her acceptance of its benefits." Id at 62.  Justice Dennis pointed out that the plaintiff had "ratified the transaction between Delta [Airlines] and [the defendant] by commencing and prosecuting this law suit."  It is not clear from the opinion whether the court is referring to the "transaction" as a term of art – that is, as a codal "transaction or compromise" – or instead is referring to the "transaction" as a novation, that is, as a new pension for the old pension plan of which the plaintiff had been a beneficiary.  In any event, the principle

18

of tacitly ratifying the unauthorized juridical act by filing suit is clearly expressed in this case.

## F. THE COURT SHOULD ENFORCE THE SETTLEMENT AGREEMENT BECAUSE THERE IS A STRONG PUBLIC POLICY IN FAVOR OF THE CONTRACT OF TRANSACTION OR COMPROMISE.

There is no doubt that the Settlement Agreement is a valid contract of Transaction or Compromise. The "Settlement Agreement" of May 1996 is enforceable as a valid contract of transaction or compromise: " A *transaction or compromise* is an agreement between two or more persons, who, for preventing our putting an end to a law suit, adjust their differences by mutual consent, in the matter which they agree on, and which everyone of them prefers to the hope of gaining, balanced by the danger of losing." La. Civ. Code art. 3071(1) (West 1996).

As article 3071 clearly demonstrates, a transaction or compromise is a bilateral contact, since the concession each party. *See* art. 1908 (West 1996) ("A contract is bilateral or synallagmatic when the parties obligate themselves reciprocally, so that the obligation of each party is correlative to the obligation of the other."). Hence, as applied to the facts of this case, Ms. Galiano's concession, through the sacrifice of part of her claim against Harrah's, has as its cause Harrah's concomitant renouncement of its asserted right to cancel, with no liability, its original contract with Galiano. *See* "Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment" at p. 3 (indicating that Harrah's had decided to terminate its original agreement with Galiano, but in order to settle the dispute over monies owed, entered the Settlement Agreement dated 6 May 1996). Hence, applying article 3071(1), the court should find as a matter of law – based on the admitted and uncontested material fact of competing and compromised claims – that the "Settlement Agreement" is supported by a valid

19

cause, as required by article 1966 (West 1996) ("An obligation can not exist without a lawful cause.").

Moreover, the transaction or compromise is one of the contracts with a twofold purpose or cause: first, the cause discussed in the preceding paragraph – which is based on the desired end that each of the parties pursues individually, namely, the reciprocal concession or forbearance of the other's claim – and another purpose (cause) that both of them pursue in common, namely, the desire to prevent or put an end to litigation, which is one of the purposes contemplated by this Settlement Agreement: to settle the dispute over fees and thereby to avoid litigation.[11] Thus, should Harrah's argue that the first transactional cause of adjusting differences through reciprocal concessions does not exist, then the understanding that there is a second cause in every contract of transaction – the desire to terminate or to prevent litigation, that is, to settle a dispute – this idea of a second transactional cause should be asserted here; for its existence is proved by Harrah's own characterization of its having entered the Settlement in order to put an end to the dispute with Ms. Galiano about monies owed for Harrah's use of the uniforms; and as explained in article 3071(1), this cause or purpose to prevent litigation makes the Settlement Agreement enforceable as an onerous compromise.

The crucial material fact for this "second cause" argument has been admitted by Harrah's at the top of p. 3 of its Opposition to Plaintiffs' Motion for Partial Summary Judgment: "In early 1996, when

---

[11]See 1 Saul Litvinoff, Louisiana Civil Law Treatise: Obligations sec. 378, at 639-40 (1969) ("As in every synallagmatic contract either party to a transaction or compromise acts in view of the expected counter-presentation of the other. Therefore, the sacrifice that one of the parties makes of a claim, or part of a claim, has at its cause the concomitant renouncement by the other. But to this ordinary cause, another and special once is added, the putting and end to their dispute. This is an aim that both parties share in common. Thus, the transaction or compromise is one of the instances of contracts with a twofold cause: an end that each of the parties pursues individually, and another end that both of them pursue in common." (footnote omitted)).

20

Harrah's decided to terminate the Agreement with Galiano, a *dispute* arose regarding the use of the uniforms *which is the* subject of a Settlement Agreement dated May 6, 1996." (emphasis added). This admitted fact is thus undisputed and provides the factually material base for demonstrating the existence of an onerous cause – a matter in dispute with Ms. Galiano was "settled" by Harrah's to avoid potential litigation. In sum, then, the admitted facts as applied to the law of transaction support a summary judgment as to the enforceability of the Settlement Agreement.

## II. AS A MATTER OF UNDISPUTED FACT, DEFENDANTS DID "USE" SOME OF PLAINTIFFS' DESIGNS BECAUSE THEY COPIED THOSE DESIGNS, PUT THEM INTO PRODUCTION, AND DID NOT PAY HER ANY ROYALTIES.

The discovery conducted since the previous motions leaves no doubt.

Defendants did in fact "use" Plaintiffs' designs without paying her any royalties.

The only remaining issue are how many of her designs they used, and what the damages add up to.

*Harrah's "used" plaintiffs' designs by putting them on the cover of its magazine without her permission.* The designs are literal copies of plaintiffs' designs. [*Undisputed fact no. 11*].

*Harrah's "used" plaintiffs' designs because Allbilt created patterns for Harrah's using literal copies of plaintiff's designs.* [*Undisputed fact no. 12*].

*Harrah's "used" plaintiffs designs because Allbilt manufactured for Harrah's designs which are almost literal copies of plaintiffs; designs.* [*Undisputed fact no. 13*].

## III. ALTERNATIVELY, PLAINTIFFS ARE ENTITLED TO A JUDGMENT AGAINST DEFENDANTS FOR UNJUST ENRICHMENT IF THERE IS NO CONTRACT OR COPYRIGHT REMEDY.

Unjustified Enrichment in the Louisiana Jurisprudence. In 1967 the Louisiana Supreme Court formally recognized a general action for unjustified enrichment in *Minyard v. Curtis products, Inc.*, 251 La. 624, 205 So. 2d 422 (1967). In this opinion, the Supreme Court assimilated into Louisiana law the French judicially-created remedy known as the action *de in rem verso*.

In receiving the French action *de in rem verso,* the *Minyard* court relied heavily on two articles by Professor Barry Nicholas, *see* Nicholas, *Unjustified Enrichment in the Civil Law and Louisiana Law* (pts. 1 & 2), 36 Tul. L. Rev. 605, 37 Tul. L. Rev. 49 (1962). The *Minyard* court essentially copied the Nicholas analysis and judicially received within our jurisprudence a general action for unjustified enrichment as permitted by article 21 of the Civil Code of 1870, now article 4 (West 1996). The *Minyard* court also expressly recognized the action for unjustified enrichment as quasi-contractual in nature, arising under Civil Code articles 2293 (defining quasi-contracts) and 2294 (describing the quasi-contracts of management of the affairs of another – *negotiorum gestio* – and payment of a think not due). The *Minyard* court explained that these two quasi-contract articles contain particular applications of a general unjustified enrichment principle, from which principle the courts, by analogy, can develop more specific remedies for particular case not provided for in the Code. *See Minyard,* 251 La. at 648-50, 205 So. 2d at 431-32. *See Tate*, *The Louisiana Action for Unjustified Enrichment: A Study in Judicial Process,* 51 Tul. L. Reve. 446, 459 (1977) [hereinafter Unjustified Enrichment].

Basing its analysis on Professor Nichola's analysis, the *Minyard* court then specifically acknowledged and approved the five requisites of a *de in rem verso* action as developed in the French Jurisprudence. In recognizing the action, the *Minyard* court concluded:

22

As Nicholas points out, in France the action has rightfully been subjected to limitations

by the courts in its application....  There are now five prerequisites to the successful suit

by *actio de in rem verso*: (1) there must be enrichment, (2) there must be an

impoverishment, (3) there must be a connection between the enrichment and resulting

impoverishment, (4) there must be an absence of "justification" or "cause" for the

enrichment and impoverishment, and finally (5) the action will be allowed when there is

no other remedy at law, i.e., the action is subsidiary or corrective in nature. 251 La. at

651-52, 205 So. 2d at 432.

The 1985 revision of the Civil Code's articles on conventional obligations filed this lacuna by

setting forth the general principle of unjustified enrichment in article 1757.  This article, however, does

not contain the details of the unjustified enrichment action, so the *de in rem verso* action of *Minyard*

remains the approved methodology for approaching unjustified enrichment cases.

The undisputed facts show that plaintiffs meet every requirement for an unjust enrichment claim

if there is no contract or copyright claim against defendants.

*Undisputed fact no. 14: Harrah's has not paid one cent in royalties or markup to*

*plaintiffs since the $7,500 check which it sent soon after the Settlement Agreement.*

*Undisputed fact no. 14: Plaintiffs are impoverished and Harrah's is enriched because the*

*Allbilt documents show Harrah's has "used" her designs for almost literal copies of those*

*designs produced by Allbilt for Harrah's for years without paying her a cent.* [See documents,

Fact No. 11]

*Undisputed fact no. 15: There is an obvious connection between the enrichment and the*

23

impoverishment.

Undisputed fact no. 16: There is no legal cause or justification for the use of plaintiffs' designs without paying any royalties or markup to plaintiffs because Harrah's insisted the Settlement Agreement was valid, and refused to renegotiate it or even discuss it, and then proceeded to "use" her designs in spite of the language of the Settlement Agreement, paragraph 5 which prohiits any "use" of her designs unless expressly permitted by that Agreement. [See letters of De Young, June 25, September 30, 1996, Annex 5]

The law is clear. Harrah's cannot have its cake and eat it too.[12]

Undisputed fact no. 17: The $7,500 check does not provide cause or justification for the use of plaintiffs' designs thereafter. The letter tendering the check does not say that it is payment in full per the Settlement Agreement. The check does not say it is payment in full per the Settlement Agreement. *Unjustified Enrichment in the Louisiana Jurisprudence*.  In 1967 the Louisiana Supreme Court formally recognized a general action for unjustified enrichment in *Minyard v. Curtis products, Inc.*, 251 La. 624, 205 So. 2d 422 (1967).  In this opinion, the Supreme Court assimilated into Louisiana law the French judicially-created remedy known as the action *de in rem verso*.

For all of these reasons, the Court should grant the partial summary judgment on liability.

---

[12]*Walton v. Walton*, 597 So. 2d 479, 483 (La. App. 1Cir. 1992); *Middlebrroks v. Int'l. Indem.*, 670 So. 2d 740, 744 (La. App. 3 Cir. 1991); *State ex rel. Dep't of Soc. Serv. v. Southern Baptist Hospital*, 663 So. 2d 443, 448 (La. App 4 Cir. 1995).

Respectfully submitted,

SIDNEY L. SHUSHAN,  #12055
JONATHAN M. SHUSHAN, #21977
BRIAN L. GLORIOSO, #27226
Guste, Barnett & Shushan, L.L.P.
639 Loyola Avenue Suite 2500
New Orleans, Louisiana  70113
Telephone:  (504)  529-4141
Facsimile:    (504) 561-0326
Attorneys for plaintiffs,
Jane Galiano and Gianna, Inc.

25

EASTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

| | | |
|---|---|---|
| JANE GALIANO, AND GIANNA, INC. | * | CIVIL ACTION NO. 00-0071 |
| *Plaintiffs* | * | |
| | * | |
| | * | |
| VERSUS | * | SECTION " E " " (5) |
| | * | |
| | * | JUDGE MARCEL LIVAUDAIS, JR. |
| | * | |
| HARRAH'S OPERATING CO., INC., | * | |
| AND | * | |
| HARRAH'S ENTERTAINMENT, INC. | * | MAGISTRATE: JUDGE ALMA CHASEZ |
| *Defendants* | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * *

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Amended and Supplemental Trial

Exhibit List has been served upon:

Mr. Joseph W. Looney, T.A.
Ms. Melissa S. LaBauve
Adams and Reese LLP
4500 One Shell Square
New Orleans, Louisiana 70139
Attorney for Defendants,
Harrah's Operating Co., Inc. and
Harrah's Entertainment, Inc.

by hand delivery of a copy of same on the ___7___ day of _Februry_, 2002.

BRIAN L. GLORIOSO

26