FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

# UNITED STATES DISTRICT COURT

2002 MAR 15 AM 11: 57

## EASTERN DISTRICT OF LOUISIANA

LORETTA G. WHYTE
CLERK

| | |
|---|---|
| JANE GALIANO and GIANNA, INC.  * <br> Plaintiff  * <br> * <br> versus  * <br> * <br> HARRAH'S OPERATING CO., INC.  * <br> And  * <br> HARRAH'S ENTERTAINMENT, INC. * <br> Defendant  * <br> * | CIVIL ACTION <br><br> No. 00-0071 <br><br> SECTION "E"(5) |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MOTION FOR PARTIAL SUMMARY JUDGMENT
## FILED BY HARRAH'S OPERATING CO., INC.

NOW INTO COURT, through undersigned counsel, comes Defendant Harrah's Operating Co., Inc., who respectfully moves that this Court partial grant summary judgment in the above-captioned matter dismissing plaintiffs' breach of contract claim because under the undisputed facts, defendant is entitled to a judgment of dismissal as a matter of law. The reasons for granting this motion are more fully set forth in the attached memorandum in support.

Respectfully submitted,

ADAMS AND REESE LLP

Joseph W. Looney, T.A. (8773)
Melissa S. LaBauve (25745)
Kristen P. Biever (27382)
4500 One Shell Square
New Orleans, Louisiana 70139
Tel: (504) 581-3234
Fax: (504) 566-0210
*Attorneys for Defendant*
*Harrah's Operating Co., Inc.*

Fee_____
Process_____
X  Dktd_____
    CtRmDep____
    Doc. No._____

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 8th day of March, 2002, I have served a copy of the foregoing pleading on counsel for plaintiffs via facsimile and by hand.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| JANE GALIANO and GIANNA, INC. * <br> Plaintiff * <br> * <br> versus * <br> * <br> HARRAH'S OPERATING CO., INC. * <br> And * <br> HARRAH'S ENTERTAINMENT, INC. * <br> Defendant * <br> * | CIVIL ACTION <br><br> No. 00-0071 <br><br> SECTION "E"(5) |

******************************************

## STATEMENT OF UNCONTESTED FACTS SUBMITTED BY HARRAH'S OPERATING CO., INC.

1.   Plaintiff, Jane Galiano started plaintiff company Gianna, Inc. on or about August 16, 1995.

2.   In August, 1995, Gianna, Inc. entered into a Design Consulting Agreement as a minority contractor with Harrah's to do certain design services.

3.   Galiano was the designer;  the company had only one employee, a sketch artist.

4.   Commencing with the signing of the Design Consulting Agreement, Gianna, Inc. and plaintiff Galiano began invoicing Harrah's monthly for purported design services rendered to Harrah's for its casinos.

5.   The services invoiced relate primarily and almost exclusively to drawing and inking of pictures.

6.    The invoices also specifically relate to particular kinds of uniforms, namely, the Fresh Market Chef, Fresh Market novelty hats, Gold Card shirt and Gold Card jackets.

7.    The effort to bring these sketched designs to reality in the manufacture of actual clothing was done with the assistance of third-party suppliers.

8.    Two of those suppliers were All Bilt Uniform Fashion and Uniform Ideas, Inc.

9.    Gianna, Inc., through Galiano and Scott Buhrer, the company's vice president, worked directly with persons at All Bilt to select certain Gianna design sketches to be manufactured as uniforms that could be sold to Harrah's.

10.    In October and December, 1995, All-Bilt's president Howard Wecksler wrote to plaintiffs stating prices for garments for certain Gianna designs.

11.    Plaintiffs were also negotiating with Uniform Ideas, Inc. to explore possible pricing and manufacture of uniforms from Galiano's sketches.

12.    Uniform Ideas also submitted letters to plaintiffs pricing garments for certain designs for manufacture into uniforms.

13.    Manufacturing of garments made from the Gianna designs was done under the supervision of the suppliers' production departments.

14.    The Production Department submitted specifications to its pattern makers.

15.    The pattern makers then prepared constructive patterns consisting, in some cases, of hard paper cut to actual size for each segment of the garment being manufactured.

16.    The other means of using patterns in the construction of uniforms was through an automated CAD program.

17.    All Bilt manufactured a couple of vests used in the Range restaurant and a couple of chef garments and pieces of novelty headwear for Fresh Market Chefs, all of which plaintiffs claim to have designed.

18.    All Bilt completed its design work and manufacturing of the items identified in Statement 17 above before May 6, 1996.

19.    Uniform Ideas did not sell any uniforms made from Gianna designs after May 6, 1996.

20.    In late 1995 and early 1996, disagreements arose between plaintiffs and Harrah's over the amounts plaintiffs were invoicing Harrah's, supervising the manufacturing of garments, and who had actually originated the ideas for some of the sketches Gianna's artist drew.

21.    Connie Albright, Harrah's Corporate Director for Alliances/Costuming, claimed credit for some of the ideas that ended up on Gianna's sketches.

22.    Connie Albright reviewed the Galiano sketches and assigned percentages for some of those designs.

23.    The percentages reflected what portion of the idea for the garment originated with plaintiffs and which originated with someone else.

24.    Still, the dispute over origination continued.

25.    Plaintiffs then made claims against Harrah's seeking additional royalties and claiming entitlement to royalties on a number of the non-originated aspects of the drawings.

26.     Settlement discussions were commenced and a meeting was held on May 6, 1996 to attempt to resolve this dispute.

27.     On the same day, a Settlement Agreement was signed by Scott Buhrer, Vice President for Gianna, Inc., and Connie Albright on behalf of Harrah's.

28.     On June 4, plaintiff Jane Galiano wrote to Harrah's renouncing the Settlement Agreement claiming it was invalid and unenforceable.

29.     After Harrah's responded that the settlement was made the subject of a signed Settlement Agreement by Buhrer, Galiano retained attorneys on her behalf.

30.     Plaintiffs, through their attorneys, then wrote to Harrah's makinmg a new settlement demand.

31.     In the same letter, plaintiffs' attorneys stated that the Settlement Agreement of May 6 was without legal effect and that Mr. Buhrer's signature was without authorization by the company.

32.     Responding to the letter from plaintiffs' counsel, Harrah's wrote that it considered it unfortunate that additional claims would be raised but that Harrah's had no intention of responding to or offering any settlement proposal.

33.     Substantial discovery has been undertaken and thousands of pages of documents reviewed by both parties.

34.     There is no evidence that any of plaintiffs' designs were developed or sold as garments after May 6, 1996.

35.     All Bilt Uniform Fashions designed a version of a Gold Card jacket, casino shirts with placket braid or brocade trim, and a Gold Card shirt and manufactured and sold those items to Harrah's.

4

36.    All Bilt did not manufacture any Gianna-designed Gold Card jacket, Gold Card shirt or Casino shirt.

Respectfully submitted,

**ADAMS AND REESE LLP**

Joseph W. Looney, T.A.  (8773)
Melissa S. LaBauve (25745)
Kristen P. Biever (27382)
4500 One Shell Square
New Orleans, Louisiana  70139
Tel: (504) 581-3234
Fax: (504) 566-0210
*Attorneys for Defendants,*
*Harrah's Operating Co., Inc.*
*and Harrah's Entertainment, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 8th day of March, 2002, I have served a copy of the foregoing pleading on counsel for plaintiffs via facsimile and by hand.

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JANE GALIANO and GIANNA, INC. *<br>Plaintiff *<br> *<br>versus *<br> *<br>HARRAH'S OPERATING CO., INC. *<br>And *<br>HARRAH'S ENTERTAINMENT, INC. *<br>Defendant *<br> * | | CIVIL ACTION<br><br>No. 00-0071<br><br>SECTION "E"(5) |

**********************************************

## NOTICE OF HEARING

TO:  Jane Galiano and Gianna, Inc.
    through their attorney of record
    Sidney L. Shushan, Esq.
    Brian L. Glorioso, Esq.
    Guste, Barnett & Shushan, L.L.P.
    639 Loyola Avenue, Suite 2500
    New Orleans, LA  70113-7103

**PLEASE TAKE NOTICE** that defendant's Motion for Summary Judgment is scheduled for hearing at _____ o'clock a.m. on _____, the _____ day of _____, 2002.

New Orleans, Louisiana, this _____ day of _____, 2002.

Respectfully submitted,

**ADAMS AND REESE LLP**

Joseph W. Looney, T.A. (8773)
Melissa S. LaBauve (25745)
Kristen P. Biever (27382)
4500 One Shell Square
New Orleans, Louisiana  70139
Tel: (504) 581-3234
Fax: (504) 566-0210

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| JANE GALIANO and GIANNA, INC. * <br> Plaintiff * <br> * <br> versus * <br> * <br> HARRAH'S OPERATING CO., INC. * <br> And * <br> HARRAH'S ENTERTAINMENT, INC. * <br> Defendant * <br> * | CIVIL ACTION <br><br> No. 00-0071 <br><br> SECTION "E"(5) |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

MEMORANDUM IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT
FILED BY HARRAH'S OPERATING CO., INC.

**MAY IT PLEASE THE COURT:**

This memorandum is filed in support of Harrah's Operating Co., Inc.'s motion for partial summary judgment.

## INTRODUCTION

Harrah's Operating Company has filed a motion for partial summary judgment seeking dismissal of plaintiffs' claim for breach of a purported Settlement Agreement, marked Exhibit H-1 hereto.[1]  Plaintiffs have also filed a motion for partial summary judgment seeking judgment on the same breach of contract claim.  Plaintiffs have also asserted claims for copyright infringement which are not the subject of the present motion.

---

[1]    The exhibits addressed herein are filed separately accompanying the motion and memorandum Harrah's exhibits are numbered "Exhibit H-1," et seq.

## STATEMENT OF FACTS AND BACKGROUND OF THE DISPUTE

Plaintiff Jane Galiano is a principle shareholder of plaintiff Gianna, Inc. Galiano is currently a clerical employee by trade, but over the past twenty years has had a variety of occupations.  Deposition of Jane Galiano, taken 1/18/2002, page 254 line 24-25; page 259 lines 12 –25; page 260 lines 1-19, (hereinafter referred to as "II Galiano dep." Exhibit H-2.) Her longest period of employment was with Covenant House where she worked for eight years. *Id.* page 287 line 25 through page 288 line 2, Exhibit H-3.  During the mid-Nineties Galiano explored becoming a fashion designer.  After Harrah's Operating Co., Inc. ("Harrah's") announced plans to open a land-based casino in New Orleans, Galiano started Gianna, Inc., a minority-owned corporation specializing in design.  Galiano served as the designer.

On August 28, 1995, Galiano succeeded in landing a contract to provide design services to Harrah's. The contract was entitled "Design Consulting Agreement." Exhibit H-4.  Commencing with the signing of the Design Consulting Agreement, Gianna, Inc. and Galiano began invoicing Harrah's monthly for purported design services related to uniform designs for its casinos.  The invoices relate primarily and almost exclusively to drawing and inking of sketches of uniform designs.  The invoices are attached collectively as Exhibit H-5.

During Fall 1995, Galiano and Harrah's Corporate Director of Alliances/Costuming Connie Albright worked on the development of uniforms for several of Harrah's casinos.  The effort also involved the participation of third-party uniform suppliers.

2

The first step in turning design ideas into actual garments was through working out the details of what would comprise the garments. The supplier started out with a drawing or concept. It worked with the customer to determine what the customer was looking for, did research on items such as fabric, braids, trims and buttons, and came back to the customer with a presentation. Once the customer approved the concept, the manufacturer wrote the production specification that was used to make a sample garment. The production specification had the pattern number information, the fabric information, the vendor information, the sketch of the garment, the style number, and information regarding the trims and embroidery to be used on the garment. Deposition of Linda Gunnerson, December 13, 2001, page 8, lines 6-23 page 12 lines 12-16 and page 143 lines 10-22, I Gunnerson dep. attached hereto as Exhibit H-8.

The sample garment would be shown to the customer for approval. See, *e.g.*, October 1995 correspondence from Uniform Ideas to Scott Buhrer of Gianna, Inc. regarding production of sample garments, attached hereto as Exhibits H-9 and H-10. If the customer approved the sample the approved garment would then be sent to the pattern maker. Deposition of Harvey Klein, page 36 line 9 through page 37 line 18, attached hereto as Exhibit H-11.

The pattern maker then used the specification or sample garment to create original hard patterns and worked with the CAD manager to put the pattern into the computer so that the garment pieces can be cut. For each garment order a marker was prepared that included all of the sizes in the order and determined how many layers of fabric were utilized. The actual cutting of the fabric was made to the marker and then the fabric was either cut by hand or by computer.

3

All of the pattern pieces were then identified with a note indicating which piece it was and bundled together. The pieces were then sent to the contract shops along with the paper specifications and the contract shops assembled the completely finished garment which was sent back to the manufacturer. II, Gunnerson dep., page 144 line 19 through page 147 line 15.

Patterns are basically templates that when superimposed on fabric provide a guide for cutting the fabric to actual size. For example, the front half of a skirt would be drawn out on a pattern of onionskin paper in the actual size needed to cut that panel or component of the skirt, and the cutter would folflow around the pattern cutting the fabric. See II Galiano dep., p. 322, line165 through page 323 line 6; page 339 lines 19-25, Exhibit H-13.

The Design Consulting Agreement expired by its own terms on December 31, 1995. Plaintiffs sought to have the contract renewed but various disagreements had arisen between the parties. Harrah's objected to plaintiffs' invoicing, lack of involvement in the manufacturing process, and claims to entitlement to royalties for uniforms that were largely or primarily the concepts of Harrah's employees rather than Galiano. Deposition of Scott Buhrer, page 62 line 11-22; page 70 line 23 through page 71 line 13; page 73 line 13 through page 74 line 11, Exhibit H-6 (hereinafter "Buhrer dep."). Scott Buhrer, Gianna's vice president, discussed these matters with Ms. Albright and sent a letter addressing them on December 10, 1995. Exhibit H-7. Plaintiffs acknowledged that their services to date had been mainly limited to providing sketches of uniforms and discussed becoming more involved in the actual manufacturing process.

Mr. Buhrer's December 10 letter suggested that plaintiffs' involvement in these post-sketch phases would involve more compensation. He then discussed

4

the issue of origination and proposed that for those designs that Gianna sketched and that were chosen for manufacture plaintiffs would receive at least 50% of the agreed royalty even if the ideas were originated by the customer.

Mr. Buhrer's proposal was unacceptable to Ms. Albright. Exhibit H-14, Buhrer dep. page 74 line 23 through page 75 line 1. On February 14, she sent him a letter proposing instead that plaintiffs should provide supervision of manufacturing as part of the basic compensation, and that plaintiffs would not receive royalty or other compensation for design concepts that plaintiffs did not originate. Exhibit H-15.

Plaintiffs rejected Ms. Albright's proposal and the issues were left unresolved. Exhibit H-16, Buhrer dep. page 94 lines 17-20. The dispute led to a meeting on May 6, 1996, attended by Ms. Albright, Jan Starnes, a Harrah's employee, Mr. Buhrer, Ms. Galiano, and Gianna stockholder Bennett Wolfe. Exhibit H-17, I Galiano dep., page 207 line 18 through page 208 line 16.

Ms. Albright reviewed the Galiano sketches and assigned percentages for them.  Deposition of Connie Albright, page 135 lines 9-19, referred to as "Albright dep." Exhibit H-18. The percentages reflected what portion of the idea for the design originated with plaintiffs and what parts originated with someone else. The meeting resulted in the parties' agreeing to prepare a written settlement document addressing which of the Galiano-designed uniforms would be subject to a royalty and which would not. Harrah's attorney Vincent De Young prepared the Settlement Agreement (Exhibit H-1) which Mr. Buhrer and Ms. Albright then signed.

On June 4, plaintiff Jane Galiano wrote to Harrah's renouncing the Settlement Agreement claiming it was invalid and unenforceable. Exhibit H-19.[2] When Harrah's responded that the settlement had been made the subject of a signed Settlement Agreement by Buhrer, plaintiffs retained attorneys on their behalf. Plaintiffs, through their attorneys, then wrote to Harrah's reaffirming their repudiation of the Settlement Agreement and making a new settlement demand. Exhibit H-20. The letter stated that they were prepared to settle Gianna, Inc.'s claims for $500,000.[3] In the same letter, the attorneys stated that the Settlement Agreement of May 6 was without legal effect and that Mr. Buhrer's signature was without authorization by the company.

Upon receipt of the letter from plaintiffs' counsel, Mr. De Young stated that he regretted that unjustified claims would be made but that Harrah's had no intention of responding to or offering a settlement proposal.

Subsequently, this lawsuit was filed in October, 2000. Plaintiffs claim that Harrah's purchases of casino shirts, jackets and other items violates the Settlement Agreement. Harrah's has denied that it breached the Settlement Agreement and has argued that plaintiffs repudiated the Settlement Agreement and declared it to be, and treated it as, not binding and without effect.

Despite more than two years of discovery and the production of thousands of pages of documents, plaintiffs are still not able to prove any breach of the Settlement Agreement on Harrah's part. As shown hereinafter, this matter is now ripe for partial summary judgment dismissing the contractual breach claims.

---

[2]    See the discussion at page 8-9, *infra*.
[3]    See the discussion at page 9-11, *infra*.

## ARGUMENT AND LAW

Under controlling law relating to breach of contract, Harrah's is entitled to summary judgment dismissing the contract claim in this action.

### 1.    The Standard For Summary Judgment.

Summary judgment must be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### 2.    The Breach of Contract Claims Should Be Dismissed Based on Plaintiffs' Argument of Contract Invalidity.

Plaintiffs cannot dispute that Galiano never signed the Settlement Agreement, and that Mr. Buhrer did not have express authority. In fact, plaintiffs denied the validity of the Settlement Agreement on that ground. Subsequent to their renunciation they reaffirmed that the agreement was invalid and proceeded to make demands against Harrah's in violation of their agreed concession to release Harrah's from such claim. Because the material facts are undisputed on this issue, Harrah's is entitled to judgment as a matter of law dismissing plaintiffs' claim for breach of the Settlement Agreement.

### A.    Plaintiffs Have Established That The Settlement Agreement Was Not Valid when Executed.

The Settlement Agreement provided that each party released the other party and their respective affiliates, subsidiaries, officers and directors from "any and all past or future claims whatsoever arising under the Design Consulting Agreement." Exhibit H-1, paragraph 5.)

Plaintiffs informed Harrah's by letter to Mr. Phil Satre on June 4, within thirty days of the date of the executed agreement, that Gianna, Inc. did not consider the Settlement Agreement binding or enforceable. Exhibit H-19, June 4, 1996 letter from "Gianna Galiano, President, Gianna, Inc." to Mr. Satre.  In her letter she stated:

> I am writing this letter to inform Harrah's Entertainment, Inc. and Harrah's Operating Company (and you personally) that the asserted, self-styled May 6, 1996 "Settlement Agreement" that was generated by Harrah's in connection with and as a direct result of the May 6, 1996 meeting held in New Orleans, which was attended by employees of the respective companies, was never signed or agreed to by any person **"legally authorized to bind Gianna, Inc."** to any such agreement.  Consequently, Harrah's <u>asserted</u> "agreement" is absolutely void; and furthermore, **no legally binding settlement agreement was ever executed** by our respective companies on May 6, 1996, as Mr. Buhrer was never authorized to compromise or settle any matters with Harrah's on behalf of Gianna, Inc.

(Emphasis added.)

The letter continued that under Louisiana's law of mandate, a mandatary must "first obtain express authority from the principal before compromising a matter on behalf of that principal."  She stated, "R. Scott Buhrer was at no time authorized to bind Gianna, Inc. to a contract that purports to compromise or settle a dispute concerning any outstanding debts and/or contractual obligations owed to Gianna, Inc.  Gianna Galiano, President, is the only person/agent who is authorized to act on behalf of Gianna, Inc. with respect to executing legally binding contracts such as the asserted May 6, 1996 agreement document." Exhibit H-19, page 3, paragraph 3.

Gianna, Inc. "never passed a corporate resolution that granted Mr. Buhrer the requisite authority needed to allow him to legally bind Gianna, Inc. to the asserted May 6, 1996 'agreement' document." Exhibit H-19, page 3, paragraph 4.

8

Prior to that point Gianna Inc. had never granted Mr. Buhrer express authority to accept or legally bind Gianna to the May 6, 1996 proposal for a settlement agreement. *Id.* Gianna, Inc.'s articles contain no such authorization (see Exhibit H-21), nor do its by-laws (Exhibit H-29).[4] According to plaintiffs "Mr. Buhrer's signature affixed to the May 6, 1996 asserted 'settlement agreement document' was made without Gianna, Inc.'s knowledge or authorization." Plaintiffs insisted that "this unauthorized act by Mr. Buhrer cannot possibly legally bind Gianna, Inc. to your asserted May 6, 1996 settlement agreement document." *Id.*

According to plaintiffs, the Settlement Agreement was "absolutely void and without legal consequence or significance." Exhibit H-19, page 4.

Plaintiffs were not alone in insisting that the Settlement Agreement was invalid. Plaintiffs hired attorneys Pugh & Associates of New Orleans, and on June 18, 1996, Ricky Hudson of that firm contacted Harrah's in-house counsel Vincent DeYoung. Mr. Hudson reaffirmed plaintiffs' position that the May 6, 1996 letter agreement was not binding. Exhibit H-22, letter Vincent DeYoung to Ricky Hudson, June 25, 1996. Mr. DeYoung responded in his letter of June 25 that he understood that Galiano had agreed to the terms and "shook hands" even if she didn't sign the agreement. He expressed surprise that plaintiffs were now taking the position that the agreement was not binding because it was not signed personally by plaintiff Galiano. Mr. DeYoung pointed out that Buhrer was an officer with Gianna, Inc. and was acting as its attorney and stated it was "very apparent that Scott Buhrer had authority to sign for Gianna, Inc." Finally, Mr. DeYoung observed that the $7,500.00 check was accepted and cashed on May 20, 1996.

---

[4]     No by laws of record were filed with the Clerk of Court in Orleans Parish

Mr. Hudson responded on September 18, 1996,[5] and insisted that the May 6, 1996 Settlement Agreement document was "legally non-effectual." Exhibit H-20. The attorney reiterated the position plaintiffs had taken in the June 4 letter that Mr. Buhrer had not been granted the express authority to bind Gianna, Inc. to the document and that such express authority is legally required in Louisiana. According to the attorneys, "only Ms. Galiano had the requisite authority necessary to legally bind Gianna, Inc. such as Harrah's asserted, self-styled May 6, 1996 'settlement agreement'." She neither signed the document nor acquiesced to it; and indeed she was against such an agreement. . . " (Exhibit H-20, p. 1, paragraph 3.)

Mr. DeYoung wrote on September 30, 1996, refusing to respond or make any settlement proposals. Mr. DeYoung pointed out that the Settlement Agreement included a release from any and all past or future claims arising under the Design Consulting Agreement. He reiterated that the check was accepted and cashed by Gianna, Inc. He stated that Harrah's regretted that "unjustified claims would continue to be made." Exhibit H-23, letter Vincent G. DeYoung to Ricky R. Hudson, Pugh & Associates, dated September 30, 1996.

Under Louisiana law, settlement agreements are subject to the Civil Code articles on transaction and compromise. La. C.C. art. 3071, *et seq.* Under Louisiana law, a transaction or compromise agreement is an agreement for preventing or putting an end to a lawsuit and adjusting differences by mutual consent in a manner agreed upon. It has to be either reduced to writing or recited in open court. La. C.C. art. 3071. Article 3072 provides that such

---

[5]     During the interim, plaintiffs and their attorneys sought information from various manufacturers about Harrah's purchases of uniforms for its casino employees. (Exhibit H-20).

transaction must be by a person who has capacity to dispose of the things included in the transaction.

The essential elements of compromise are (1) the mutual intention of putting an end to litigation; and (2) reciprocal concessions of the parties in the adjustment of their differences. *Rivett v. State Farm Fire and Cas. Co.*, 508, So.2d 1356 (La. 1987).

Compromises are valid if there is a meeting of the minds between the parties as to exactly what they intended when the compromise was reached. *Munna v. Mangano*, 404 So.2d 1008, 1010 (La. App. 4th Cir. 1981); *see, also, Moak v. American Automobile Ins. Co.*, 242 La. 160, 134 So.2d 911, 913 (1961). Compromise instruments are governed by the same rules of construction that apply to contracts. *Brown v. Drillers, Inc.*, 630 So.2d 741 (La. 1994). In order for a settlement to have validity, it must possess the essential elements of any type of contract, including that of an offer made and accepted by each party to the agreement. *Nugent v. Hartford Accident & Indemnity Co.*, 467 So.2d 623 (3rd Cir. 1985) (reversing a summary judgment of dismissal based on compromise where the movant's evidence established that the proposed agreement was rejected by one of the purported settling parties.)

The issue of whether or not a valid compromise has been agreed to is subject to the production of parole evidence to examine the actions of the parties and the facts surrounding the asserted compromise. *Moak v. American Automobile Ins. Co., supra; Baker v. Purselley*, 411 So.2 553 (1st Cir. 1982) (holding that a party's counsel did not have authority to compromise his client's claim without his client's clear and express consent.) In this regard, the court may look to correspondence between the attorneys regarding the terms of purported

11

settlement. *Mayeaux v. Denny's Inc.*, 663 So.2d 822 (La. App. 5 Cir. 1995) (affirming trial court's refusal to enforce the settlement agreement after considering attorneys' correspondence indicating there was no meeting of the minds.)

The plaintiffs' unequivocal statements that Scott Buhrer lacked authority to compromise and their attorney's repudiation of the concession not to pursue any further amounts under the Design Consulting Agreement precludes them from arguing now that there was a meeting of the minds. Although strategically attempting to pursue rights under the Settlement Agreement may now be in their interest, plaintiffs cannot so easily avoid the effect of their past actions. Within thirty days of Mr. Buhrer's signature, plaintiffs Galiano and Gianna denied that he had authority. This position was reaffirmed through counsel hired by Galiano. Rather than abide by the agreement not to pursue any further amounts under the Design Consulting Agreement, plaintiffs' counsel made a new demand for $500,000 to settle, which was contrary to the Settlement Agreement.

These clear statements preclude plaintiffs from maintaining on this motion that the Settlement Agreement was binding on Harrah's.

### B.   Plaintiffs Also Established That They Did Not Subsequently Ratify The Agreement.

According to the Settlement Agreement the plaintiffs settled their claims under the Design Consulting Agreement in exchange for payments of $7,500 (Exhibit H-1, paragraph 1) and royalties on certain enumerated garments.

(Exhibit H-1, sections 3 and 4).  Harrah's issued a check to Gianna, Inc. on May 14, 1996 in the amount of $7,500.  Gianna, Inc. cashed the check.

The attorneys addressed Mr. DeYoung's observation about plaintiffs having cashed the $7,500 check.  According to plaintiffs' attorneys, the check was already owed and still owing to Gianna, Inc. for services that had already been performed in December 1995.  The attorneys stated "the fact remains that the notation written (and indeed written by Harrah's) on the check stub/receipt reads '<u>CONSULTING SERVICES</u>,' just like all of the other stubs for Harrah's checks generated as payment for Gianna, Inc.'s monthly billing, rather than 'final settlement,' or some like notation evidencing the alleged final Settlement Agreement."  (Exhibit H-20, p. 3, paragraph 3.)

The attorneys specifically denied that cashing the check was a ratification of the agreement, stating:

> The memo written by Harrah's on the May 14, 1996 check stub/receipt contradicts Harrah's contention that Gianna, Inc. may have, nonetheless, subsequently **ratified** Harrah's asserted May 6, 1996 settlement document.  Additionally, the check was tendered without any additional formal release or settlement document.

(Emphasis added.)  (Exhibit H-20, p. 3, paragraph 4).  The attorneys concluded that "this notation written by Harrah's on its own check stub * * * factually destroys Harrah's contention that Gianna, Inc. subsequently accepted Harrah's asserted May 6, 1996 settlement agreement by negotiating the May 14, 1996 check."

Plaintiff's counsel then proceeded to reiterate that Harrah's had breached the Design Consulting Agreement.  They stated that if Harrah's did not accept one of their settlement offers in a timely fashion or the "contractual dispute" is not otherwise amicably resolved, "Gianna, Inc. would then insist upon full

enforcement of all of the terms of the Design Consulting Agreement and * * * seek to recover the maximum damages allowed by law." The terms according to which Gianna would then settle were set forth in a new proposed option. The first would have provided a structure for continued royalty payments. The second required a lump sum payment of $500,000. (Exhibit H-20, pp. 5-7).

Ratification is the adoption by one person of an act done on its behalf by another without authority. La. C.C. art. 1843; *First National Bank of Shreveport v. Crawford*, 455 So. 2d 1209, 1215 (La. App. 2d Cir.), *writ denied*, 459 So. 2d 538 (La. 1984). It can occur where personnel with the authority to bind another acquire knowledge of the unauthorized act and thereafter *fail to repudiate it* within a reasonable time. *3 A's Towing Co. v. P&A Well Service, Inc.*, 642 F. 2d 756, 758-759 (5th Cir. 1981); *State Bank v. BOAT D.J. Griffin*, 755 F. Supp. 1389 (E.D. La. 1973) (court held there was no ratification where an authorized person informed the other party to the act that the act was beyond the signatory's authority, the corporation's subsequent conduct did not comport with the act, and the corporation retained legal counsel to pursue the protection of the corporation's rights).

By making a swift denunciation and repudiation of Mr. Buhrer's act of signing the Settlement Agreement, plaintiffs acted to foreclose any ratification. They refused to adopt Mr. Buhrer's act as their own, and insisted the agreement was not binding because he lacked authority. They then acted contrary to the terms of the Settlement Agreement. They retained attorneys to assert their rights under the Design Consulting Agreement. They disregarded the fact that they released Harrah's from any claims under the Design Consulting Agreement and asserted rights which they then offered to release for a new settlement demand

14

of $500,000.  Under the clear law on ratification and the undisputed facts, plaintiffs have precluded any argument on ratification.

### C.   Plaintiffs Themselves Breached Any Agreement And Harrah's Was Not Bound To Its Terms.

Even if the Court were to find that Mr. Buhrer was initially authorized to bind plaintiffs to the Settlement Agreement and that a meeting of the minds was reached on May 6, 1996, Galiano and her counsel's letters clearly repudiated the Agreement.  Both clearly announced that Galiano would not honor it.  On September 18, Galiano's counsel's new more onerous settlement demand was in clear violation of the concessions plaintiffs granted in the May 6 Agreement and constituted a material breach.

Plaintiffs' breach relieved Harrah's of any further obligation it might have had under the Settlement Agreement.  As stated, compromise settlements are subject to the same legal principles as contracts.  A settlement is a bilateral, commutative contract.  Bilateral agreements are those under Louisiana law where both parties obligate themselves and the obligation of one party is the correlative of the obligation of the other.  La. C.C. art. 1908.  They are commutative if the performance of one party is dependent on the performance of the other.  Under Louisiana law, where one party refuses and does not merely fail or neglect to comply with his contractual obligation, his refusal constitutes an active breach of the contract which relieves the other party of having to continue to perform. *Marek v. McHardy*, 234 La. 841, 101 So.2d 689 (1985).  Moreover, a definite refusal to perform obviates the necessity of formal putting in default as a

15

prerequisite to recovery by the obligee. *Eota Realty Co. v. Carter Oil Co.*, 225 La. 790, 74 So.2d 30 (1984).

The affirmative refusal to perform by one party relieves the other party of the duty to perform. *Andrew Development Corp. v. West Esplanade Corp.*, 347 So.2d 210, 212 (La. 1977). Moreover, the obligee has a cause of action when the obligor signifies his intent to repudiate his obligation. *See, e.g., Fairfield Development Co. v. Jackson*, 438 So.2d 664, 671 (La. App. 1983); *Shell Offshore Co. v. M.H. Marr*, 916 F.2d 1040 (5th Cir. 1990).

Plaintiffs reneged on their concession not to make claims under the Design Consulting Agreement. Their subsequent demand constitutes a clear repudiation that relieved Harrah's of any duty of further performance.

### 3.    The Alleged Breach Asserted by Plaintiffs Is Not Covered By The Settlement Agreement.

Plaintiffs have offered no evidence establishing that Harrah's used Gianna's designs in violation of the May 6 agreement.

Plaintiff's claim that Harrah's continued to use Gianna's designs after the May 6 agreement, but the undisputed evidence is to the contrary. First, the presentation boards featuring the Gianna designs were returned to Gianna, Inc. on March 25, 1996, Exhibit H-30. This was in response to a direct request by Gianna, Inc. by letter of March 25, 1996, Exhibit H-31.

Uniform Ideas completed its development work on the Gianna design concepts and garments and ceased selling those garments before the May 6 agreement. Uniform Ideas' president Tom Michaelman and vice president Mary Beth Morgan testified that all of the orders and reorders based in any way on any

16

of the Gianna sketches were invoiced and paid by April 1996. Exhibit 33, Mary Beth Morgan dep., page 75 lines 1-25, page 76 line 1; Exhibit H-32, Tomas Michaelman dep., page 19 lines 20-25. Uniform Ideas paid all the royalties owed to Gianna on these orders and reorders. Morgan dep., page 76 lines 3-8. In fact, Ms. Galiano never notified Uniform Ideas that she felt additional royalties were owed on any of these uniforms made by Uniform Ideas. Morgan dep., page 76 lines 14-21. Ms. Morgan's testimony is uncontradicted. Thus, by May 1996 Uniform Ideas was no longer developing uniforms or selling any garments to Harrah's.

All Bilt, too, had ceased to work on Gianna's designs by May 6. By that point, Gianna had succeeded in producing only a handful of uniforms, namely, the Fresh Market display chef garments and Range vests.[6]

Plaintiffs' purported evidence that the suppliers sold and Harrah's bought garments based on Gianna's designs consist of invoices, purchase orders and other purchase-related documents obtained from All Bilt. These purchases related to casino dealer shirts, Gold Card jackets and Gold Card shirts. However, none of these documents relate to Gianna designs.

All Bilt designed its own version of casino dealer shirts, as well as its own Gold Card jacket and Gold Card shirts. Linda Gunnerson, All Bilt's designer, was questioned extensively about the Gold Card jacket. She testified that All Bilt never manufactured Gianna's design. Exhibit 34, II Gunnerson dep., page 155 lines 22-24. She testified that she would have been in a position to know because

---

[6]    Plaintiffs and All Bilt disagreed over whether the chef outfits were actually Gianna designs or rather were stock chef garb. Plaintiff waived any claim to the chef designs in the settlement agreement. Exhibit 1, paragraph 1. All Bilt also came up with its own version of the range vest. None of this raises an issue, however, that need be decided on this motion.

17

she would have had to write the specification in order to get it produced. *Id.,* page 156, lines 16-20. Ms. Gunnerson observed that the Galiano Gold Card jacket design was a mandarin collared jacket with one showing button. It had side vents and an extended shoulder design, a center panel and star details going down the panel. Exhibit 35, I Gunnerson Dep., page 70 line 24 through page 71 line 6. Gunnerson described Gianna's jacket as "more like a tunic look as opposed to a blazer look." *Id.,* page 71 lines 11-12. The jacket went all the way to the chin. *Id.,* p. 71 lines 15-16. Gianna's sketch of the Gold Card jacket is attached as Exhibit H-36.

Gunnerson created a more traditional blazer of a 3-button cardigan style jacket with welt pockets. *Id.,* page 70 lines 20-23. All Bilt's Gold Card jacket design is shown on the excerpts from All Bilt's catalog marked Exhibit H-37.

Plaintiffs state that both jacket designs use color blocking of black and putty. Color blocking even if similar in both jackets, however, is only a feature and not an entire garment design. Mr. Wecksler commented that the only feature of the Gianna Gold Card jacket that also appears in the All Bilt jacket, other than the basic silhouette of a jacket, is color blocking. Exhibit 38, Wecksler dep., page 102 lines 14-20.

Plaintiffs have not introduced a single piece of evidence that All Bilt actually manufactured the Gianna Gold Card jacket or that Harrah's ever purchased or used a Gianna Gold Card jacket.

Plaintiffs also question the appearance in All Bilt's records of a specification for a Gold Card shirt that includes Gianna's sketch. The specification sheet at issue is for Style No. 831, Exhibit H-39. While it is true that

18

All Bilt sold to Harrah's a shirt called "Gold Card," it is clear from the specifications that it was a different shirt. The specification sheets feature a different drawing than Gianna's, as well as a different style number, No. 737. Exhibit 40. The designs of the shirts actually sold to Harrah's, then, are distinct from the Gianna sketch shown on the specification for Style 831.

Plaintiffs' other principal evidence relates to dealer shirts. Plaintiffs' extensive discovery relating to All Bilt shirts shows there is no evidence that the Gianna-designed dealer shirt was ever manufactured. Plaintiffs rely on All Bilt's program shirts photos of which are marked as Exhibits H-24 through H-38. Plaintiffs claim that these shirts feature a vertical pattern over the center placket or suspenders and therefore assert that the shirts are Gianna designs. Ms. Gunnerson's testimony establishes, however that she designed all the All Bilt shirts. Ms. Gunnerson explained that the shirts were done as part of a program for the native American theme properties. The properties could choose from options of different braid or brocade trims that ran down the front of the shirt. Exhibit 35, I Gunnerson dep., page 32, line 19 through page 33 line 8. The braids consisted of diamond patterns, star fabrics and others. See Exhibits H-24 through H- 28. Ms. Gunnerson testified that she either used existing fabric for the braids or designed them herself. Exhibit 35, I Gunnerson dep., page 69 lines 14-21. She specifically testified she did not rely on any of Gianna's drawings in coming up with the program braids. Id., page 69, lines 22-25. In fact, she had designed shirts with suspender motifs before 1994, long prior to ever meeting Galiano or seeing any of her sketches. Exhibit 34, II Gunnerson dep., page 173 lines 7 through page 174 line 5.

Thus, plaintiffs have offered no competent evidence to support their claim that Harrah's used Galiano designs after May 6, 1996. To the extent plaintiffs attempt to connect Harrah's to All Bilt designing efforts, plaintiffs offer no testimony to dispute All Bilt's sworn testimony that it manufactured none of Galiano's designs except some Fresh Market chef's wear and Range vests.

In any event, plaintiffs have offered no viable legal basis for making Harrah's responsible for its suppliers' design activities. Harrah's clearly attempted to honor the May 6 agreement. There is no evidence that it failed to do so.

## CONCLUSION

Plaintiffs have failed to demonstrate that they have any right to recover under the Settlement Agreement. Plaintiffs have had abundant opportunity to support their claim, but have failed. Consequently, the claim for breach of contract must be dismissed. Harrah's motion for partial summary judgment should be granted.

Respectfully submitted,

**ADAMS AND REESE LLP**

Joseph W. Looney, T.A. (8773)
Melissa S. LaBauve (25745)
Kristen P. Biever (27382)
4500 One Shell Square
New Orleans, Louisiana 70139
Tel: (504) 581-3234
Fax: (504) 566-0210
*Attorneys for Defendant*
*Harrah's Operating Co., Inc.*

20

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 8th day of March, 2002, I have served a copy of the foregoing pleading on counsel for plaintiffs via facsimile and by hand.

21

SEE RECORD FOR
EXHIBITS
OR
ATTACHMENTS
NOT SCANNED