

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2002 MAR 26  PH 5:02

MAR 2 6 2001
LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JANE GALIANO and GIANNA, INC. | * | CIVIL ACTION |
| *Plaintiffs* | * | |
| | * | NO. 00-0071 |
| VERSUS | * | |
| | * | SECTION "E" (5) |
| | * | |
| HARRAH'S OPERATING CO., INC. | * | JUDGE MARCEL LIVAUDAIS, JR. |
| and | * | |
| HARRAH'S ENTERTAINMENT, INC. | * | MAGISTRATE JUDGE ALMA CHASEZ |
| *Defendants* | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * *

## OPPOSITION TO DEFENDANTS' MOTION FOR
## PARTIAL SUMMARY JUDGMENT

MAY IT PLEASE THE COURT:

I.     THE COURT SHOULD DENY DEFENDANTS' MOTION [AND GRANT

PLAINTIFFS'] BECAUSE THE CONTRACT OF TRANSACTION AND COMPROMISE

HAS THE AUTHORITY OF THE THING ADJUDGED, AND CANNOT BE REPUDIATED

PER THE PLAIN LANGUAGE OF CIVIL CODE ARTICLE 3078.

Defendants' rely heavily on Plaintiffs alleged "repudiation" of the Settlement Agreement.

There is no such thing in Louisiana law as "repudiation" of a Settlement Agreement.[1]

---

[1] The word itself - or any synonym - does not appear anywhere in the Civil Code.  But there is no choice of law issue here. Many of the cases cited by Defendants show that common

Fee
Process
X  Dktd
CtRmDep
Doc. No.

As the name shows, the "Settlement Agreement" was a nominate contract, a "contract of transaction or compromise" under Civil Code Articles 3071ff.

The contract of "transaction or compromise" has a special protected status in the law.

Civil Code Article 3078 says in plain language that a Settlement Agreement cannot be "repudiated". Article 3078 provides that: "Transactions have, between the interested parties, a force equal to the authority of things adjudged".

All Louisiana contracts have the "effect of law for the parties and may be dissolved only thru the consent of the parties or on grounds provided by law". LCC Art. 1983. Only contracts of transaction or compromise have the authority of the "thing adjudged" without any judgment of Court.

Case after Louisiana case - state and federal - applies and respects the special status of a Settlement Agreement as a "thing adjudged".

Brown v. Simoneaux, 4th Cir. 1992, 91-CA-0962, 593 So.2d 939; 1992 La.App. LEXIS 87 is a good example. In Brown, as in the present case, a party who was represented by an attorney and signed a broad form release later tried to argue the settlement agreement in that case did not mean what its clear language indicated. The Court applied the plain language of the release. The Court noted that the party attacking the release was an "intelligent adult", even if he was not an attorney, or represented by an attorney. In our case the Vice President was an attorney.

An even better representation of this principal is Barbara Daigle, et Al. V. Clemco Industries, et Al., 613 So. 2d 619; (La. 1993). In Daigle, a plaintiff was injured. He settled his

---

law authorities would reach the same conclusion. See also Corbin, Contracts at 1026: "Compromises are known to be favored by the law; and if the court is asked to enforce a valid compromise it generally does so without question". [One volume ed. 1952]

claims, and his family settled theirs, with the defendants. The plaintiff subsequently died. The settlement agreement had waived any future causes of action. This included the wrongful death claims.

The Louisiana Supreme Court held that the agreement did not violate public policy. It held that article 3078 applied to bar the claim. It finally held that unless a party compromises "gross fault" or there is a "specific provision" of the law prohibiting the particular compromise at issue, then the parties agreement has the force "of a thing adjudged" and a party cannot later get out of the agreement unilaterally. That is exactly what is happening in this case. No party to the compromise agreement at issue can "repudiate" the agreement. Louisiana law simply does not provide for repudiation.[2]

Case after case holds that a Settlement Agreement made out of court supports a plea of "res judicata" in a subsequent lawsuit.

The language of 3078 is not empty verbiage. The Courts apply it literally. The best example of this is Cochgennic v.City of New Orleans, 722 So.2d 325, (La. App. 4th Cir. 1998). In this case, the plaintiff settled his case against the City of New Orleans. His attorney notarized the settlement agreement and sent it to the defendant. The plaintiff then discovered that his attorney had been disbarred prior to the settlement's finality. The Louisiana Court of Appeals upheld the settlement agreement. It held that because they are not specifically enumerated in

---

[2]See also, Campbell v. Roman Catholic Church, 490 So. 2d 798 (La.App. 3d Cir.), writ denied, 494 So. 2d 1175 (La.1986). Cited by: Sidney R. WILHITE, v. H.I. SCHENDLE; Federal Deposit Insurance Corporation, Defendants-Appellees, and James W. Beaver; James M. Rasbery, 92 F.3rd 372, (5th Cir. 1996). Both cases holding that an agreement under Louisiana Civil Code Article 3078 cannot be attacked even for an error of law. Even when that error of law injures a party, the agreement is still enforceable.

Article 3078, a false notary entry and a disbarred attorney who concealed this fact was insufficient to set aside the agreement. The Court of Appeals used C. C. Art. 3078 to uphold the agreement. Federal Courts have made the same essential holding.

Defendants' cases all turn on the issues not present in this case, such as the lack of any document signed by all parties, or ambiguous language in the "settlement agreement" in those cases - not the authority of the corporate officer and attorney who signed it.[3]

II.    THE COURT SHOULD DENY DEFENDANTS' MOTION [AND GRANT PLAINTIFFS'] BECAUSE REPUDIATION OF A SETTLEMENT AGREEMENT IS CONTRARY TO PUBLIC POLICY AND COMMON SENSE

There are very good reasons of policy and common sense behind Article 3078.

The Courts of Louisiana, state and federal, have expressed it time and again in plain language. Judge Schwartz, of this Honorable Court, held that:

_____

[3] In Moak v. American Automobile Insurance Company, La. 1962, 242 La. 160, 134 So.2d 911; 1961 La.LEXIS 623 the issue was whether the parties who signed the release without benefit of counsel understood that the release was a complete release.
The Court obviously gave an unrepresented party the benefit of the doubt. In other cases cited by Defendants there was nothing in writing at all! Rivett v. State Farm, La. 1987, 508 So.2d 1356, 1987 La.LEXIS 9529; Mayeaux v. Denny's, Inc., 5th Cir. 1995, 95-CA-453, 663 So.2d 822; 1995 La.App.LEXIS 3077.
In another case the only person who signed was an agent/mediator for both parties who did not have express or putative authority to bind both sides, and both sides did not sign the settlement agreement - obviously very different from the present case. Baker v. Purselley, 1st Cir. 1982, 411 So.2d 553; 1982 La.App.LEXIS 6849.
In other cases the fact issue was the scope of the settlement agreement, but there was no issue as to the authority of the person who signed. Brown v. Drillers, Inc., La. 1994, 93-CC-1019, 630 So.2d 741, 1994 La.LEXIS 181; Munna v. Buffone, 4th Cir. 1981, 404 So.2d 1008, 1981 La.App.LEXIS 5274. Here there is no issue as to the scope of the Settlement Agreement. (See headnote below).
In other case there was no settlement agreement purporting to be signed by all of the parties. Nugent v. Hartford, 3d Cir. 1985, 467 So.2d 623, 1985 La.App.LEXIS 9188.

Articles 3078 and 3079 of the Louisiana Civil Code clearly provide that *compromise transactions cannot be attacked on account of error in law*, but can be contested for errors in calculation, or in the person or the subject matter of the agreement, or for fraud or violence.

Plaintiff in the instant case has alleged no mathematical error, and no mistake as to the person, the accident, or which policy is in dispute. There are similarly no allegations of fraud or duress.

Plaintiff [**17] rather alleges mistake in the nature of **"error of law"**, that is the *legal effect* of the *May 28, 1986 rejection form.*

Maatki v. Moore, 760 So.2d 1180, (E.D. La. 1991).

This is a simple statement of the law. Harrah's simply cannot argue ANYTHING to set aside a valid compromise agreement EXCEPT those specific items listed in Articles 3078 et seq. There are no other valid reasons under Louisiana law.

No Court - civil law or common law - would give any party the right to "repudiate" a Settlement Agreement simply by changing his mind.[4]

The LCC spells out certain very limited grounds for setting aside a Settlement Agreement. **(See LCC Articles 3071, 3078 et seq.).** Defendants' brief invokes none of those. It is highly unlikely that the usual reasons for challenging a release in a personal injury case with an unrepresented plaintiff would apply to the Settlement Agreement drafted and negotiated by attorneys for both sides in this case.

III.    THE COURT SHOULD DENY DEFENDANTS' MOTION [AND GRANT PLAINTIFFS'] BECAUSE ONLY A DIRECT ACTION IN A COURT OF LAW CAN SET ASIDE A SETTLEMENT AGREEMENT.

---

[4] Federal Courts permit repudiation of Settlement Agreements in certain very limited fact situations such as Jones Act cases, where a strong public policy intervenes to protect a party of limited means and competence. Lanvin Leblanc and Charlotte Leblanc Versus Callais Enterprises Partnership, Inc., Connecticut Specialty Underwriters, Miss Charlotte, Inc. and Sunderland Marine Mutual Insurance Company Limited , 767 So.823, (La. App. 5th Cir. 2000). Plaintiffs were certainly a very small corporation and Harrah's a very large one, but this is not a Jones Act case.

The courts of Louisiana have held consistently that only a direct action in court attacking a settlement agreement can set aside a Settlement Agreement because it has the authority of the "thing adjudged". <u>Chris Cormier v. Ellender's Portable Bldg.</u>, 781 So.2d 776, (La. App. 3rd Cir. 2001).[5]

IV.     EVEN IF THE DOCTRINE OF REPUDIATION DID APPLY TO CONTRACTS OF TRANSACTION OR COMPROMISE, THE DOCTRINE OF REPUDIATION CARRIES WITH IT THE RIGHT TO RETRACT A REPUDIATION AND ENFORCE THE CONTRACT AT ANY TIME PRIOR TO A JUDICIAL DETERMINATION OF THE DISSOLUTION OF THE CONTRACT.

Even if repudiation did apply to contracts of transaction or compromise, the doctrine of repudiation carries with it the right to retract the repudiation. In Louisiana that right exists even after a suit for a judicial dissolution of the contract at any time up to final judgment. See Comment, 50 Tul L. Rev. at 945 and authorities cited.

Even if Plaintiffs' alleged repudiation did have some legal effect, Plaintiffs withdrew that repudiation by filing this lawsuit.

V.      EVEN IF REPUDIATION APPLIED TO SETTLEMENT AGREEMENTS, THE COURT SHOULD DENY DEFENDANTS' MOTION [AND GRANT PLAINTIFFS'] BECAUSE DEFENDANTS HAVE ADMITTED UNDER LR56.2 THAT SCOTT BUHRER HAD ACTUAL AND APPARENT AUTHORITY TO ENTER INTO THE SETTLEMENT AGREEMENT.

Local Rule 56.2 requires a separate, short and concise statement of the material facts by the opponent. It then provides that "All material facts...will be deemed to be admitted, for

---

[5] See also: <u>Allen v. Noble Drilling, Inc.</u>, 637 So.2d 1298, (La. App. 4th Cir. 1994) and <u>Wholesale Distributing v. Warren</u>, 84 So.2d 250, (La. App. 2nd Cir. 1955)

purposes of this motion, unless controverted as required by this Rule."

That is exactly what defendants have done. Plaintiffs Statement of Undisputed Facts

contains the following:

"The Articles and Bylaws of the Plaintiff's corporation clearly and undisputedly gave the Vice President (Scott Buhrer) authority to sign the settlement agreement. (Annex 2, Articles and Bylaws).

1.     The Articles and Bylaws of the Plaintiff's corporation give the Vice President the authority to act in the absence of the president.  (Annex 2).

2.     Jane Galiano left the meeting where the Settlement Agreement was reached, and literally left her Vice President in charge of the meeting and the Agreement. (Annex 1, Galiano deposition, II, p. 209, Annex 3,  Buhrer Deposition, p. 102 ).

Under the Articles and Bylaws, the Vice President had authority to act in the absence of the president.  The President left him in charge of the meeting where the Settlement Agreement was reached. (Annex 2, Articles and Bylaws).

3.     The Vice President was a disclosed mandatary because he signed the Settlement Agreement as vice president.  (Annex 4, Settlement Agreement).

4.     The Vice President had negotiated and signed the previous [first] contract between the parties by exchange of letters. (Annex 5, Letter of August 28, 1995 Buhrer to Albright, and Letter of September 14, 1995, Albright to Buhrer, which constitutes the first contract).

5.     The Plaintiff's Vice President had spoken for the corporation in a long series of negotiations by letters both before and after the previous [first] contract between the parties.  He was the contact person for the corporation in all business matters between Defendants and Plaintiffs. He spoke for the corporation in negotiations to try to work out a new design agreement.  After the Settlement Agreement was signed, Defendants asked him to sign an amendment to the Settlement Agreement.  When he was not available, another Vice President spoke for Plaintiffs.  (Annex 5, Preliminary Letters of July 21, 1995, and August 22, 1995, follow up letter of September 25, 1995.  Letters of November 1, 1995, November 28, 1995, second letter of November 28, 1995 and others. Letter of December 10, 1995 Buhrer to Albright, letter of February 14, 1996, Albright to Buhrer, letter of February 15, 1996, Buhrer to Albright, Letter of March 1, 1996, Buhrer to Albright, March 25, 1996, Letter of May 15, 1995, Albright to Buhrer,

6.     Harrah's letters after the Settlement Agreement show Harrah's believed Buhrer had authority to act for plaintiffs.  Harrah's insisted to the very end that the Settlement Agreement was valid, and refused to negotiate further. (Annex 5, Letters of June 25, 1996, De Young to Hudson, September 30, 1996, De Young to Hudson.  Letters prior to the Settlement Agreement cited above.  Compare the letter of June 4, 1996 written weeks after the negotiations and signing of the Settlement Agreement).

7.     There was no notification to Harrah's that Buhrer lacked authority until after he had negotiated and signed the Settlement Agreement. (Annex 5, Letters prior to the Settlement Agreement cited above.  Compare the letter of June 4, 1996 written weeks after the negotiations

and signing of the Settlement Agreement).

        8.       At the time of the negotiation and signing of the Settlement Agreement, Buhrer believed he had authority to act for Plaintiffs. (Annex 3, Deposition of Buhrer, p. 23)."

Not one single fact in Defendants' list of material facts disputes any of the above facts pleaded by Plaintiffs. They are admitted.

VI.      EVEN IF THE DEFENDANTS HAVE NOT ADMITTED BUHRER'S AUTHORITY, THE COURT SHOULD DENY DEFENDANTS' MOTION [AND GRANT PLAINTIFFS'] BECAUSE THE UNDISPUTED FACTS SHOW THAT HE HAD SCOTT BUHRER HAD ACTUAL OR APPARENT AUTHORITY AT THE TIME HE SIGNED THE SETTLEMENT AGREEMENT.

Not one single fact or allegation by defendants denies that Buhrer had authority to act for the corporation in the absence of the president. Therefore he had actual authority.

Not one single fact or allegation denies that the president left the meeting where the Settlement Agreement was reached and left Buhrer in charge. He had actual express authority when the president walked out of a settlement meeting and left the vice president in charge.

Not one single fact or allegation denies that Buhrer had a long history of acting and speaking for the corporation. That history gave him a putative mandate under Civil Code Article 3021. It also gave him actual and apparent authority.

Louisiana Civil Code Article 2997.

Defendants rest their case on a subsequent repudiation of his authority.

**But that repudiation did not take place until after the Settlement Agreement had been signed.**

**It is black letter law that the meeting of the minds between the parties is measured as of the time the contract is signed, not as of some later date. LCC Articles 1927, 1934,**

**1935, 1936.** A complete contract must have a meeting of the minds as between the parties upon a common ground of a mutual understanding of facts and of subject matter, and the contract must afford a complete expression of this meeting of the minds, and leave no material element unexpressed, and the offer and assent must coincide and the result must be a complete obligation. Thompson v. State Farm Ins. Companies, 145 F.Supp. 473 (W.D. La. 1956), *affirmed* 244 F.2d 291. "A contract is not the instrument by which it is witnessed. It results exclusively from the consent, the aggregatio mentium of the parties, without which no contract can exist." Erwin v. Bank of Kentucky, 5 La. Ann. 1 (1850). Further, a compromise is valid only if there is a meeting of the minds between the parties as to exactly what they intended when the compromise was reached. Sceroler v. Rancher, 2002 WL 227083, (La. App. 1st Cir, 2002) citing Shell Oil Co. v. Jackson, 655 So.2d 482,484 (La. App. 1st Cir. 1995). Without a meeting of the minds, there is no consent. Without consent, there is no contract. Therefore for purposes of contract validity, the time to measure whether there was a meeting of the minds and consent is the time the agreement was executed. The principles of obligations would not allow the implication of absurd alternative: consent possibly established after the formation of the contract.

VII.    EVEN IF PLAINTIFFS COULD REPUDIATE A SETTLEMENT AGREEMENT, THE COURT SHOULD ENFORCE THIS ONE BY SUMMARY JUDGMENT BECAUSE NEITHER THE FACTS ON THE FACT LIST OR THE ARGUMENT IN THE BRIEF GOES TO THE SCOPE OF THE SETTLEMENT AGREEMENT OR THE BROAD MEANING OF THE WORD "USE" IN THE FINAL PARAGRAPH.

Plaintiffs' Undisputed Statement of Undisputed Material Facts represents that:

"11. Harrah's "used" plaintiffs' designs by putting them on the cover of its magazine without her permission. (Annex 7, Harrah's People's Magazine, Plaintiffs' Motion for Summary

Judgment).  The designs are literal copies of plaintiffs' designs.  (Annex 8, Plaintiffs' designs,

Plaintiffs' Motion for Summary Judgment).

      12.     Harrah's "used" plaintiffs' designs because All-Bilt created patterns for Harrah's

using literal copies of plaintiff's designs.  (Annex 9,  All-Bilt patterns which are literal copies of

plaintiffs' designs annexed thereto, Plaintiffs' Motion for Summary Judgment)>

      13.     Harrah's "used" plaintiffs designs because All-Bilt manufactured for Harrah's

designs which are almost literal copies of plaintiffs' designs.  (Annex 10, Cover sheets of All-

Bilt patterns and production orders and invoices to Harrah's which are almost literal copies of

plaintiffs', Plaintiffs' Motion for Summary Judgment).

      Nowhere do Defendants dispute these allegations, fact by fact, design by design.  Their

so-called Statement of Facts No. 34 makes a sweeping and conclusory allegation that "There is

no evidence that any of plaintiffs' designs were developed or sold as garments after May 6,

1996".

      These broad, vague conclusory statements do not satisfy the well known requirements for

opposition to a summary judgment in this Court.

      The seminal case in this area is <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 106 S.Ct.

2505, 91 L.Ed.2d. 202, (1986).  In discussing the standard which applies to the "quality" of the

evidence presented for or against a motion for summary justice, Mr. Justice White wrote that:

> Thus, in ruling on a motion for summary judgment, the judge must view the
> evidence presented through the prism of the substantive evidentiary burden. This
> conclusion is mandated by the nature of this determination. The question here is
> whether a jury could reasonably find *either* that the plaintiff proved his case by the
> quality and quantity of evidence required by the governing law *or* that he did not.
> Whether a jury could reasonably find for either party, however, cannot be defined
> [***216] except by the criteria governing what evidence would enable the jury to
> find for either the plaintiff or the defendant: It makes no sense to say that a jury
> could reasonably find for either party without some [*255] benchmark as to what

standards govern its deliberations and within what boundaries its ultimate
decision must fall, and these standards and boundaries are in fact provided by the
applicable evidentiary standards.
Anderson, 477 U.S. at 255.

In applying a "malice" standard in a liable case, as the Court will apply Louisiana contract

law in our case, Mr. Justice White further wrote:

> In sum, we conclude that the determination of whether a given factual dispute
> requires submission to a jury must be guided by the substantive evidentiary
> standards that apply to the case. This is true at both the directed verdict and
> summary judgment stages. Consequently, where the *New York Times* "clear and
> convincing" evidence requirement applies, the trial judge's summary judgment
> inquiry as to whether a genuine issue exists will be whether the evidence
> presented is such that a jury applying that evidentiary standard could reasonably
> find for either the plaintiff or the defendant. Thus, where the factual dispute
> concerns actual malice, clearly a material issue in a *New York Times* case, the
> appropriate summary judgment question will be whether the evidence in the
> record could support a reasonable jury finding [*256] either that the plaintiff has
> shown actual malice by clear and convincing evidence or that the plaintiff has not.
> Anderson, 477 U.S. at 255-256.

That is the point. Harrah's must put forward evidence which would be admitted at trial.

The vague conclusions discussed above do not come anywhere near this standard. Harrah's

motion should be denied.

Statement #34 also avoids the key issue: Were elements of Plaintiffs' designs not only

used but copied in the Allbilt/Harrah's designs. Plaintiffs facts show the Court the specifics,

design by design. See also the supplemental Statement of Undisputed Facts filed herewith,

Annex *).

Defendants "Facts" actually admit that "All Bilt... designed A VERSION OF A GOLD

CARD JACKET, CASINO SHIRTS WITH PLACKET BRAID OR BROCADE TRIM, AND A

GOLD CARD SHIRT AND MANUFACTURED AND SOLD THOSE ITEMS TO

HARRAH'S." (No. 35). That admission goes far towards proving up Plaintiffs' summary

judgment on the issue of "use" of their designs to create the All-Bilt designs.

No. 35 does not dispute that key elements of plaintiffs' designs were "used" to create the

Allbilt/Harrah's designs. It is admitted, and proven by the visual evidence filed into the record

11

by Plaintiffs.

No. 36 is another sweeping, conclusory, argumentative allegation: "All Bilt did not manufacture any Gianna-designed Gold Card Jacket, Gold Card shirt or Casino shirt". That allegation also does not satisfy the requirement for a specific fact sworn to by a specific person which puts at issue the facts alleged by Plaintiffs, namely the undisputed fact that key elements of Plaintiffs' designs were used to create the Allbilt/Harrah's designs - and in some cases Plaintiffs' entire design was copied literally.

According to Webster's Unabridged Dictionary, "use" includes: "to put into action or service, to employ". That is broad enough to cover very comfortably what happened in this case - the use of plaintiffs' entire design, or key elements from her designs to create the Allbilt designs. (See also Plaintiffs' Motion in Limine on this issue).

VIII. EVEN IF THE DOCTRINE OF REPUDIATION DID APPLY TO THE SETTLEMENT AGREEMENT, THE ALLEGED REPUDIATION WAS ONLY PARTIAL BECAUSE IT NEVER WAS INTENDED TO GIVE DEFENDANTS THE UNRESTRICTED RIGHT TO "USE" PLAINTIFFS' DESIGNS TO CREATE MILLIONS OF DOLLARS WORTH OF COSTUMES WITHOUT PAYING PLAINTIFFS ONE CENT IN ROYALTIES.

The old and the new Undisputed Facts lists prepared by Plaintiffs show very clearly that Plaintiffs' at that time did not intend to give Defendants the unrestricted right to use their designs. They intended just the opposite. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

IX.    THE COURT SHOULD DENY DEFENDANTS' MOTION [AND GRANT PLAINTIFFS'] BECAUSE DEFENDANTS' CASE LAW ON ANTICIPATORY BREACH DO NOT INVOLVE SETTLEMENT AGREEMENTS AND ACTUALLY SUPPORT PLAINTIFFS' POSITION IN THIS CASE.

Defendants' case law dealing with anticipatory breach of non-settlement contracts

12

actually supports Plaintiffs' motion and undercuts Defendants' motion.

Two of the leading cases were in fact employment contract cases.

Marek v. McHardy, La. 1958, 234 La. 841, 101 So.2d 689, 1958 La. Lexis 1155, and Simpson v. Kelly Services, Inc, 2d Cir 1976, 339 So.2d 490, 1976 La. App. Lexis 3557 were not contracts of transaction or compromise. They were suits for specific performance of contracts of employment. Employment contracts are severely limited and disfavored in Louisiana. Louisiana Civil Code Articles 2746, 2747. They are the opposite of contracts of transaction or compromise.[6]

Eota Realty Co., Inc. v. Carter, La. 1954, 225 La. 790, 74 So.2d 30; 1954 La. Lexis 1264, did not involve a contract of transaction or compromise. It was a suit to cancel an oil lease pursuant to the terms of the lease, which provided for a right of cancellation. The Settlement Agreement did not give either side the right to withdraw from or repudiate or cancel the Settlement Agreement.

The other cases following Marek and Eota cited by Defendants have nothing whatsoever to do with Settlement Agreements, i.e. contracts of transaction or compromise. Andrew Development Corporation v. West Esplanade Corporation, La. 1977, 347 So.2d 210; 1977 La. LEXIS 550 did not involve a contract of transaction or compromise. It was a suit for damages for breach of an agreement to purchase and sell immovable property. Fairfield Development Company v. Jackson, 2d Cir. 1983, 1983 La. App. LEXIS 9212, was a suit for specific performance of a promise to pledge a security interest - not a contract of transaction or compromise. Shell Offshore v. Marr, 5th Cir. 1990, 916 F.2d 1040, 1990 U.S. App. Lexis 19756 was a suit for damages for breach of a loan agreement - not a transaction or compromise.

---

[6]See e.g. Gearheard v. De Puy Othopedics, , 2000 U.S. Dist. Lexis 6473, (E.D. La. 2000) and Ashland Chemical Company, Inc. v. Lombardino, 1993 U.S. Dist. Lexis 13736, (E.D. La. 1993).

X.    THE COURT SHOULD DENY DEFENDANTS' MOTION  [AND GRANT

PLAINTIFFS' MOTION] BECAUSE DEFENDANTS' STATEMENT OF UNDISPUTED

FACTS DOES NOT COMPLY WITH THE SPIRIT OF LOCAL RULE 56.1.

Counsel respectfully refer the Court to the Reply Memorandum in Support of Plaintiffs'

Motion filed herewith for the substance of this headnote.

XI.    THE COURT SHOULD DENY DEFENDANTS' MOTION [AND GRANT

PLAINTIFFS'] BECAUSE PLAINTIFFS HAD EVERY RIGHT TO RATIFY THE

SETTLEMENT AGREEMENT BY FILING THIS LAWSUIT.

As a matter of common sense, Plaintiffs do and should have the right to ratify the

Settlement Agreement by filing this lawsuit because Harrah's insisted to the very end of the

discussions that the Settlement Agreement was valid.  Defendants' attorney refused to

renegotiate it because it was valid.  He said: "We continue to believe the settlement agreement is

valid." (Annex 48,  Letter from De Young to Hudson of September 30, 1996)

As long as Defendants insisted it was valid, Plaintiffs had the right to ratify it.

The Civil Code and the case law show why. The Civil Code articles provide that one

party can ratify as long as the other party leaves the door open. Under Louisiana Civil Code Art.

1843,  ratification is a "declaration whereby a person gives his consent to an obligation incurred

on his behalf by another without authority" and can be tacit or express.  Tacit ratification occurs

when the person ratifying has knowledge of the obligation incurred on her behalf and "accepts

the benefit of that obligation".  La. C.C. Art. 1843.  Further, the Code Articles regarding

ratification and its effects as to third parties do not place a time limitation as to when a person

must ratify. La. C.C. Art. 1843, 1844, 3010, and 3021.  The language of the Code Articles

regarding ratification provide for one party making such ratification: the person on whose behalf

an agent incurred an obligation.  Here, the principal is the Plaintiff.   By filing this lawsuit to try

to avail herself of the benefits owed to her under the settlement agreement, Plaintiff has tacitly

14

ratified the settlement agreement as supported by the aforementioned Code Articles.

Further, no defects or vices in the agreement exist to prevent Plaintiff's ratification. This lack of defects is supported by the Defendant's repeated contentions as to the settlement agreements validity. Harrah's left the door wide open because its final words communicated to Plaintiffs that the Settlement Agreement was valid. Therefore, the principal, plaintiff here, has every right under the Civil Code articles to ratify a settlement agreement that was incurred by an agent. "The general theory of ratification of the unauthorized acts of an agent is that the principal, with full knowledge of the facts, consents to the unauthorized actions and adopts the contract as if it had been previously authorized." Everett v. Foxwood Properties, 584 So.2d 1233 (La. App. 2d Cir. 1991) citing Ledoux v. Old Republic Life Insurance Co., 233 So.2d 731 (La.App.1970), *writ refused*, 256 La. 372, 236 So.2d 501 (1970); Bamber Contractors, Inc. v. Morrison Engineering and Contracting Company, Inc., 385 So.2d 327, 331 (La.App.1st Cir.1980). The defendant's position has been the same: that the agreement was valid. Plaintiff's ratification has not compromised this position. Plaintiff has just taken advantage of her right to ratification that the Civil Code provides. If anyone has changed his position in reliance on the statements of the other party, it is Plaintiffs.

The case law cited and discussed in the Plaintiffs' pending Motion shows why ratification under these circumstances is retroactive. *See Ledoux v. Old Republic Life Insurance Company*; 233 So.2d. 731 (La. App. 3d Cir. 1970), *writ refused*, 236 So.2d 501 (1970); *McCarty v. Panzico*, 467 So.2d 1228 (La. App. 2d Cir., 1985); Frazier v. Harper, 600 So.2d 59 (La. 1992) in Plaintiff's Motion for Summary Judgment Under the Settlement Agreement, February 7, 2002 at 17-18.

The Court thru no less an authority than Judge Tate (certainly a recognized authority on Louisiana law) acknowledged that ratification is retroactive: "Such ratification has retroactive effect and is equivalent to prior authority. See e.g, Acadian Production Corp. v. Savannah Corp,

15

63 So.2d at 143".

The Court also acknowledged that ratification does not require the acceptance of any benefits by the principal (see discussion by Judge Tate in n. 3).

But the Court's holding does not reach the issue of ratification by the filing of the lawsuit because the principal was the defendant, not the plaintiff in the lawsuit.

The Court's holding also does not reach the issue of an alleged unilateral anticipatory breach of a contract of transaction or compromise. The contract was a contract to drill an oil well.

There was no alleged transaction or compromise.

In First National Bank of Shreveport v. Crawford, 2d Cir. 1984, 455 So..2d 1209, 1984 La. App. LEXIS 9429, the principal was the defendant, not the plaintiff as in our case. In that case the principal did nothing to ratify, either before or after suit was filed. The Court did not reach the issue of retroactivity.

In State Bank & Trust v. Boat D.J. Griffin, E.D.La. 1991, 755 F. Supp. 1389, 1991 U.S.Dist.LEXIS 248, affirmed on other grounds, 926 F.2d 449, 1991 U.S. App. LEXIS 3590, Judge Mentz dealt with the situation where the principal was the defendant, not the plaintiff. The Court did not deal with the filing of a suit as ratification.

The Court did not deal with the situation where the adverse party insisted throughout that the mandatary had authority to bind the principal, and the principal concurred by filing the lawsuit.

The bottom line is that Defendants' cases show thru Judge Tate agrees with that Plaintiffs that ratification is retroactive, and does not necessarily require the acceptance of any benefits by the principal. That law applied to the facts of this case leads to a partial summary judgment for Plaintiffs, not defendants.

16

XII.    THE COURT SHOULD DENY DEFENDANTS' MOTION [AND GRANT PLAINTIFFS'] BECAUSE THEIR ALLEGED STATEMENT OF UNDISPUTED FACTS IS ANYTHING BUT ACCURATE, RELEVANT AND UNDISPUTED.

Plaintiffs respectfully refer the Court to the Reply Brief in Support of Plaintiffs' Motion for Partial Summary Judgment for the substance of this headnote.

XIII.    THE COURT SHOULD DENY DEFENDANTS' MOTION [AND GRANT PLAINTIFFS' MOTION] BECAUSE DEFENDANTS' PLAINLY AND UNDISPUTEDLY "USED" PLAINTIFFS' DESIGNS TO THE ALLBILT/HARRAH'S DESIGNS WHICH WENT INTO PRODUCTION BEFORE THE SETTLEMENT AGREEMENT WAS EVER SIGNED.

Plaintiffs' new Undisputed Facts show design by design exactly which Gianna designs were "used" to create which Allbilt designs. See Undisputed Facts, Nos. 19 through 51.

Plaintiffs' unrebutted previous argument shows why the Allbilt designs "use" plaintiff's designs per the dictionary definition of "use" and the legal authorities cited in the previous brief. "Use" means " "to put into action or service, to employ" in Webster's Unabridged Dictionary. The LCC articles on contract interpretation apply that definition to this case. LCC Articles 2045-2057.

That definition does not lead to any absurd results.

Defendants' discussion of how a design is put into production is completely irrelevant to the breach of the Settlement Agreement not to "use" Plaintiffs' designs for any purpose at all within the broad dictionary definition of "use".

Defendants' "used" all or parts of Plaintiffs' designs for the All-Bilt designs created behind Plaintiffs' back and put into production to the tune of millions of dollars beginning before the Settlement Agreement was ever signed, and continuing thru 2001 - in brazen defiance of this lawsuit.

17

The Settlement Agreement is not limited to "putting exact copies of Plaintiffs' designs into production". If that is what Defendants meant, their expert attorneys who drafted the Settlement Agreement should have said so! Defendants as a part of the Settlement promise not to "USE" those designs.

"Use" is what they did.

A visual comparison of each design shows exactly which designs - or features of designs - were used for which Allbilt/Harrah designs. (Annex 73, Side by Side Comparison).

XIV.    THE COURT SHOULD DENY DEFENDANTS' MOTION [AND GRANT PLAINTIFFS'] BECAUSE CIVIL CODE ARTICLE 3083 AND THE NEW CONSPIRACY EVIDENCE SET FORTH IN THE AMENDED COMPLAINT FILED HEREWITH SHOW THAT DEFENDANTS SIGNED AND BREACHED THE SETTLEMENT AGREEMENT IN BAD FAITH.

The facts and inferences from the newly discovered Allbilt conspiracy evidence show why plaintiff's alleged "repudiation" of the contract would be contrary to law and public policy. See Statement of Undisputed Facts Numbers 19 through 50.

Per Defendants' cases, even at common law the repudiator can repudiate his repudiation unless the other side has changed its position in reliance on the repudiation. See Marek v. McHardy, supra. As a matter of law and based on the undisputed facts of the new conspiracy evidence, Defendant did not change its position in reliance on the Settlement Agreement because it had already begun "using" Plaintiff's designs for Allbilt designs and had put those designs into production before it ever signed the Settlement Agreement promising not to "use" Plaintiffs' designs!

XV.    THE COURT SHOULD DENY DEFENDANTS' MOTION [AND GRANT PLAINTIFFS'] BECAUSE CIVIL CODE ARTICLE 3083 AND THE JURISPRUDENCE

18

GIVES PLAINTIFFS - NOT DEFENDANTS - THE RIGHT TO RESCIND THE CONTRACT
BASED ON THE NEWLY DISCOVERED CONSPIRACY EVIDENCE, AND PLAINTIFFS
HAVE CHOSEN NOT TO EXERCISE THAT RIGHT.

On September 14, 1995 a contract was finalized between Harrah's and Gianna Inc., for
design consulting services. (Annex 34). Gianna Inc., immediately began creating designs for
Harrah's casino properties, and also Jane Galiano began to travel to the casino properties to meet
with employees and view the properties.

Gianna Inc., also negotiated a contract with Uniform Ideas calling for Uniform Ideas to
manufacture the Galiano designs for use in the Harrah's properties. (Annex .

On October 14, 1995 Gianna Inc., sent a sample dealer shirt to All-Bilt for All-Bilt to
prepare a price quote for production. (Annex 35). Jane Galiano also went to New York to meet
with Howard Wecksler of All-Bilt, on DATE, concerning the possible manufacture by All-Bilt of
other Gianna Inc., designs.

On October 19, 1995 All-Bilt quoted prices to Gianna Inc., for the production of male and
female dealer shirts. (Annex 36).

On November 17, 1995 Harrah's issued a purchase order number B85-075180-P to All-
Bilt for the production of Gianna Inc., design numbers H1039, Fresh Market Chef Hats and
Jackets.

On December 4, 1995, All-Bilt sent a letter to Jan Starnes of Harrah's, containing price
proposals for 10 of Gianna Inc.'s designs. (Annex 42).

In December of 1995, Jane Galiano attended the uniform installation at Harrah's Skagit
Valley Casino, in Washington. At that time Jane Galiano, witnessed several of her designs being
used for which she had not authorized production. These designs included the use of silkscreens,
Gianna Inc., design numbers H1009, H1017, and H 1018. Jane Galiano learned that Harrah's
had gone directly to All-Bilt and Varsity Spirts to have the aforementioned designs produced.

19

(Annex 39, Affidavit of Galiano).

Following the Skagit Valley installation a series of disputes arose between Gianna Inc., and Harrah's regarding Harrah's going directly to manufacturers to have Gianna Inc., designs produced and regarding royalty amounts. (Annex 39, Affidavit of Galiano).

During this time on March 8, 1996, Harrah's ordered Gianna Inc., design number H1041, Range Vest, and Gianna Inc., design number H1114, Chef Jacket, from All-Bilt.  (See Annex 50).

On March 12, 1996 Harrah's ordered a design substantially similar to Gianna Inc., design numbers H1004, H1051, and H1053 from All_Bilt.  (Annex 53, Purchase order and side by side comparison).  Harrah's subsequently reordered this design on October 9, 1996, December 28, 1996, December 30, 1996 and has continuously ordered this design through the present time. See attached table.

On May 6, 1996 Harrah's and Gianna Inc., signed a settlement agreement whereby Gianna Inc., waived royalties on certain designs, Harrah's agreed to pay royalties on other designs, and Harrah's agreed not to "use" any designs not mentioned in the agreement.  (Annex 61).

On May 15, 1996, Harrah's sent a proposed amendment to the settlement agreement to Gianna Inc., proposing to make All-Bilt responsible for paying royalties to Gianna Inc., for the production of the Range Vest, Gianna Inc., design number H1041 and H1040.  (Annex 62).  This amendment was never signed.

On June 11, 1996, Harrah's placed an order with All-Bilt for production of Gianna inc., design numbers H1041 and H1114.  (Annex 65).  All-Bilt specification sheet 66279 dated June 13, 1996, contains a photocopy of Gianna Inc., design number H1041, and All-Bilt specification sheet 66280 dated June 13, 1996, contains a photocopy of Gianna Inc., design number H1114. (Annex 76).  According to the express terms of the May 6, 1996, settlement agreement, Harrah's

agreed to pay a royalty of 5% on future purchases of Gianna Inc., design number H1041 (Range Vest) within 30 days of receipt of the invoice. (Annex 61). All-Bilt invoice number 112230(AB1738) was sent to Harrah's casino in Joliet, Illinois on September 19, 1996. Harrah's has to date not paid any royalty to Gianna Inc., relating to this invoice. Further Gianna Inc., design number H1114, "Range Chef" is prohibited from use by Harrah's pursuant to the settlement agreement. The sale of Gianna Inc., design number H1114 is also evidenced by All-Bilt invoice number 112230. (Annex 66).

Linda Gunnerson, All-Bilt's in house designer, admitted that the designs contained in the All-Bilt specification sheets are Gianna Inc., designs. (Annex 67, Gunnerson's deposition) . The use of these designs clearly establishes that Harrah's breached the settlement agreement.

Harrah's further continuously since 1996 has ordered designs which are either identical to Gianna Inc., designs or clearly based upon Gianna Inc., designs. See side by side comparisons (Annex 56 and 54). Table of orders, and Report of Dr. Belleau.

XVI.    THE COURT SHOULD DENY DEFENDANTS' MOTION [AND GRANT PLAINTIFFS'] BECAUSE THE UNDISPUTED FACTS SHOW DEFENDANTS HAVE NOT COMPLIED WITH THE ORDER OF THIS COURT TO PRODUCE ALL OF THEIR RECORDS, OR THE ORDER TO OBTAIN ALL OF THEIR MANUFACTURERS' RECORDS.

On March 29, 2001, in response a Motion to Compel Harrah's to respond to discovery issued by plaintiffs, Judge Chasez, ordered defendants to obtain records directly from the manufacturers relating to the gold card jacket, dealer shirt, and fresh market designs, as well as to obtain documents relating to plaintiffs' Request for Production of Documents No. 1 and those identified on pages 73 and 74 of the Albright deposition. (Annex 77).

In response Harrah's issued subpoenas and produced a limited amount of color and black and white phonographs of designs from All-Bilt. Defendant also produced some records from

Red the Uniform Tailor and Varsity Spirits. Defendants' further produced affidavits stating that the records produced were complete.

Subsequently Harrah's produced computer records relating to purchases by several of the casinos. However these computer records contained no key to identify which designs were ordered and also did not evidence the purchases of all of the Harrah's casinos.

All-Bilt then produced additional copies of designs, specification sheets, and invoices relating to the Gold Card Jackets and Dealer Shirts.

However the All-Bilt documents evidenced purchases that were not contained in the Harrah's production.

Subsequently Plaintiffs renewed their Motion to Compel, and Judge Chasez ordered Plaintiffs to go to the manufacturers to inspect documents.

At the inspection of All-Bilt, plaintiffs discovered numerous Gianna Inc., designs which All-Bilt had produced from 1996 until 2001. Included in this discovery was several literal copies of plaintiffs' designs contained in All-Bilt specification sheets, as well as many additional orders of Gold Card Jackets and Dealer shirts which both All-Bilt and defendants had failed to produce.

Following the All-Bilt inspection plaintiffs requested an inspection of the Joliet casino and production of documents from Joliet. Harrah's eventually did produce copies of designs which were kept at the Joliet casino and which evidenced further use of plaintiffs' designs.

Despite Harrah's previous response that it did not have visual representations of the designs, the documents from Joliet in fact contained color copies of All-Bilt sketches of plaintiffs' designs.

The production of documents from Joliet clearly indicate that Harrah's has visual representations of the designs it has utilized at its various casinos. Further following Harrah's production of designs from Joliet, plaintiffs traveled to Joliet, Illinois to inspect the records and

found additional records relating to the purchase of uniforms for Joliet employees.

Each time Harrah's has produced documents the production has been incomplete, and each time plaintiffs have had to travel to inspect records onsite in order to discover the complete records.

Respectfully submitted,

SIDNEY L. SHUSHAN, #12055
JONATHAN M. SHUSHAN, #21977
BRIAN L. GLORIOSO, #27226
Guste, Barnett & Shushan, L.L.P.
639 Loyola Avenue, Suite 2500
New Orleans, Louisiana 70113-7103
Telephone: (504) 529-4141
Facsimile:  (504) 561-0326
Sidney L. Shushan Direct Line: (504) 681-4519
Attorneys for Plaintiffs,
Jane Galiano and Gianna, Inc.

EASTERN DISTRICT OF LOUISIANA
UNITED STATES DISTRICT COURT

| | | |
|---|---|---|
| JANE GALIANO, AND GIANNA, INC. | * | CIVIL ACTION NO. 00-0071 |
| *Plaintiffs* | * | |
| | * | |
| | * | |
| VERSUS | * | SECTION " E" " (5) |
| | * | |
| | * | JUDGE MARCEL LIVAUDAIS, JR. |
| | * | |
| HARRAH'S OPERATING CO., INC., | * | |
| AND | * | |
| HARRAH'S ENTERTAINMENT, INC. | * | MAGISTRATE: JUDGE ALMA CHASEZ |
| *Defendants* | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing pleading has been served upon:

Mr. Joseph W. Looney, T.A.
Ms. Melissa S. LaBauve
Adams and Reese LLP
4500 One Shell Square
New Orleans, Louisiana 70139
Attorney for Defendants,
Harrah's Operating Co., Inc. and
Harrah's Entertainment, Inc.

by hand delivery of a copy of same on the ___26___ day of _March_, 2002.

BRIAN L. GLORIOSO

24

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JANE GALIANO, AND GIANNA, INC.<br>*Plaintiffs* | * <br> * <br> * <br> * | CIVIL ACTION NO. 00-0071 |
| VERSUS | * <br> * <br> * <br> * | SECTION " E" " (5)<br><br>JUDGE MARCEL LIVAUDAIS, JR. |
| HARRAH'S OPERATING CO., INC.,<br>AND<br>HARRAH'S ENTERTAINMENT, INC.<br>*Defendants* | * <br> * <br> * <br> * <br> * | MAGISTRATE ALMA CHASEZ |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## SUPPLEMENTAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS
## BASED ON NEWLY DISCOVERED EVIDENCE

Plaintiffs respectfully supplement their Statement of Undisputed Facts by adding thereto the following facts per the latest discovery from All Bilt and previous documents compared with the latest All Bilt discovery documents:

19.     On September 14, 1995 a contract for design and consulting work between Gianna, Inc., and Harrah's was finalized.  (Annex 34, Design Consulting Agreement).

20.     On October 14, 1995 Gianna Inc., sent a  sample casino dealer shirt to All-Bilt to prepare a price quote.  (Annex 35, New Orleans Dealer Shirt, Gianna Inc.'s Design H1001).

21.     On October 19, 1995 All-Bilt quoted prices to Gianna Inc., for the production of male and female dealer shirts. (Annex 36, Dealer Shirts Price Quotes for Harrah's New Orleans).

22.    On October 30, 1995, All-Bilt sent a letter to Gianna Inc., regarding production specifications for Harrah's New Orleans Dealer Shirts. (Annex 37, Dealer Shirt Description).

23.    On November 17, 1995 Harrah's issued a purchase order number B85-075180-P, to All- Bilt for the production of Gianna Inc., design, H1039, Fresh Market Chef Hats and Jackets. (Annex 38, Purchase Order). Gianna Inc., did not authorize Harrah's to order this design from All-Bilt, nor did Gianna Inc., authorize All-Bilt to manufacture the design. (Annex 39, Affidavit of Jane Galiano).

24.    On November 20, 1995, All-Bilt sent copies of purchase orders received from Harrah's for the production of Gianna Inc., designs to Gianna Inc. These orders were for Fresh Market Buffet Chef Jackets and custom Gianna Inc.'s Hats. Gianna Inc. design number H1039. (Annex 40, Purchase Orders).

25.    On November 22, 1995 Harrah's issued purchase order number B85-075750-P to All-Bilt for Gianna Inc., designed Chef Coats and Hats. (Annex 41, Purchase Orders).

26.    On December 4, 1995, All-Bilt sent a letter to Jan Starnes, of Harrah's, containing All-Bilt's price proposals for approximately 10 of Gianna Inc.'s designs. The letter also states "We have not priced all of the designs presented by Gianna". (Annex 42, All-Bilt's Price Proposals to Gianna).

27.    On December 10, 1995 Gianna Inc., sent a letter to Connie Albright of Harrah's confirming a telephone discussion regarding new contract terms proposed by Harrah's. (Annex 43, New Contract Terms by Harrah's).

28.    On December 27, 1995 Harrah's issued purchase order number B85-079556-P, to All-Bilt for Gianna Inc.'s design Chef Coats. (Annex 44, Purchase Orders).

29.    On January 5, 1996, Jane Galiano sent a handwritten letter to Jan (Starnes), of

Harrah's, enclosing illustrations of the Range Restaurant designs (Gianna Inc.'s, design numbers H1040 and H1041). (Annex 45, Illustrations of Range Restaurant Designs).

30.    On February 14, 1996, Connie Albright sent a letter to Gianna Inc., regarding new terms for design consulting agreement. The proposal calls for specific royalty percentages on certain designs which Connie alleges she helped to create. The designs at issue are attached to the letter. (Annex 46, New Terms for Design Consulting Agreement).

31.    On February 15, 1996, Scott Buhrer, of Gianna Inc., issued a letter to Harrah's acknowledging receipt of the February 14, 1996 letter and addressing issues concerning the December 1995 bill which had gone unpaid by Harrah's. (Annex 47, Issues Concerning Bill of 1995).

32.    On March 1, 1996, Gianna Inc., responded to the February 14, 1996 letter from Connie Albright. Gianna Inc., disputes Albright's claim to designs and rejects new royalty scheme proposed by Albright. Connie Albright later admitted in her deposition that she never sketched or otherwise fixed any "idea" into a tangible medium. (Annex 48, Allbrigt's deposition, pp 25, and 26). See Plaintiff's Motion for Summary Judgment, February 7, 2002, Annex 14, for a complete copy of deposition. Further there is no evidence that any Harrah's employee ever created a design. Rather several employees simply claim to have had "ideas". (Annex 49, Gianna's response to Albright's February 14, 1996 correspondence).

33.    On March 8, 1996 Harrah's ordered Range Vest, Gianna Inc., design number H1041, and Range Chef, Gianna Inc., design number H1114 for the Harrah's Joliet Casino from All-Bilt. (Annex 50; Bates H00167). The sale is further evidenced by All-Bilt invoice 110286 (Annex 51; Bates H00166) and Harrah's computer records (Annex 52; Bates H00104). Gianna Inc., did not authorize the production of these designs.

34.    On March 12, 1996, Harrah's ordered a design from All-Bilt which is substantially similar to and based upon Gianna Inc.'s Design Numbers H1004, H1051, and H1053. (Annex 53, Purchase Orders). As evidenced by All-Bilt's purchase orders. See comparison of design by Dr. Bonnie Belleau, (Annex 54, Report) and side by side comparison attached hereto as (Annex 55, Comparison Sheets.). Harrah's subsequently reordered this design again on October 9, 1996; December 28, 1996; December 30, 1996, and has ordered this design continuously through present. See attached table. (Annex 56, Table).

35.    On March 19, 1996, Gianna Inc., sent a letter to Connie Albright regarding the December 1995 bill which was more than thirty days past due. (Annex 57, Past Due Bill).

36.    On March 25, 1996, Gianna Inc., issued a letter to Connie Albright regarding a proposed May 1, 1996 meeting, and demanded the return of Gianna Inc., original presentation boards. (Annex 58, Proposed May1996 Meeting and Return of Boards). To date Harrah's has not returned several Gianna Inc.'s, original presentation boards and prototype garments. (Annex, 39, Affidavit of Jane Galiano).

37.    On April 12, 1996, All- Bilt's, Howard Wecksler, sent a letter to Gianna Inc., regarding Fresh Market and North Beach Chef jackets. (Annex 59, Royalty Payments). Wecksler claims that he did not receive a sketch from Gianna of the North Beach jacket and claims that there is a "question" as to who designed the jacket. He states that if the jacket is similar to the Gianna Inc. sketch, that All-Bilt will pay a royalty. Also the letter states that All-Bilt will remit a royalty payment of 7% on the Range Vest male and female. (Gianna Inc., design numbers H1040 and H1041).

38.    Undated response by Gianna Inc., to Wecksler letter of April 12, 1996. (Annex 60, North Beach and Deli Chef Jacket). The letter discussed North Beach Deli chef jacket

design, " Please see illustration provided for your review" .

39.     On May 6, 1996, a Settlement Agreement was signed following a meeting in New Orleans. (Annex 61, Settlement Agreement).

40.     On May 15, 1996, Harrah's sent a letter to Gianna Inc., attempting to amend the Settlement Agreement to make All-Bilt, rather that Harrah's, responsible for paying royalties directly to Gianna Inc., on the Range Restaurant vest "now in use at Harrah's Joliet, designed by Gianna Inc.". (Annex 62, Amended Settlement Agreement). This amendment was never signed. It clearly indicates that prior to any claims by Gianna Inc. that the settlement agreement had not been properly executed, Harrah's attempted to renegotiate the terms of the agreement.

41.     On May 15, 1996, Harrah's also issued a separate letter enclosing the check for Seven Thousand Five Hundred Dollars ($7,500.00) (under the settlement agreement) which was cashed by Gianna Inc.. This check represented the amount due per the December 1995 invoice and was not "consideration" for the settlement agreement. The letter request that no Gianna Inc., employee contact Harrah's properties and/or personnel to request information regarding "invoices, shipments, or uniforms." This evidences Harrah's attempt to hide its continuing use of Gianna Inc.'s designs from Jane Galiano and Gianna Inc. (Annex 63, Check of $7,5000.00)

42.     On June 4, 1996, Jane Galiano sent a letter to Phil Satre, president of Harrah's Entertainment, stating that the settlement agreement was not valid because Scott Buhrer was not authorized to sign the document. (Annex 64, Settlement Agreement Not Valid).

43.     On June 11, 1996 Harrah's placed an order with All-Bilt for production of Gianna Inc.'s design numbers H1041 and H1114. (Annex 65, Purchase Order). All-Bilt specification sheet 66279 dated June 13, 1996 contains a photocopy of Gianna Inc., design number H1041, and All-Bilt specification sheet 66280 dated June 13, 1996 contains a photocopy of Gianna Inc.,

design number H1114. According to the May 6, 1996 settlement agreement Harrah's agreed to pay a royalty of 5% on future purchases of Gianna Inc., design number H1041 within 30 days of receipt of the invoice. All-Bilt invoice number 112230 (AB1738) was sent to Harrah's casino in Joliet, Illinois on September 19, 1996. Harrah's has to date not paid any royalty to Gianna Inc., relating to this invoice. Further Gianna Inc., design number H1114 "Range Chef" is prohibited from use by Harrah's pursuant to the settlement agreement. The sale of Gianna Inc., H1114, is also evidenced by All-Bilt invoice number 112230. (Annex 66, All-Bilt Invoice). There is no question that the designs contained in this order are Gianna Inc.'s designs. Linda Gunnerson, of All-Bilt, admitted in her deposition that the designs in the All-Bilt specification sheets are Gianna Inc.'s designs. (Annex 67, Gunnerson Deposition, pp. 127, 128, 129, 130 and 131). See Plaintiffs' Motion for Summary Judgment, February 7, 2002, Annex 21 for a complete copy of deposition. The use of these designs clearly establishes that Harrah's breached the settlement agreement by ordering designs prohibited from use and by failing to pay royalties on designs which were not prohibited from use.

44.     On June 25, 1996, Vincent De Young, an attorney for Harrah's, sent a letter to Gianna Inc., stating that the settlement agreement is valid and that it was apparent that Mr. Buhrer had authority. He further argued that the cashing of the check was further evidence of Gianna Inc.'s acceptance of the settlement agreement. (Annex 68, Settlement Agreement Valid per Harrah's ).

45.     On June 28, 1996, Howard Wecksler, of All-Bilt, sent a letter to Gianna Inc., regarding a royalty schedule for the Fresh Market Hats (Gianna Inc. design number H1039) and Range "programs". The letter purports to attach Harrah's purchase orders from the ordering property. (Annex 69, Royalty Schedule for Fresh Market Hats).

46.     On September 18, 1996, Pugh and Associates, attorneys for Gianna Inc., issued a letter to Harrah's arguing that the settlement agreement was invalid because of the lack of authority of Buhrer. (Annex 70, Invalid Settlement Agreement).

47.     On September 30, 1996, Harrah's issued a letter to Gianna Inc., stating that the settlement agreement is valid and refusing to respond to any further discussion of the settlement agreement. (Annex 71, Harrah's refuses to further discussion).

48.     On December 3, 1996, Harrah's ordered a design from All-Bilt which is substantially similar to and based upon Gianna Inc.'s Design Numbers H1052. As evidenced by Harrah's Purchase Orders. (Annex 72, Purchase Order). See comparison of designs by Dr. Bonnie Belleau, (Annex 54, Report) and side by side comparison attached hereto as (Annex 73, Comparison Sheets). Harrah's subsequently reordered this design again on January 15, 1997, September 2, 1997, September 2, 1997, March 19, 1998, and has ordered this design continuously through present. See attached table. (Annex 56, Table).

49.     On December 18, 1996, Harrah's ordered a design from All-Bilt which is substantially similar to and based upon Gianna Inc.'s Design Number H1055, as evidenced by Harrah's Purchase Orders. (Annex 74, Purchase Order). See comparison of designs by Dr. Bonnie Belleau, (Annex 54, Report) and side by side comparison attached hereto as (Annex 73, Comparison Sheet). Harrah's subsequently reordered this design again on November 3, 1998. See attached table. (Annex 56, Table).

50.     Gianna Inc., relying on the assertions of Harrah's as to the validity of the settlement agreement filled this suit alleging Harrah's breach of the express terms of the settlement agreement.

Respectfully submitted,

SIDNEY L. SHUSHAN, #12055
JONATHAN M. SHUSHAN, #21977
BRIAN L. GLORIOSO, #27226
Guste, Barnett & Shushan, L.L.P.
639 Loyola Avenue, Suite 2500
New Orleans, Louisiana 70113-7103
Telephone: (504) 529-4141
Facsimile:   (504) 561-0326
Sidney L. Shushan Direct Line: (504) 681-4519
Attorneys for Plaintiffs,
Jane Galiano and Gianna, Inc.

EASTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

| | | |
|---|---|---|
| JANE GALIANO, AND GIANNA, INC. | * | CIVIL ACTION NO. 00-0071 |
| *Plaintiffs* | * | |
| | * | |
| | * | |
| VERSUS | * | SECTION " E " " (5) |
| | * | |
| | * | JUDGE MARCEL LIVAUDAIS, JR. |
| | * | |
| HARRAH'S OPERATING CO., INC., | * | |
| AND | * | |
| HARRAH'S ENTERTAINMENT, INC. | * | MAGISTRATE: JUDGE ALMA CHASEZ |
| *Defendants* | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * *

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing pleading has been served upon:

Mr. Joseph W. Looney, T.A.
Ms. Melissa S. LaBauve
Adams and Reese LLP
4500 One Shell Square
New Orleans, Louisiana 70139
Attorney for Defendants,
Harrah's Operating Co., Inc. and
Harrah's Entertainment, Inc.

by hand delivery of a copy of same on the _____ day of _____, 2002.

_____
BRIAN L. GLORIOSO

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JANE GALIANO and GIANNA, INC. | * | CIVIL ACTION |
| *Plaintiffs* | * | |
| | * | NO. 00-0071 |
| VERSUS | * | |
| | * | SECTION "E" (5) |
| | * | |
| HARRAH'S OPERATING CO., INC. | * | JUDGE MARCEL LIVAUDAIS, JR. |
| and | * | |
| HARRAH'S ENTERTAINMENT, INC. | * | MAGISTRATE JUDGE ALMA CHASEZ |
| *Defendants* | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * *

REPLY BRIEF IN SUPPORT OF PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT

MAY IT PLEASE THE COURT:

I.      THE COURT SHOULD GRANT PLAINTIFFS' MOTION [AND DENY

DEFENDANTS'] BECAUSE DEFENDANTS DID NOT COMPLY WITH LR RULE 56.2

AND TRAVERSE PLAINTIFFS UNDISPUTED FACTS.

Defendants in their rush to judgment did not bother to file an Opposition to the Plaintiffs'

Summary Judgment. They did not ever go through the motions of a token compliance with LR

56.2. The Court should draw the consequences set forth in that Rule.

II. THE COURT SHOULD DENY DEFENDANTS' MOTION [AND GRANT

PLAINTIFFS' MOTION] BECAUSE DEFENDANTS' STATEMENT OF UNCONTESTED

FACTS DOES NOT COMPLY WITH THE SPIRIT OF LOCAL RULE 56.1.

The so-called Statement of Uncontested Facts does not cite or quote any documents or deposition testimony or affidavits.

Without those citations, it is impossible for the Court to cross check the sources or the accuracy of the alleged uncontested facts.

Without those citations, it is impossible to separate fact from argument of counsel.

Nor does the Memorandum of Law cross reference the so-called "Uncontested Facts". That makes it even harder for the Court to determine whether the Defendants' motion meets the standard of the Local Rule, or the legal standard for granting or denying a summary judgment.

For example, No. 36 contains the statement that "All Bilt did not manufacture any Gianna-designed Gold Card jacket, Gold Card shirt or Casino Shirt". It does not cite one single document. It is conclusory and argumentative. It does not offer the Court a side by side comparison of one single Gianna design with the All Bilt designs which in"use" elements from Plaintiffs' designs in contravention of the Settlement Agreement.

It does not comply with the Local Rule or FRCP 56.

III.    THE COURT SHOULD GRANT PLAINTIFFS' MOTION [AND DENY DEFENDANTS'] FOR THE REASONS SET FORTH IN THE OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT.

Plaintiffs respectfully refer the Court to the Opposition to Plaintiffs' Motion for Partial Summary Judgment for the argument of other issues.

Respectfully submitted,

SIDNEY L. SHUSHAN, #12055
JONATHAN M. SHUSHAN, #21977
BRIAN L. GLORIOSO, #27226
Guste, Barnett & Shushan, L.L.P.
639 Loyola Avenue, Suite 2500
New Orleans, Louisiana 70113-7103
Telephone: (504) 529-4141
Facsimile:  (504) 561-0326
Sidney L. Shushan Direct Line: (504) 681-4519
Attorneys for Plaintiffs,
Jane Galiano and Gianna, Inc.

EASTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

| | | |
|---|---|---|
| JANE GALIANO, AND GIANNA, INC. | * | CIVIL ACTION NO. 00-0071 |
| *Plaintiffs* | * | |
| | * | |
| | * | |
| VERSUS | * | SECTION " E " " (5) |
| | * | |
| | * | JUDGE MARCEL LIVAUDAIS, JR. |
| | * | |
| HARRAH'S OPERATING CO., INC., | * | |
| AND | * | |
| HARRAH'S ENTERTAINMENT, INC. | * | MAGISTRATE: JUDGE ALMA CHASEZ |
| *Defendants* | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * *

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing pleading has been served upon:

Mr. Joseph W. Looney, T.A.
Ms. Melissa S. LaBauve
Adams and Reese LLP
4500 One Shell Square
New Orleans, Louisiana 70139
Attorney for Defendants,
Harrah's Operating Co., Inc. and
Harrah's Entertainment, Inc.

by hand delivery of a copy of same on the 26 day of March, 2002.

BRIAN L. GLORIOSO

**SEE RECORD FOR
EXHIBITS
OR
ATTACHMENTS
NOT SCANNED**