

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2002 APR -2 PM 4: 45

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JANE GALIANO and GIANNA, INC. | * | CIVIL ACTION |
| Plaintiff | * | |
| | * | No. 00-0071 |
| versus | * | |
| | * | SECTION "E"(5) |
| HARRAH'S OPERATING CO., INC. | * | |
| And | * | Judge Livaudais, Jr. |
| HARRAH'S ENTERTAINMENT, INC. | * | |
| Defendant | * | Mag. Chasez |
| | * | |

********************************************

### OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
### ON THE SETTLEMENT AGREEMENT

1.    **Plaintiffs Have Not Proven the Settlement Agreement Was Initially Valid Or Subsequently Ratified.**

Plaintiffs did not authorize Mr. Buhrer either by the Articles or By-Laws to sign the Settlement Agreement, contrary to their argument at page 11 of their brief and "Undisputed Fact" No. 1. Indeed, the vice president's role is nowhere set out in any of the Articles or the By-Laws. There is no indication or evidence that either the Executive Committee or the Board of Directors authorized Mr. Buhrer to sign the Settlement Agreement.

Plaintiffs also misstate the deposition testimony in support of their Undisputed Fact No. 3. Plaintiffs reference a page of Galiano's deposition that does not support the statement. To the contrary, Galiano testified that after she learned Mr. Buhrer had signed the Agreement, she asked him, "Who gave you the authorization to sign on my behalf?" Galiano Deposition, March 13,



2002, p. 209 lines 11-12.  Although Mr. Buhrer's deposition is cited in support on Undisputed Statement No. 3 the page referred to contains his testimony that in fact he did not recall Galiano leaving the meeting but for that matter he didn't recall her being there either, nor did he remember anyone leaving.  Scott Buhrer Deposition, March 16, 2001, p. 102, lines 1-3, 10.

Plaintiffs' reference to the *Oliver, Martin Fuel and Cartinez* decisions are unavailing.  In *Oliver*, the court found no express agency agreement or implied agency.  The court based the opinion on deposition testimony and commented that the plaintiff's argument on appeal was "conclusory and provides this court with nothing new to review."

The *Martin Fuel* case held that "in an action based on the existence of an agency relationship, the relationship has to be clearly established and can't be presumed."  That relationship was found to be established by means of a written power of attorney which was filed of record, precisely the kind of evidence that plaintiffs lack in this case.

In *Cartinez*, the court specifically found that there was no evidence of actual authority to contract on the part of the purported mandatary, as the purported principal had made no manifestation that the would-be mandatary was authorized to engage in the particular transaction involved.

Plaintiffs' reliance on the supposed series of negotiations and letters prior to the Settlement Agreement fails to establish the requisite agency.  Mr. Buhrer may have been the contact person and may have been negotiating for a new design agreement, but such functions do not necessarily amount to authority to bind the principal, any more than in the case of an attorney who serves as contact person and negotiator for his client.

Similarly, plaintiffs' argument that Mr. Buhrer himself believed he had authority to act for the plaintiff is not material as to the effectiveness of a mandate as to third parties.

2

Plaintiffs' argument on ratification is answered, defendants feel, in their own brief on the issue of ratification. Plaintiffs' reliance on the 1844 decision relating to filing of suit by a third-party beneficiary is not controlling. For one thing, plaintiffs' filing of suit was not an unequivocal statement that Buhrer had authority because it was pled in the alternative with a claim under the Design Consulting Agreement. Throughout the course of these proceedings, and hard upon the filing of this motion, plaintiffs have refused to commit to whether they ratified the agreement or not and whether the agreement was binding or not. It is only this late-coming strategy that has resulted in plaintiffs taking a position. Thus the lawsuit itself was not the unambiguous and unequivocal statement of ratification required by the law.

### 2. Plaintiffs Have No Evidence That Harrah's Breached The Settlement Agreement

Defendants' memorandum in support of their own Motion for Partial Summary Judgment has demonstrated that none of the uniforms in use at Harrah's properties after May 6, 1996, were or are Gianna designs. Relying on testimony of the suppliers Uniform Ideas, Inc. and All Bilt Uniform Fashions, Inc., Harrah's has shown beyond dispute that only a handful of Gianna designs were ever made into uniforms. None of those was purchased after May 6, 1996, the date of the Settlement Agreement that plaintiffs claim was breached.

Gianna's only remaining theory is that All Bilt's designs for Harrah's uniforms came from Gianna's designs. Plaintiffs maintain that "[Harrah's] employees worked with All Bilt to use the plaintiffs' designs for millions of dollars worth of costumes for their subsidiaries." Plaintiffs' Opposition to Harrah's Motion for Partial Summary Judgment, p. 13.

Plaintiffs have not connected Harrah's with any of the Gianna designs during the post-settlement agreement process of creating the All Bilt designs. There is not a scintilla of evidence that Harrah's "used" or "worked with" any of the Gianna designs after May 6, 1996. All Bilt's

3

designer Linda Gunnerson was deposed twice – on April 23 and December 13, 2001. Connie Albright, who was in charge of procuring uniforms for the casinos, gave a deposition on February 19, 2001. Plaintiffs took full advantage of the opportunity to question these witnesses, and yet developed no evidence whatsoever of any complicity of Harrah's in any offending conduct by All Bilt, Uniform Ideas or anyone else. Plaintiffs' motion papers are remarkable primarily because they lack any reference to deposition testimony to support their allegations that Harrah's used any Gianna designs during All Bilt's creation of its own designs.

Plaintiffs keep their allegations general and vague, avoiding any careful analysis of the deposition "annexes" they submitted. On summary judgment motions, it is incumbent on the party seeking the motion, however, to prove he is entitled to judgment as a matter of law. It is also incumbent on the movant to produce evidence to support his allegations and pleadings. The annexes plaintiffs submit fail to disclose any evidence that Gianna designs were used *by Harrah's* after May 6, 1996, the date of the Settlement Agreement.

Plaintiffs' case against Harrah's lacks any and all evidentiary support. Plaintiffs' vague allegation that "Harrah's used plaintiffs' designs because All Bilt created patterns for Harrah's using literal copies of plaintiff's designs," see, Plaintiffs' Motion for Summary Judgment under the Settlement Agreement per New Undisputed Facts and Legal Authorities, p. 21, is unsupported and unsupportable. Similarly unsupported are plaintiffs' statements that Harrah's "used" plaintiffs [sic] designs because All Bilt manufactured for Harrah's designs which are almost literal copies of plaintiffs; [sic] designs." *Id.* At page 23 of the same brief, plaintiffs make similar allegations, again without any evidentiary support. *Id* p. 23.

Plaintiffs would create a Ponzi-like appearance of support by citing to their own list of Undisputed Material Facts (statements 12, 13 and 15). But a cursory review of those statements shows they, too, are bankrupt in terms of evidentiary support.

Plaintiffs similarly allege in their Statement of Undisputed Material Facts in Support of Motion for Partial Summary Judgment on Liability against defendants Harrah's Operating Company, Inc. that the persons at Harrah's who worked with All Bilt were Connie Albright and Jan Starnes. See, Statement of Undisputed Material Facts/Partial Summary Judgment on Liability against Harrah's Operating Company, Inc., p. 6, statement 4. Although the statement purports to refer to depositions, no specific page is "cited." The depositions referred to are of Ms. Albright and Ms. Gunnerson. Plaintiffs opted not to take the deposition of Ms. Starnes. Contrary to statement 4, however, Connie Albright nowhere testified that she or Jan Starnes used Gianna's designs after May 6, 1996.

Plaintiffs questioned All Bilt designer Gunnerson during her April 23, 2001, deposition whether she had any discussions with anyone at Harrah's while she was developing the Range designs. Exhibit 2, Deposition of Linda Gunnerson, April 23, 2001, p. 26 lines 20-22 (exhibit #1 not used). Ms. Gunnerson testified that that's how All Bilt generally works, but that she was not sure with whom she had contact, or the time frame of that contact. She also mentioned that another gentleman was hired as a "go-between." Exhibit 2, Gunnerson Deposition, *supra*, p. 27 lines 2-5. Notably, plaintiffs follow-up question was whether Harrah's ever conveyed to her that "there were some things about certain Gianna designs which they liked and certain things which they didn't like." Exhibit 2, *Id*, p. 27 lines 6-9. All Ms. Gunnerson was able to answer was, "I don't recall. Possibly." Exhibit 2, *Id*. line 10. Ms. Gunnerson testified that she did not recall

any discussions with the people at Harrah's about any of the Gianna designs. Exhibit 2, *Id*, p. 27 lines 11-14.

Plaintiffs' counsel also pursued questioning about of Gianna's purported influence over the All Bilt casino shirts. But Ms. Gunnerson stated that Harrah's did not suggest to her the use of the two panels on the casino shirt that she recalled. Exhibit 2, *Id*. p. 38 lines 11-21. She further explained to plaintiffs' counsel that the only suggestions Harrah's would have made during the design process were concepts and general direction, as would every account of All Bilt; Ms. Gunnerson never connected Harrah's with any specific Gianna design or indeed with the Gianna designs as a whole.

Plaintiffs have placed a great deal of emphasis in this case on the Gold Card jacket. Plaintiffs specifically asked Ms. Gunnerson about the jacket's development. She was not sure how the Gold Card jacket (illustrated in Exhibit 18 to the deposition) came about, other than that the color idea came from Harrah's. Exhibit 2, *Id*. page 43 lines 7-14, p. 45 lines 7-8. Ms. Gunnerson remembered being in Harrah's office and that "it was a very spur-of-the-moment thing.". She said, "I remember utilizing something that we had done before." She continued to state she did not know whether she showed Harrah's the actual garment All Bilt had made or "just sketched something up quick for them." Exhibit 2, *Id*. p. 75 lines 10-14.

Plaintiffs took another deposition from Ms. Gunnerson on December 13, 2001. This time they asked her again about any input from Harrah's in the design process for All Bilt's casino shirts. She said that she was not sure what level of input Harrah's may have had. She testified that she was at a meeting about the casino shirts with Harrah's, but "I don't know how much input, if any, there was." Exhibit 3, Gunnerson Deposition, December 13, 2001, p. 84 lines 13, 19. She was specifically asked what input Connie Albright had into the design of the casino

shirt. Her answer was, "Again, I don't remember the specifics of how – it is a pretty basic shirt. I know that I came up with the star fabric." Exhibit 3, *Id*. p. 93 lines 11-16.

Plaintiffs also took the deposition of Connie Albright. Ms. Albright testified that it was Disney that came up with the Gold Card idea, a very tailored jacket and selected gold as one color. Exhibit 4, Deposition of Connie Albright, February 19, 2001, p. 133 lines 18-23. Ms. Albright explained that All Bilt was helpful in the uniform designing process, getting the designs to actually fit the employees and to actually work. Ms. Albright commented that All Bilt was familiar with the casino industry and had designed for other casinos. All Bilt and Harrah's worked together building the samples and prototypes, and Harrah's then trying and testing on employees and getting input. Exhibit 4, *Id*. page 134 lines 2-12.

Noticeably absent from all the depositions is any evidence that Harrah's worked with any actual Gianna designs after May 6, 1996, whether in conjunction with All Bilt or otherwise.

The Fifth Circuit has held that the principal function of the Motion for Summary Judgment "is to show that in the absence of factual disputes, one or more of the essential elements of a claim or defense before the court is not in doubt and that, as a result, judgment should be entered on the basis of purely legal considerations." *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir. 1986). "If the movant bears the burden of proof on an issue he must establish beyond peradventure all of the essential elements of the claim * * * to warrant judgment in his favor." *Id*.

Plaintiffs have had ample time allowed for discovery, but there is a complete absence of proof of an essential element of their case. As the Fifth Circuit stated, "There is no sound reason why conclusory allegations should suffice to require a trial when there is no evidence to support them." The court noted that absent direct, circumstantial or inferential evidence that would

create a genuine issue of fact, and absent any suggestion concerning the utility of additional time for further discovery, the motion to dismiss the claim should be granted. *Id.*

The court cited the Advisory Committee on Civil Rules for the proposition that "the very mission of the summary judgment procedure is to pierce the pleadings and to asses the proof in order to see whether there is a genuine need for trial." The court noted that to permit the pleadings themselves to carry a case to trial when they "rest only on the invention of counsel" would permit ultimate circumvention of the Federal Rule of Civil Procedure 11. "Some evidentiary material should be available to support each essential element of the claim." Here, there is no evidentiary material to support the allegation that Harrah's used any specific Gianna design or the group as a whole, during All Bilt's design process after May 6, 1996. For that reason, the breach of contract claim must be denied.

## CONCLUSION

The Plaintiffs' Motion For Summary Judgment on the Settlement Agreement should be denied.

Respectfully submitted,

**ADAMS AND REESE LLP**

Joseph W. Looney, T.A. (8773)
Melissa S. LaBauve (25745)
Kristen P. Biever (27382)
4500 One Shell Square
New Orleans, LA 70139
Tel: (504) 581-3234
Fax: (504) 566-0210
***Attorneys for Defendant, Harrah's Operating Co., Inc.***

8

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of April 2002, I have served a copy of the foregoing pleading on counsel for plaintiffs by Hand Delivery.

2

1

EASTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

JANE GALIANO, and GIANNA,          )
                                   )
INC.,                              )
                                   )
            Plaintiffs,            )
                                   )
      versus                       )
                                   )
HARRAH'S OPERATING CO.,            )
                                   )
INC.,                              )
                                   )
      - and -                      )
                                   )
HARRAH'S ENTERTAINMENT,            )
                                   )
INC.,                              )
                                   )
            Defendants.            )
_____)

# COPY

Civil Action No.

00-0071

DEPOSITION OF LINDA GUNNERSON

New York, New York

Monday, April 23, 2001

> **EXHIBIT**
>
> 2

Reported by:
LINDA DEVECKA
JOB NO. 120769B



ESQUIRE
DEPOSITION SERVICES

216 East 45th Street, 8th Floor
New York, NY 10017-3304
212.687.8010 • 800.662.3287
Fax 212.557.5972

1                        Gunnerson

2        Q.      What do you mean by "pretty common type

3    design"?

4        A.      Most chef's attire is a jacket.   It

5    generally has buttons down both sides like a

6    double-breasted type of a look.   It comes either

7    with plastic buttons or not buttons.   Generally

8    every chef coat I have ever seen has a Mandarin

9    collar or standard stand collar.

10        Q.      Is it your testimony that all the

11    designs you did for Harrah's were completely

12    original and that any similarity with Gianna's

13    design is purely accidental?

14        A.      Specific for this Range?

15        Q.      Anything in the collection that you

16    did.

17        A.      No, I wouldn't say that.   I would

18    probably need to talk about each particular item

19    to make that determination.

20        Q.      Did you have any discussions with

21    anyone at Harrah's while you were in the process

22    of developing these designs for Harrah's?

23        A.      Absolutely.   That's how we work.

24        Q.      Who did you talk to?

25        A.      Connie Albright, Jan Stearns.   I was

1    Gunnerson

2    trying to remember if she was initial or if it was

3    after.  I'm not really sure what the time frame

4    was there.  Also another gentleman that they had

5    hired as a go-between was Alan Lauri.

6    Q.    Did any of these people at Harrah's

7    ever convey to you that there were some things

8    about certain Gianna designs which they liked and

9    certain things which they didn't like?

10    A.    I don't recall.  Possibly.

11    Q.    Do you recall whether any of the Gianna

12    designs entered into your discussions with any of

13    these people with Harrah's?

14    A.    I don't recall specifically.  Possibly.

15    Q.    You said a little while ago that if you

16    went back through your collection design by design

17    you might be able to comment more specifically on

18    what the process was.

19         Would that be a fair statement or have

20    I misinterpreted what you said?

21    A.    Possibly.  You were referring to a very

22    general scope and without looking, it was a number

23    of years ago, I would really have to look at

24    something to be more specific, to be accurate

25    about that.

1                    Gunnerson

2  Gianna does not look familiar to me at all.

3       Q.    It's just an accident that it has two

4  vertical panels and a Mandarin collar?

5       A.    Actually it has three vertical panels

6  and a Mandarin collar.

7       Q.    It has two vertical panels and a center

8  placket; would that be a better description?

9             MR. LOONEY:  Let's quit arguing with

10       the witness.

11      A.    No, I wouldn't think that they are the

12 same shirt looking at the sketch and the product

13 that we produced.

14      Q.    Why are they not the same shirt?

15      A.    Because it's all color blocked with

16 three panels going down.  It's a tri-panel as

17 opposed to a bi-design with two designs going

18 down.

19      Q.    Did anyone at Harrah's suggest to you

20 that it might be a good idea to use two panels?

21      A.    Not that I recall.

22      Q.    Is it possible that it happened and at

23 this point in time you just wouldn't recall, you

24 just might not recall everything that Harrah's

25 suggested to you?

43

1                        Gunnerson

2            MR. SHUSHAN:  Yes.  And a Mandarin

3       collar.

4            MR. FLANAGAN:  And a Mandarin collar.

5       Okay.

6            MR. SHUSHAN:  That's correct.

7       Q.    Let's look at another one.  Let's look

8    at the one which I marked with a Post-It note 18

9    which has the letter D on the back.

10           Do I recall correctly your testimony to

11   the effect that you might have seen that one

12   before?

13      A.    Possibly, yes.  I'm not sure how this

14   particular one came about.  This was a very early

15   on one.

16      Q.    Can you explain that for me, meaning

17   you are not sure how it came about.

18      A.    I don't recall where -- I think the

19   color combination was something that Harrah's

20   requested.  As for the style of the garment, I'm

21   not sure where that was derived from, as it

22   pertains to the female.

23           The male garment was something that I

24   put together to coordinate with the female one and

25   I'm not sure really if it was an existing pattern

1                          Gunnerson

2    disagree with him?

3              MR. LOONEY:   Let me object to the form.

4         Q.    Please answer the question.

5         A.    I wouldn't disagree with him, I just

6    don't recall where the origin of this one in

7    particular came from.   I do remember that the

8    color came from as directed by Harrah's.

9         Q.    Perhaps the overall cut or silhouette

10   of the female garment?

11        A.    Possibly.

12        Q.    Do you have any recollection of whether

13   the Total Gold jacket that we have just been

14   talking about, which is number D and marked on the

15   front as Exhibit 18, went into production or not?

16        A.    Yes, it did go into production.

17        Q.    You wouldn't know which casinos ordered

18   it or in what quantities, correct?

19        A.    I know a number of them use this.   As

20   far as quantities, I don't know.

21        Q.    Do you have any recollection of how

22   long they used it?

23        A.    No, I don't know how long they used it.

24        Q.    Would it be fair to say Mr. Wecksler

25   was involved in the process of communicating -- he

Gunnerson

1

2 any input from or communication about the jacket

3 with anyone from Harrah's?

4      A.      We were working in Harrah's offices

5 when I believe we were talking about this.  I am

6 sitting here trying to remember how the jacket

7 came to be.  I don't know if we brought documents

8 with us that we adapted.

9            The more I am sitting here thinking

10 about it, I remember being in their offices and it

11 was a very spur-of-the-moment type of thing and I

12 remember utilizing something that we had done

13 before.  I don't know if we actually had a garment

14 or I just sketched something up quick for them.

15 I'm really not sure --

16            Again, I don't recall specifically how

17 it came to be.

18      Q.      Do you remember whether one of the

19 persons you were working with at Harrah's in

20 connection with the jacket was Connie Albright?

21      A.      Yes.

22      Q.      Do you remember whether or not Connie

23 said anything to you about a survey or study that

24 was done by Walt Disney in connection with any of

25 these uniforms?

1

2                    EASTERN DISTRICT OF LOUISIANA

3                    UNITED STATES DISTRICT COURT

4
   JANE GALIANO and GIANNA,        )
5  INC.,                           )
                                   )
6              Plaintiffs,         )
                                   )
7         vs.                      ) No. 00-0071
                                   )
8  HARRAH'S OPERATING CO., INC.    )
   and HARRAH'S ENTERTAINMENT,     )
9  INC.,                           )
                                   )
10             Defendants.         )
   ----------------------------)

11

12

13

14             DEPOSITION OF LINDA GUNNERSON

15                  New York, New York

16             Thursday, December 13, 2001

17

18

19

20

21

22

23  Reported by:
    PAMELA J. MAZZELLA, RPR
24  JOB NO. 129113A

25

EXHIBIT

3

82

Gunnerson

1 and this was one that I found in the folder.

2    This was done for Harrah's, the position

3 looks like bar back, and the pattern A B 832.

4    Q.   Do these pages go together, pages K

5 through N?

6    A.   Yes, they do.

7    Q.   And is some of your work product on

8 those pages, namely the drawings?

9    A.   The drawings again, the handwritten, the

10 front page is Walter Schwab's, who wrote the spec

11 sheet.

12    Q.   How about the handwriting in boxes with

13 arrows pointing to the drawings, is that yours?

14    A.   Again on page K it is Walter Schwab's

15 writing as well.

16    Q.   Is there a date on any of these pages

17 that would tell us when it was, when it was done?

18    MR. FLANAGAN:   May I see those for a

19 second, please?

20    MR. SHUSHAN:   Sure.

21    Q.   Is there a date anywhere on any of those

22 pages to show us when the spec sheet was done, or

23 any of the other sheets were done?

24    A.   I do not see a date.

83

Gunnerson

1    Q.   Is there any way that you can tell us,

2 for instance, whether this design was done, whether

3 you did this design before or after, let's say, the

4 design on page I, which I think you said was dated

5 1994?

6    A.   This one was definitely done after

7 because I remember doing this sketch at Harrah's

8 New Orleans. Not New Orleans, Harrah's Memphis.

9    I brought my markers with me and we kind

10 of designed a lot of stuff together.

11    Q.   That would have been '95 or '96?

12    A.   I would guess so, just based on the

13 other documents around, a time frame.

14    Q.   At the time you did that design, if you

15 remember, was Gianna/Jane Galiano still working

16 with Harrah's in some capacity?

17    A.   Not to my knowledge. I know she was not

18 present at any meetings from this point forward

19 that I had been involved with.

20    Q.   And does the design tell us anything

21 about the material out of which the front placket

22 is to be made?

23    A.   Yes, it is a fabric from Raxon that I

24 had had in my office. It was an old pattern from

84

Gunnerson

1 Raxon and it has a style number. It was a stock

2 star fabric that they had in their line.

3    Q.   Could you put a circle around that,

4 please. Put a circle around the language that you

5 just referred to.

6    A.   The information referring to the fabric?

7    Q.   Yes, ma'am.

8    Was Connie Albright or anyone who worked

9 for Harrah's involved in the design of the garment

10 shown on page K?

11    MR. LOONEY:   Object to the form, vague.

12    A.   I was at a meeting with Connie Albright.

13 I'm not sure who else was there at that time. It

14 might have been a gentleman Alan Laurie, who I

15 think has since passed away, was at that meeting.

16 As for the level of input, I'm not really certain

17 what that was.

18    Q.   Did Connie Albright have some level of

19 input into that decision?

20    MR. LOONEY:   That has been asked and

21 answered.

22    MR. SHUSHAN:   No, it hasn't.

23    Q.   Please answer the question.

24    A.   I don't know. She was at the meeting,

85

Gunnerson

1 but I don't know how much of an input, if any,

2 there was.

3    Q.   The words "back pleat" down on page K on

4 the right, what does that refer to?

5    A.   Back pleat refers to that it is a back

6 pleat. And over here it describes further inverted

7 back pleat, which is like an inside box pleat.

8    Q.   Did the design on page I have a inverted

9 back pleat, or can you tell?

10    A.   I can't really tell what this says here.

11 It looks like it says back length. I don't believe

12 so.

13    Q.   What about the design on page F, did

14 that have an inverted back pleat or can you tell?

15    A.   Based on page H of that document, it

16 says "No pleat in back."

17    Q.   Let's go back, the last one I asked you

18 about, which was K.

19    What about the cuffs, does it describe

20 the cuffs in any detail, as to what goes in the

21 cuffs?

22    A.   It says "Combo black with 218 cordedge

23 gold metallic." That is --

24    Q.   Is there any braid or embroidery on the

90

Gunnerson

1
2  A.  Yes. Were these together or --
3  Q.  Do they go together? The witness is
4  referring to pages S, T and U I think, which do
5  they all three have the same sketch or drawing?
6  A.  Yes, I believe they were together when I
7  had sent them.
8  Q.  And that's a Gianna and Jane Galiano
9  sketch, correct?
10  A.  Correct.
11  Q.  Is there any of your work product on
12  these three pages?
13  A.  No, these are the same documents that
14  you showed me earlier in the deposition.
15  Q.  This is Mr. Walter Schwab?
16  A.  Correct.
17  Q.  And the date is January '96, correct?
18  A.  January '96, 25th.
19        MR. LOONEY:  I object to the
20  highlighting on this --
21        MR. SHUSHAN:  Yep. I believe we
22  discussed that earlier in the deposition.
23  Q.  The words which are highlighted on page
24  U at the top, I believe you testified that was not
25  your handwriting, correct?

91

Gunnerson

1
2  A.  Correct.
3  Q.  That was the handwriting of Mr. --
4  A.  Wecksler.
5  Q.  -- Wecksler. And this at the bottom
6  where it says "Gold Card shirt" is highlighted on
7  page U.
8        Whose handwriting is that, if you know?
9  A.  I do not know, but it possibly may have
10  been one of his assistants at the time. I don't
11  remember.
12        MR. FLANAGAN:  Do you know how it got
13  highlighted?
14        THE WITNESS:  I don't believe I did it.
15  I only -- I did highlight some things that were
16  like suspender, placket, something specific to what
17  I was requested to show.
18        MR. LOONEY:  I will also state that the
19  copy I received from Mr. Flanagan was not
20  highlighted, so at least I got a different version.
21  Unless counsel, Mr. Shushan highlighted it, maybe
22  that would explain it.
23        MR. SHUSHAN:  It is very possible
24  somebody in our office highlighted those words
25  because we wanted to ask the witness about those

92

Gunnerson

1
2  words.
3        MR. LOONEY:  Thank you.
4        MR. SHUSHAN:  I think that is probably
5  the most logical explanation for the highlighting.
6  So we don't disagree about everything, just many
7  things.
8  BY MR. SHUSHAN:
9  Q.  The next group that we got as a group I
10  have marked V, W, X, Y.
11        Can you identify those for us, please?
12  A.  Again it is a spec sheet, it is listed
13  as Harrah's pit clerk, AB 882, it is indicated here
14  as a house sample.
15  Q.  Dated March 1996?
16  A.  Correct.
17  Q.  And the drawing is yours?
18  A.  The drawing is mine.
19  Q.  And the handwriting is not yours?
20  A.  It is -- let me go through it, please.
21  On V is Walter Schwab's, as well as W, and X looks
22  like our pattern-maker Jack Zaccheo's handwriting.
23        And the last page, Y, are my sketches,
24  my writing of pit clerk player tracking. Gold no
25  cordedge, resketch are mine, but the word

93

Gunnerson

1
2  "Harrah's" is not mine.
3  Q.  Are the words in your handwriting done
4  some later date, or were they done at the time the
5  documents were prepared?
6  A.  This sketch was again done at that same
7  meeting where the previous document we talked
8  about, and I was sketching with my markers and my
9  work pad on the spot.
10  Q.  And Harrah's was represented at that
11  meeting by Connie Albright?
12  A.  I believe she was there. Again I don't
13  know if it was Alan Laurie at that point. This was
14  a pretty early meeting.
15  Q.  Okay. Do you have any recollection as
16  to any, what input, if any, Connie Albright had
17  into the design?
18  A.  Again I don't remember the specifics of
19  how -- it is a pretty basic shirt. I do know that
20  I came up with the star fabric.
21        Again I had brought some samples with me
22  from that we had in our shop. I believe the
23  original we did was, I believe Resorts was
24  originally blue with silver stars we had done a
25  long time ago.

1       IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF LOUISIANA

2

3 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

JANE GALIANO, and GIANNA, INC.,

4
            Plaintiff,

5
Vs.          Case No. 00-0071
6           Section "E" (5)

7 HARRAH'S ENTERTAINMENT, INC.,

8          Defendant.

9 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

10

11

12

13

14     THE DEPOSITION OF CONNIE ALBRIGHT

15        February 19, 2001

16

17

18

19

20    MORROW, SANDERS & ASSOCIATES
          COURT REPORTERS
21    Suite 420 - 80 Monroe
         Brinkley Plaza
22   Memphis, Tennessee 38103
        (901) 528-1168

23

24

25

**EXHIBIT**

4

## Page 133

1 front of the customer, were they responsible for
2 handling money, did they need a more professional
3 image, a more entertaining image, did they need
4 to stand out, did they need to blend into the
5 background such as environmental worker who was
6 cleaning. And that professionalism when they
7 talked about being professional.
8      MR. SHUSHAN: I am going to object
9 to the whole concept. Are we in the same solar
10 system as the specific facts of the relationship
11 between Gianna and Harrah's?
12      MS. LaBAUVE: I am getting there.
13      MR. SHUSHAN: This is a deposition.
14 She can't make a speech. You have to ask her a
15 question, she gives an answer.
16      MS. LaBAUVE: I am getting there. I
17 am waiting for her to finish.
18 Q.    Did Disney ever mention the idea of
19 using a gold card?
20 A.    A gold card, they recommended that it
21 had to be very professional, very tailored, and
22 they even suggested using gold as the primary
23 color.
24 Q      When you began working with
25 manufacturers such as All Built and getting these

## Page 134

1 uniforms out and onto the employees, was All
2 Built helpful in actually recreating these
3 designs and getting them to actually fit the
4 employees and to actually work?
5 A.    Yes, they worked very closely with us,
6 number one, they offered us a designer to use.
7 We had design capabilities and they were very
8 familiar with the casino industry because they
9 had designed for other casinos and worked with us
10 and actually built samples and designs that we,
11 actually prototypes, that we would try and test
12 on employees and get the input.
13 Q.    And one thing that was mentioned earlier
14 was the design consulting agreement which has
15 been marked as Exhibit Number 18. I think there
16 was a question as to whether Ms. Galiano in fact
17 did sign that and I do have a signed copy which I
18 would like to attach.
19      MR. SHUSHAN. Okay, no problem.
20      MS. LaBAUVE We will mark this as
21 28.
22      (The above-mentioned document was
23 marked Albright Exhibit 28.)
24 Q.    I would like to ask a question about the
25 invoices that Ms. Galiano submitted to Harrah's

## Page 135

1 for payment and I will attach this as Exhibit
2 Number 29. This appears to be an invoice
3 detailing which items she worked on and which
4 particular dates. Do you know what ink and wash
5 means?
6 A.    I have no idea
7      (The above-mentioned document was
8 marked as Albright Exhibit 29.)
9 Q.    During the course of the settlement
10 agreement were there discussions as to who
11 contributed what to which designs?
12 A.    Yes, we took the actual sketches and
13 there were numbers written up, I believe in the
14 upper right-hand corner as to percentages of
15 input and.
16 Q.    So that was a reflection of input?
17 A.    From Gianna and I, and the agreement was
18 made of who designed it, if it was collaborative
19 or not.
20 Q.    When you started this project with Ms.
21 Galiano at the time that the design consulting
22 agreement was signed, September of 1995, did you
23 know fully what a designer was supposed to
24 accomplish?
25 A.    Not completely. I was a novice and I

## Page 136

1 admit that openly. I was not aware that the
2 design concept including designing, making
3 samples and all the way through to manufacturing
4 which was normal in the uniforming industry.
5      MS. LaBAUVE: I think that's all I
6 have.
7      MR. SHUSHAN: Nothing further. I
8 think we're done.
9      AND FURTHER DEPONENT SAITH NOT
10      SIGNATURE NOT WAIVED
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 133

1  front of the customer, were they responsible for
2  handling money, did they need a more professional
3  image, a more entertaining image, did they need
4  to stand out, did they need to blend into the
5  background such as environmental worker who was
6  cleaning. And that professionalism when they
7  talked about being professional.
8          MR. SHUSHAN: I am going to object
9  to the whole concept. Are we in the same solar
10 system as the specific facts of the relationship
11 between Gianna and Harrah's?
12         MS. LaBAUVE: I am getting there.
13         MR. SHUSHAN: This is a deposition.
14 She can't make a speech. You have to ask her a
15 question, she gives an answer.
16         MS. LaBAUVE: I am getting there. I
17 am waiting for her to finish.
18 Q.   Did Disney ever mention the idea of
19 using a gold card?
20 A.   A gold card, they recommended that it
21 had to be very professional, very tailored, and
22 they even suggested using gold as the primary
23 color.
24 Q.   When you began working with
25 manufacturers such as All Built and getting these

Page 134

1  uniforms out and onto the employees, was All
2  Built helpful in actually recreating these
3  designs and getting them to actually fit the
4  employees and to actually work?
5  A.   Yes, they worked very closely with us,
6  number one, they offered us a designer to use.
7  We had design capabilities and they were very
8  familiar with the casino industry because they
9  had designed for other casinos and worked with us
10 and actually built samples and designs that we,
11 actually prototypes, that we would try and test
12 on employees and get the input.
13 Q.   And one thing that was mentioned earlier
14 was the design consulting agreement which has
15 been marked as Exhibit Number 18. I think there
16 was a question as to whether Ms. Galiano in fact
17 did sign that and I do have a signed copy which I
18 would like to attach.
19         MR. SHUSHAN: Okay, no problem.
20         MS. LaBAUVE: We will mark this as
21 28.
22         (The above-mentioned document was
23 marked Albright Exhibit 28.)
24 Q    I would like to ask a question about the
25 invoices that Ms. Galiano submitted to Harrah's

Page 135

1  for payment and I will attach this as Exhibit
2  Number 29. This appears to be an invoice
3  detailing which items she worked on and which
4  particular dates. Do you know what ink and wash
5  means?
6  A.   I have no idea
7          (The above-mentioned document was
8  marked as Albright Exhibit 29.)
9  Q.   During the course of the settlement
10 agreement were there discussions as to who
11 contributed what to which designs?
12 A.   Yes, we took the actual sketches and
13 there were numbers written up, I believe in the
14 upper right-hand corner as to percentages of
15 input and.
16 Q.   So that was a reflection of input?
17 A.   From Gianna and I, and the agreement was
18 made of who designed it, if it was collaborative
19 or not.
20 Q.   When you started this project with Ms.
21 Galiano at the time that the design consulting
22 agreement was signed, September of 1995, did you
23 know fully what a designer was supposed to
24 accomplish?
25 A.   Not completely. I was a novice and I

Page 136

1  admit that openly. I was not aware that the
2  design concept including designing, making
3  samples and all the way through to manufacturing
4  which was normal in the uniforming industry.
5          MS. LaBAUVE: I think that's all I
6  have.
7          MR. SHUSHAN: Nothing further. I
8  think we're done.
9          AND FURTHER DEPONENT SAITH NOT
10         SIGNATURE NOT WAIVED
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| JANE GALIANO and GIANNA, INC. *<br>        Plaintiff     *<br>     *<br>versus     *<br>     *<br>HARRAH'S OPERATING CO., INC. *<br>And     *<br>HARRAH'S ENTERTAINMENT, INC. *<br>        Defendant   *<br>     * | CIVIL ACTION<br><br>No. 00-0071<br><br>SECTION "E"(5) |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### HARRAH'S OPERATING COMPANY, INC.'S LIST OF CONTROVERTED FACTS IN RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendant Harrah's Operating Co, Inc.'s Controverts the Statement of

Motion For Summary Judgment Under The Settlement Agreement per New

Undisputed Facts and New Legal Authorities, pursuant Local Rule 56.2E.

1.     Denied. See response to Statement 3, *infra*.

2.     Denied. See response to Statement 3, *infra*.

3.     Denied. The referenced page of the Galiano deposition quotes

Galiano as asking Buhrer after she learned he had signed, "Who gave you the

authorization to sign on my behalf?" Galiano deposition, March 13, 2002, page

209 lines 11-12. Buhrer testified that he didn't recall Galiano leaving the meeting

but for that matter didn't recall her being there either. In fact he didn't

remember anyone leaving. Scott Buhrer deposition, March 16, 2001, page 102

lines 1-3, 10.

4.    Denied. Galiano and her attorneys specifically denied that Buhrer was mandatary.

5.    Denied, except to admit that Buhrer signed the Design Consulting Agreement.

6.    Statement 6 is objected to because it does not comply with the rule that statements be short and concise. Out of an abundance of caution the statement is Denied.

7.    Statement 7 is objected to because it does not comply with the rule that statements be short and concise. Out of an abundance of caution the statement is Denied.

8.    Admitted, but the parenthetical reference to "letters prior" is denied.

9.    Denied; Buhrer testified at the page referenced in Statement 9 that he didn't believe that he ever had Galiano saying it was okay and that he had to have approval.  Buhrer deposition, page 23, lines 12-16.

10.    Denied; the original claim in this case was a copyright infringement claim.

11.    Denied as worded.

12.    Denied.

13.    Denied.

14.    Admitted as to direct payments to plaintiffs; denied as to any other allegation.

15.    Denied.

16.    Denied.

17.    Statement 17 is objected to because it does not comply with the rule that statements be short and concise. Out of an abundance of caution the statement is Denied.

18.    Statement 18 is objected to because it does not comply with the rule that statements be short , concise and factual. Out of an abundance of caution the statement is Denied.

Respectfully submitted,

ADAMS AND REESE LLP

Joseph W. Looney, T.A. (8773)
Melissa S. LaBauve (25745)
Kristen P. Biever (27382)
4500 One Shell Square
New Orleans, Louisiana 70139
Tel: (504) 581-3234
Fax: (504) 566-0210
*Attorneys for Defendant*
*Harrah's Operating Co., Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of April, 2002, I have served a copy of the foregoing pleading on counsel for plaintiffs via facsimile and by hand.

3