United States Court of Appeals
Fifth Circuit
**F I L E D**
July 7, 2005
Charles R. Fulbruge III
Clerk

U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
FILED  JUL 29 2005
LORETTA G. WHYTE
CLERK

# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 04-30521

D.C. Docket No. 2:00-CV-71-E

Consolidated w/04-30806

JANE GALIANO; GIANNA INC

    Plaintiffs - Appellants

v.

HARRAH'S OPERATING COMPANY INC; HARRAH'S ENTERTAINMENT INC

    Defendants - Appellees

Appeals from the United States District Court for the Eastern District of Louisiana, New Orleans.

Before DAVIS, SMITH, and DeMOSS, Circuit Judges.

## J U D G M E N T

This cause was considered on the record on appeal and was argued by counsel.

It is ordered and adjudged that the judgment of the District Court is affirmed in part, dismissed in part, vacated in part, and the cause is remanded to the District Court for further proceedings in accordance with the opinion of this Court.

IT IS FURTHER ORDERED that in case #04-30521 costs are to be taxed against the appellants, and in case #04-30806 costs are to be taxed against the appellees.

ISSUED AS MANDATE: JUL 29 2005

A true copy
Test
Clerk, U.S. Court of Appeals, Fifth Circuit
By _____
Deputy
New Orleans, Louisiana  JUL 29 2005

___ Fee _____
___ Process _____
_X_ Dktd _____
___ CtRmDep _____
___ Doc. No. _____

REVISED JULY 8, 2005

In the

# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 7, 2005

Charles R. Fulbruge III
Clerk

N⁰ 04-30521
N⁰ 04-30806

JANE GALIANO AND GIANNA, INC.,

Plaintiffs-Appellants,

VERSUS

HARRAH'S OPERATING COMPANY, INC.; HARRAH'S ENTERTAINMENT, INC.,

Defendants-Appellees.

Appeals from the United States District Court
for the Eastern District of Louisiana
N⁰ 2:00-CV-71-E

Before DAVIS, SMITH, and DEMOSS,
  Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Gianna, Inc. ("Gianna"), sued Harrah's Entertainment, Inc. ("Harrah's"), for copyright infringement. The district court granted Harrah's' motion for summary judgment on the infringement claim and denied Gianna's motion for summary judgment on Harrah's' fraud on the Copyright Office counterclaim. After the court issued its judgment, in a separate motion Harrah's requested, and the district court granted, attorney's fees. Gianna timely appealed (1) the summary judgment against its copyright infringement claim; (2) the denial of its summary judgment motion involving Harrah's fraud on the Copyright Office counterclaim; and (3) the award to Harrah's of attor-

ney's fees. We have consolidated all issues for appellate argument. We affirm the summary judgment in favor of Harrah's on the infringement claim, dismiss the appeal regarding the denial of summary judgment to Gianna on the counterclaim, and vacate and remand the order awarding attorney's fees.

I.

Jane Galiano is the founder and owner of Gianna, Inc., which designs clothing and counsels various industries regarding their professional attire. In August 1995, Gianna and Harrah's entered into an agreement (the "Design Consulting Agreement") pursuant to which Gianna was to design uniforms for employees of various Harrah's casinos. Subsequent exchanges between the parties resulted in the creation of several proposed sketches.

Because Gianna did not have the capacity to produce patterns of the sketch designs or make the finished uniforms, it entered into a manufacturing agreement (the "Uniform Manufacturing Agreement") with Uniform Ideas, Inc., one of Harrah's' suppliers. That agreement stated that Uniform Ideas, Inc., would manufacture uniforms for Gianna during the period from September 1, 1995, to August 31, 1996. Gianna also contacted All-Bilt Uniform Fashion ("All-Bilt"), another Harrah's supplier, about manufacturing some of the uniform designs. Gianna and All-Bilt did not sign a contract, but All-Bilt produced some prototypes of Gianna-designed uniforms and submitted them for Harrah's' approval.

The design agreement between Gianna and Harrah's expired according to its terms on December 1, 1995. The parties entered into negotiations to extend the contract, but failed to do so and entered into an agreement purporting to settle all disputes in May 1996.[1] Harrah's continued to order Gianna-designed costumes from its suppliers.

In October 1999 Gianna sought and received copyright protection for a collection of sketches entitled "Uniform and Costume Collection submitted to Harrah's Operating Company, Inc."[2] The certificate identified the collection as "Artwork for Wearing Apparel" and classified the work as "2-dimensional artwork." Galiano is identified as the author of the copyrighted work. The collection includes more than fifty colored and numbered illustrations, including sketches of uniform style shirts, blouses, vests, jackets, pants, shorts, ensembles, elaborate masquerade-type costumes, and unique head gear and a dozen pages of silkscreen artwork.[3]

---

[1] According to the district court's opinion, the settlement agreement set a lump sum payment and confirmed a scheme of royalties to be paid to Gianna in the event that Harrah's used certain specified Gianna designs.

[2] Certificate of Registration No. 456-437.

[3] The extent of Gianna's copyrighted collection is not completely clear from the appellate record. The Gianna Collection appears to include the following:

> Uniform Jackets: semi-fitted look, princess lines in front and back, star buttons
>
> Uniform Shirts: asymmetric closures, piped mandarin collar with center front notch, embroidered cuff logo, star buttons, and coin design
>
> Chef Uniform: distinctive bib front, mandarin collar with center front notch, cuff logo and trim, and striped pants.
>
> (continued...)

2

Three months after obtaining the copyright protection, Gianna (with Galiano individually as co-plaintiff) sued in federal district court alleging that Harrah's had breached the May 1996 settlement agreement[4] and committed copyright infringement by continuing to use and order Gianna-designed uniforms. Harrah's counterclaimed for fraud and misuse of the Copyright Office, asserting that Gianna had failed to disclose that the allegedly copyrighted work was not original and that it intended to cover items that are not properly copyrightable.

---

[3](...continued)

    Chef Hats: uniquely shaped like vegetables

    Uniform Shirt: short sleeves, piped mandarin collar with center front notch, jacquard fabric trim on a concealed button or snap placket, with additional jacquard fabric stripes down either side, piped cuff trim, inverted center back pleat with star at the top

    Tuxedo Jackets: distinctive shawl collar styling with a deep V neckline

    Uniform Vests: female has princess lines with unique buckle closure, deep V neckline and a semi-fitted look; male vest also has deep V neckline and two buckle accents on one side of the front

    Uniform Shirt: color-blocked mandarin collar and concentric flanges on front accenting the princess lines, front and sleeves color-blocked

[4] On April 10, 2002, the district court granted Harrah's' motion for partial summary judgment dismissing the breach of contract claim. A panel of this court affirmed the dismissal on May 14, 2003.

II.

To prove copyright infringement, a plaintiff must show ownership of a valid copyright and actionable copying. *See Positive Black Talk, Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 367 (5th Cir. 2004). Accordingly, the district court first determined the extent of Gianna's copyright in her "registered" works. Because copyright law does not allow one to copyright "clothing designs" in which the artistic and utilitarian qualities are indivisible, the court reasoned, Gianna's copyright could not extend to the designs for the wearing apparel depicted in the illustrations referenced in her Certificate of Copyright. The court therefore found that Gianna's copyright is valid only to the extent that it protects the two-dimensional artwork, i.e., the illustrations and silkscreens that comprise the collection. We elaborate on this first holding somewhat extensively here.

The district court relied on much of the material we examine in part II.C.2.b, *infra*, in holding that Gianna's copyright did not extend to the uniform designs. The court explained that copyright protection would be available only for a design's artistic expression and not for the design of the clothing itself. Because the court could not equate the design of the uniforms' buttons, pleats, and collars—though admittedly very creative—to an artistic drawing on a shirt or a fabric design, it concluded that the design's artistic and utilitarian elements were conceptually indivisible and therefore not copyrightable subject matter.

Gianna also relies heavily on the deposition and report of Bonnie Belleau, Ph.D.,[5] who

---

[5] Belleau is Professor of Apparel Design and Production, LSU School of Human Ecology. It (continued...)

3

opined that the Gianna uniform designs are highly artistic and that the utilitarian and aesthetic elements are easily separable. Belleau testified that the Gianna uniforms have a "costume look" as distinguished from a "functional uniform appearance" and therefore should qualify for copyright protection as artistic costumes.[6] Gianna argues that Belleau's report and testimony demonstrate that these designs are not intended merely to enhance the garment's functionality, but to render the design a creative asset.[7]

The district court noted that Belleau set out in some detail the artistic features of the uniforms, but the court found that these features were nothing more than "useful design features of wearing apparel." Because none of these design features has intrinsic value as a work of art that can exist independently of the uniform wearing apparel, the district court concluded, they do not qualify for copyright protection.

Next, the court analyzed whether Harrah's committed "actionable copying" of Gianna's collection, in light of the previously determined scope of copyright. The court differentiated between "direct infringement" and "contributory or vicarious infringement," which are separate and distinct causes of action.

In her original and amended complaints, Gianna alleged that Harrah's "reproduced the copyrighted work in copies" and "prepared derivative works based on the copyrighted works throughout its gambling empire."[8] Therefore, the court concluded, Gianna based its claim on a theory of direct infringement. In its opposition to summary judgment, however, Gianna

---

[5] (...continued)
appears that the primary purpose of her report is to show that the designs manufactured by All-Bilt for Harrah's after the relationship with Gianna ended are "substantially similar" to the designs from the Gianna collection.

[6] In her report, Belleau discusses the artistic qualities of the uniforms such as the

> logo cuff, a piped mandarin collar with a notch at center front, the inverted center back pleat with a star at the top, jacquard fabric trim on a concealed button or snap placket, jacquard fabric stripes down either side, piped cuff trim, princess lines in front and back, star buttons, a flange at the shoulder, concentric flanges on the jacket front, asymmetric closures, button designs, bib front, placement of buckle closures, color blocking, and combinations of fabrics, style lines, trim, and silhouette.

She concludes that "[t]he unique design features are artistic characteristics that are not critical to the functional aspects of the garments, therefore the collection qualifies for copyright."

[7] For example, Gianna notes that its design of the "jacquard fabric stripes down either side" look like suspenders, but are not; this demonstrates that the designer's intent to create an asset that was primarily artistic. Gianna also offers the uniform (continued...)

[7] (...continued)
jacket's "star buttons," which, according to Belleau, "are very distinctive and unique and go beyond the basic functional requirements of a button, and, as such were copyrighted."

[8] We do not extensively address the derivative works argument in this opinion. Although we decline to do so because the argument is under-theorized, we also note that to find infringement based on a derivative works right (the artwork itself is protected) would be to usurp a fairly developed (albeit hotly contested) applied-art jurisprudence that takes the difference between the drawings and the objects depicted in them into full consideration.

4

alleged that Harrah's would be liable for contributory infringement even if there was insufficient evidence of direct infringement. The court considered this additional allegation to constitute Gianna's pleading a new cause of action, which the court refused to allow Gianna to do after four years of litigation in this case. Denying Gianna leave to amend her complaint to add allegations of contributory or vicarious infringement, the court dismissed the infringement claim, holding that Gianna failed to show a material fact issue existed as to whether Harrah's committed "direct actionable copying" of the Gianna collection that was entitled to copyright protection.

We conclude that Gianna did not own a valid copyright in the clothing designs. As a result of this disposition, we do not reach (1) whether Gianna's claim sounded in direct or contributory infringement or (2) whether Gianna could prevail under either theory.

### A.

We have appellate jurisdiction of the district court's final order under 28 U.S.C. § 1291.[9] We review a summary judgment *de novo*, in accordance with the Federal Rule of Civil Procedure 56 analysis that guides the district court. *See Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001).

### B.

This case involves the copyrightability of "pictorial, graphic, and sculptural works" ("PGS" works). These articles may be two- or three-dimensional and include works such as maps, fine or graphic art, diagrams, models, and technical drawings. 17 U.S.C. § 101. If an item qualifies as a "useful article" under the Act,[10] however, it is entitled to copyright protection only to the extent that its artwork or creative design is separable from the utilitarian aspects of the work.

The applicable statute provides the following:

> Copyright protection subsists in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include pictorial, graphic, and sculptural works . . . .

17 U.S.C. § 102(a). The statute then defines what a PGS work is:

> Such works shall include works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned; the design of a useful article, as defined in this section, shall be considered a [PGS] work only if, and only to the extent that, such design incorporates [PGS]

---

[9] Title 28 U.S.C. § 1388(a) conferred original jurisdiction on the district court. Gianna satisfied the jurisdictional requirement of 17 U.S.C. § 411 by filing a certificate of registration with the United States Copyright Office.

[10] A "useful article" is defined in 17 U.S.C. § 101 as "an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information." The 1976 amended version of the Copyright Act changed the former language of "sole intrinsic utilitarian function" in the 1909 Act to the current wording of "an intrinsic utilitarian function." 1 M. NIMMER AND D. NIMMER, NIMMER ON COPYRIGHT § 2.08[B][3], at 2-93-95 (2005); *see also Kieselstein-Cord v. Accessories by Pearl, Inc.*, 632 F.2d 989, 993 (2d Cir. 1980).

features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article.

17 U.S.C. § 101.

### C.

The test for whether Gianna can copyright the designs proceeds in two steps. First, we must determine whether the asset for which the creator seeks copyright protection is a "useful" article. If it is not, there is no PGS bar to copyright protection. If it is, the panel must determine whether the "design incorporates [PGS] features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article." *Id.* Answering the first question is easy; answering the second is not.

#### 1.

There is little doubt that clothing possesses utilitarian and aesthetic value. "It is common ground . . . among the courts that have examined this issue [that the 1976 Copyright Act's PGS provisions were] intended to distinguish creative works that enjoy protection from the elements of industrial design that do not." *See Pivot Point Int'l, Inc. v. Charlene Prods., Inc.*, 372 F.3d 913, 920-21 (7th Cir. 2004) (en banc). The hard questions involve the methodology for severing creative elements from industrial design features.

#### 2.

Although the statutory language ostensibly requires that two conditions be satisfied, the consensus among courts and academics is that, because the statutory language was essentially lifted from a case predating the legislation,[11] § 101's separateness requirements implement what is called the "conceptual separability test."[12] There are at least six distinct variations of that test,[13] and courts "have

---

[11] The current copyright laws expressly implement the holding in *Mazer v. Stein*, 347 U.S. 201 (1954). In *Mazer*, the Court upheld the a copyright in a statue used as a lamp base. The House Report accompanying the 1976 Act refers to "the rule of *Mazer*, as affirmed by the bill." See H.R. REP. NO. 1476, 94th Cong., 2d Sess. 105 (1976) (hereinafter "House Report").

[12] *See Pivot Point*, 372 F.3d at 923 n.8; Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co., 74 F.3d 488, 494 (4th Cir. 1996) (asking whether functional aspects of animal mannequins are "conceptually separable from the works' sculptural features"); *Brandier Int'l, Inc. v. Cascade Pac. Lumber Co.*, 834 F.2d 1142, 1144 (2d Cir. 1987) (stating that "'[c]onceptual separability is thus alive and well"); *Carol Barnhart Inc. v. Econ. Cover Corp.*, 773 F.2d 411, 418 (2d Cir. 1985) (judging copyrightability of mannequin torsos based on whether "forms possess aesthetic or artistic features that are physically or conceptually separable from the forms' use as utilitarian objects to display the clothes"); *Norris Indus., Inc. v. Int'l Tel. & Tel. Corp.*, 696 F.2d 918, 923 (11th Cir. 1983) ("Both case law and legislative history indicate that separability encompasses works of art that are either physically severable from the utilitarian article or conceptually severable [sic]."); *Kieselstein-Cord*, 632 F.2d at 993 (applying conceptual severability test).

[13] *See Kieselstein-Cord*, 632 F.2d at 993 (examining whether artistic features are "primary" and utilitarian features are "subsidiary"); *Carol Barnhart*, 773 F.2d at 422 (Newman, J., dissenting) (examining whether the article "stimulate[s] in the mind of the beholder a concept that is separate from the concept evoked by its utilitarian function"); *Brandir Int'l, Inc. v. Cascade Pac. Lumber Co.*, 834 F.2d at 1142, 1143 (adopting a (continued...)

6

twisted themselves into knots trying to create a test to effectively ascertain whether the artistic aspects of a useful article can be identified separately from and exist independently of the article's utilitarian function." *Masquerade Novelty, Inc. v. Unique Indus., Inc.*, 912 F.2d 663, 670 (3d Cir. 1990).

*Pivot Point* is a sprawling, comprehensive exegesis of conceptual separability jurisprudence. *See Pivot Point*, 372 F.3d at 920-32. Although it is not binding on this court, *Pivot Point* represents, by orders of magnitude, the most thorough and persuasive analysis of this question in any circuit.

That survey revealed several things. First, it concluded that "the circuits that have addressed [this question] have recognized that the wording of the statute does not supply categorical direction, but rather requires the Copyright Office and the courts 'to continue their efforts to distinguish applied art and industrial design.'" *Id.* at 921 (internal citations omitted). Second, and more importantly, it reframed the conceptual separability test:

---

[13](...continued)
position espoused by Professor Robert Denicola, whether the artistic design was animated by functional considerations); 1 NIMMER ON COPYRIGHT § 2.08[B][3], at 2-101 (2004) (stating the test as whether the useful article "would still be marketable to some significant segment of the community simply because of its aesthetic qualities."); 1 PAUL GOLDSTEIN, COPYRIGHT § 2.5.3, at 2:67 (1996) (asking whether the artistic features "can stand alone as a work of art traditionally conceived, and . . . the useful article in which it is embodied would be equally useful without it,"); 1 WILLIAM F. PATRY, COPYRIGHT LAW & PRACTICE 285 (1994) (suggesting that separability may actually be a frivolous requirement and that courts may be better served by relying on an alternate, two-step inquiry).

Conceptual separability exists, therefore, when the artistic aspects of an article can be "conceptualized as existing independently of their utilitarian function." This independence is necessarily informed by "whether the design elements can be identified as reflecting the designers artistic judgment exercised independently of functional influence." If the elements do reflect the independent, artistic judgment of the designer, conceptual separability exists. Conversely, when the design of a useful article is "as much the result of utilitarian pressures as aesthetic choices," the useful and aesthetic elements are not conceptually separable.

*Id.* at 931 (citations omitted). In other words, where artistic discretion dominates practical necessity as the driving force behind design choices, a useful article may nonetheless qualify for protection as a PGS work. Third, *Pivot Point* strongly suggests that the contested features may be considered in the aggregate. *See id.* at 925 (quoting *Carol Barnhart*, 773 F.2d at 418).[14]

Acknowledging the comprehensiveness of that opinion, however, is not tantamount to applying it here. We do not reject the *Pivot Point* test in this circuit, but we decline to apply it to the instant facts for several reasons.

a.
First, the degree of influence *Pivot Point* will ultimately exert is manifestly uncertain.

---

[14] *See Stanislawski v. Jordan*, 337 F. Supp. 2d 1103, 1113 (E.D. Wis. 2004), discussed *infra* ("[W]hen looking at the Stanislawski's frames, the arrangement of common elements may be an original and protectable artistic element even if the respective elements are themselves common and unprotectable.") (internal citations omitted).

Courts considering PGS issues post-*Pivot Point* seem either to be adopting the test in name only or to be straining to conform the results *both* to *Pivot Point* and to the relevant circuit's prior caselaw. For example, in *Bonazoli v. R.S.V.P. Int'l, Inc.*, 353 F. Supp. 2d 218 (D.R.I. 2005), the court cited *Pivot Point* extensively but reached a result that seems to belie the Seventh Circuit's reasoning. It held that the design of certain measuring spoons was not protectable under the Copyright Act, although the bowl of each spoon was designed in the shape of a heart and the handle in the shape of an arrow shaft. *See id.* at 220.

Although *Pivot Point* seems to require a contrary result—it is hard to conceive a utilitarian consideration animating these particular designs of bowls and shafts—the *Bonazoli* court ruled that "no reasonable trier of fact could conclude that the artistic aspects of Plaintiff's spoons are separable from their functional aspects." *Id.* at 226. Moreover, the *Bonazoli* court explicitly declined formally to adopt the *Pivot Point* test:

> But this Court need not worry whether the Seventh Circuit's test for conceptual separability would be palatable to the First Circuit because Plaintiff's claim of copyrightability also fails under every other test set forth in this decision . . . . [U]nder the *Kieselstein-Cord* primary/subsidiary test, it is readily apparent that [the spoon's artistic elements] are not primary. Rather, it is the utilitarian function of measuring spoons that is primary . . . . [Plaintiff] has presented no evidence to rebut the fairly obvious conclusion that the spoons are designed to serve a primary functional purpose.

*Id.* at 225 (internal citations omitted). The court went on to explain why the measuring spoon design would fail several other conceptual separability tests, *see id.* at 225-26, a methodology that betrays discomfort with adopting *Pivot Point* wholesale.

In the only other non-Seventh Circuit case to address the issue, *Stanislawski*, 337 F. Supp. 2d at 1113, the court seemed similarly circumspect about adopting *Pivot Point* in its entirety. *Stanislawski* considered the copyrightability of custom-designed picture frames; the plaintiff designed frames containing images such as cruise ships and bowling balls and bearing varied expressions and lettering. Not only did the court appear to resort to a crude physical separability analysis, *see id.*, but it also hedged on the *Pivot Point* methodology.[15]

b.

Thus, a clothing design that is intended to be used on clothing is copyrightable only to the extent that its artistic qualities can be separated from the utilitarian nature of the garment. How to conduct the conceptual separation is, in turn, what continues to flummox federal courts. The leading treatise in the field, NIMMER ON COPYRIGHT, discusses conceptual separability extensively. It presents the conceptual separability test somewhat differently, and one standard reads as follows: "[I]t may be concluded that conceptual separability exists where there is substantial likelihood that even if the article had no utilitarian use it would still be marketable to some significant segment of the community simply

---

[15] *See id.* ("Furthermore, the [c]ourt sees no tension between the 'conceptual separability" analysis of *Pivot Point* and the Seventh Circuit's stated disfavor for dissecting works into copyrighted and unprotected elements.").

because of its aesthetic qualities."[16]

Nimmer's cogent discussion of the scope of copyright protection in design works breaks the subject into two categories: (1) fabric design and (2) dress design. Fabric designs include patterns or artistic features imprinted onto a fabric or that appear repeatedly throughout the dress fabric. Because one can generally separate the artistic elements of this design from the utility of the wearable garment, NIMMER ON COPYRIGHT states that fabric designs are generally entitled to copyright protection. On the other hand, dress designs, which graphically set forth the shape, style, cut, and dimensions for converting fabric into a finished dress or other clothing garment, generally do not have artistic elements that can be separated from the utilitarian use of the garment, and therefore typically do not qualify for copyright protection.[17]

The caselaw generally follows Nimmer's conceptual breakdown. Design of sweaters is usually classified as "fabric design" and is entitled to copyright protection.[18] Similarly, artistic designs woven or imprinted onto rugs qualify for copyright protection. *See Peel & Co. v. Rug Market*, 238 F.3d 391, 394 (5th Cir. 2001).

Cases dealing with the copyrightability of clothing designs do not exclude them from protection *per se*; they instead focus on the "separability" analysis. In *Poe v. Missing Persons*, 745 F.2d 1238 (9th Cir. 1984), for example, the court awarded copyright protection to a swimsuit design.[19] *Poe* is quite enlightening, because it involved no ordinary swimsuit. The court found that there was little chance of this elaborately crafted swimsuit's ever being worn—it appeared that it was marketed as a work of art.[20]

The Second Circuit faced a similar situation dealing with belt buckles in *Kieselstein-Cord*. The court determined that "Winchester" and "Vaquero" belt buckles contained artistic elements that were conceptually separa-

---

[16] 1 NIMMER ON COPYRIGHT § 2.08[B][3], at 2-101.

[17] *See Id.* NIMMER ON COPYRIGHT does not conclude that clothing designs do not qualify for copyright protection *per se*, but it rather concludes that clothing designs rarely pass the "separability" test. This is an important distinction in light of existing case law, which can sometimes appear to implement a categorical approach. In *Whimsicality Inc. v. Rubie's Costume Co.*, 891 F.2d 452, 454 (2d Cir. 1989), for example, the court concluded that "[c]lothing design is not copyrightable." As Gianna points out, this statement is *dictum*, because the holding was based on fraud of the Copyright Office), and no opinion of which we are aware creates any *per se* rule for clothing or any other type of design.

[18] *See, e.g., Segrets, Inc. v. Gillman Knitwear Co.*, 207 F.3d 56, 60 (1st Cir. 2000) (failing to dispute of district court's finding that sweater embroidery entitled to copyright protection); *Knitwaves v. Lollytogs, Ltd.*, 71 F.3d 996, 1002 (2d Cir. 1995) (holding that fabric design, such as the artwork on plaintiff's sweaters, is copyrightable).

[19] In fact, the court *still* remanded the case to allow the jury to apply the separability test, concluding that "[n]othing in our legal training qualifies us to determine as a matter of law whether [the swimsuit design] can be worn as an article for swimming or any other utilitarian purpose." *See Poe*, 745 F.2d at 1242.

[20] *See id.* ("Here, as noted above, the uncontradicted evidence presented below established that the only reason for existence of Aquatint No. 5 [(the swimsuit)] was as a work of art.").

9

ble despite the buckles' utilitarian functions. *See Kieselstein-Cord*, 632 F.2d at 993. This ruling was premised on the belief that the buckles could exist independently as a valuable artistic commodity.[21] The court nonetheless determined that the belt buckle in question existed on the "razor's edge of copyright law." As with the court in *Poe*, the *Kieselstein/Cord* court's willingness to recognize the copyrightability of a useful article seems, at some elemental level, to turn on the capacity of the item to moonlight as a piece of marketable artwork.

c.

The caselaw on costume design is, to say the least, uneven. Generally speaking, however, it tends to reflect a direct relationship between a costume's copyrightabilility and its actual or potential market value as a stand-alone piece of artwork.[22]

Confusion regarding the copyrightability of costumes and questions from the garment industry led to a 1991 opinion from the United States Copyright Office, 56 FR 56530-02, 1991 WL 224879 (F.R.), which concluded that "[g]arment designs (excluding separately identified pictorial representations of designs imposed upon the garment) will not be registered even if they contain ornamental features, or are intended to be used as historical or period dress." *See id.*[23] The garment industry had sought broader protections for elaborate garment designs; the Office answered that "[g]arments are useful articles, and the designs of useful articles are generally outside of the

---

[21] The Vaquero buckle was created in 1978 and became part of a series of works inspired by a book on art nouveau design and the viewing of related architecture on the creator's trip to Spain. *See Kieselstein-Cord*, 632 F.2d at 990. The designer explained that he named the other buckle "Winchester" because he saw "in (his) mind's eye a correlation between the art nouveau period and the butt of an antique Winchester rifle." pulling "these elements together graphically." The copyright registration specifically identifies the buckle as a sculpture. *See id.* at 991.

Each buckle sold for several hundreds of dollars, sometimes even approaching prices of $1,000. The designer received the 1979 Coty American Fashion Critics' Award for his work in jewelry design and a 1978 election to the Council of Fashion Designers of America. The Metropolitan Museum of Art has accepted both buckles for its permanent collection. *See id.*

[22] *See, e.g., Animal Fair Inc. v. Amfesco Indus.*, 620 F. Supp. 175 (D.C. Minn. 1985), *aff'd mem.*, 794 F.2d 678 (8th Cir. 1986) (holding that slipper depicting a bear's foot entitled to copyright protection because it was essentially a fanciful artistic rendition of a bear's foot); *National Themes Prod. v. Beck*, 696 F. Supp. 1348 (S.D. Cal. 1988) (holding that masquerade costumes are entitled to copyright protection because their design and form have little to do with their suitability as wearing apparel—they were essentially a collection of accessories); *Whimsicality*, 891 F.2d at 456 (refusing to afford deference to registration of useful articles as "soft sculptures" where "Whimsicality knew full well that no reasonable observer could believe the costumes were soft sculpture.").

[23] The Office also concluded that "[f]anciful costumes will be treated as useful articles, and will be registered only upon a finding of separately identifiable pictorial and/or sculptural authorship." The Office added that masks were generally not useful articles, and generally would be entitled to copyright protection. *See* 56 FR 56530-02, 1991 WL 224879 (F.R.).

copyright law."[24]

Sometimes, we must favor what might be a sub-optimal prophylactic rule because it is more determinate than the theoretically superior but hopelessly subjective one. We do not mean to suggest that the Nimmer/*Poe* test we ultimately endorse is conceptually inferior, but we do conclude that, if it is, it is not so theoretically infirm that such inferiority overcomes the benefits—at least at this time—of having a more determinate rule. Despite the alleged "elegance" of the *Pivot Point* rule, the scope of that holding remains uncertain. Surely the Seventh Circuit considered itself as setting forth a test for courts to use when encountering any applied art but, as we have shown in part II.C.2.a, *supra*, courts have not rushed to extend the rule beyond mannequin designs.

Nor is it obvious that *Pivot Point* could not incorporate the Nimmer rule as a means to determine—*for garment design only*—whether the utilitarian and artistic elements are conceptually separable. In other words, as an evidentiary matter, *Pivot Point* could well require that, to prove that design choices were dominated by artistic considerations, a plaintiff must demonstrate that the piece of applied art could fetch a return functioning purely as an artistic commodity. We therefore adopt the likelihood-of-marketability standard *for garment design only*,[25] because it appears firmly rooted as the implicit standard courts have been using for quite some time. We are not unaware of the pitfalls of such a standard,[26] but its inherent problems are minimized when the rule's ambit reaches a single type of applied art.[27]

Gianna makes no showing that its designs

---

[24] *Id.* The Office further concluded that "[p]arties wishing to modify this position must address their concerns to Congress."

[25] This might most accurately be described as the *Poe* standard, even though the relevant language is found in 1 NIMMER ON COPYRIGHT § 2.08[B][3], at 2-101.

[26] For example, some have argued that (1) this standard is foreign to copyright; (2) it might unduly favor more conventional forms of art; and (3) it is too restrictive. *See* 1 NIMMER ON COPYRIGHT § 2.08[B][3], at 2-101. We do not find item (1) to be particularly compelling, because all of the lawmaking with respect to PGS works is interstitial, and most of it strikes us as freewheeling. Item (2) is a salient concern only if we apply the marketability test across the spectrum of applied artwork; here we apply it only to one art form. Item (3) represents the specific sacrifice we have chosen to make—copyright protection may become improperly thin for certain parties, but such theoretical unfairness is outweighed by the interest in having a determinate rule.

[27] One might object to using a specific test to adjudicate the copyrightability of certain kinds of applied art but not others. We note, however, that we determine the copyrightability of maps—an article within the ambit of the PGS provisions—by reference to an "arrangement" or "merger" analysis that does not at all resemble the "separability" analysis of the *Pivot Point* cases. *See, e.g.*, *Mason v. Montgomery Data, Inc.*, 967 F.2d 135, 142 (5th Cir. 1995) ("Because Mason's maps possess sufficient creativity in both the selection, coordination, and arrangement of the facts that they depict, and as in the pictorial, graphic nature of the way that they do so, we find no error in the district court's determination that Mason's maps are original."); *Kern River Gas Transmission Co. v. Coastal Corp.*, 899 F.2d 1458, 1464 (5th Cir. 1990) ("The problem for the copyrightability of the resulting maps, however, is not a lack of originality, but rather that the maps created express in the only effective way the idea of the location of the pipeline.").

11

are marketable independently of their utilitarian function as casino uniforms. Gianna correctly notes that there are costume museums and that they are replete with extravagant designs that might also have utilitarian qualities, but Gianna does not demonstrate that its designs describe such material. We therefore affirm the denial of summary judgment.

### III.

Harrah's counterclaimed against Gianna for fraud on the Copyright Office. The district court denied Gianna's motion for summary judgment on the counterclaim. Denials of summary judgment are typically not final orders[28] and are generally appealable only as provided in 28 U.S.C. 1292(b), which requires a district court's designation. Neither party points to such designation, nor can we locate one in the record.

Both parties instead premise jurisdiction for this issue on Federal Rule of Civil Procedure 54(b).[29] The district court's rule 54(b)

---

[28] See Skelton v. Camp, 234 F.3d 292, 295 (5th Cir. 2000) ("A denial of summary judgment is not a final order within the meaning of 28 U.S.C. § 1291.") (citing Lemoine v. New Horizons Ranch & Ctr., Inc., 174 F.3d 629, 633 (5th Cir.1999)).

[29] That rule states:

> When more than one claim for relief is presented in an action . . . the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision . . . which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall
> (continued...)

certification, however, says nothing of the fraud counterclaim; it certifies only the infringement determination. Both parties inexplicably and incorrectly assume that we have appellate jurisdiction and proceed directly to argument on the merits.

We may exercise only proper appellate jurisdiction, even if doing so requires us to consider the jurisdictional question *sua sponte*. See *Chunn v. Chunn*, 106 F.3d 1239, 1241 (5th Cir.1997). We lack jurisdiction over the fraud counterclaim and dismiss the appeal of that issue.

### IV.

The Copyright Act provides that "in its discretion" a district court may "award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505. In a separate appeal that we have consolidated with the case on the merits, Gianna argues that the district court erred in granting Harrah's' motion for attorney's fees. The court ruled on this motion from the bench but declined to quantify its award of fees until a later hearing.

### A.

We have jurisdiction over the rule 54(b) order granting fees as an order designated by the district court as immediately appealable. We review an award of attorney's fees for abuse of discretion. See *Alameda Films S A de C V v. Authors Rights Restoration Corp.*,

---

[29](...continued)
not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

FED. R. CIV. P. 54(b).

331 F.3d 472, 483 (5th Cir. 2003).

### B.

The district court did not consider any of the four factors set forth in *Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994), in which the Court rejected the "British Rule," used in some circuits, whereby the prevailing party in a copyright case is awarded attorney's fees as a matter of course. The Court instead favored a more discretionary approach:

> [C]opyright law ultimately serves the purposes of enriching the general public through access to creative works, it is peculiarly important that the boundaries of copyright law be demarcated as a clearly as possible. To that end, defendants who seek to advance a variety of meritorious copyright defenses should be encouraged to litigate them to the same extent that plaintiffs are encouraged to litigate meritorious claims of infringment.

*Id.* at 527. *Fogerty* instructed courts, in determining whether to award attorney's fees, to consider (1) frivolousness; (2) motivation; (3) objective unreasonableness; and (4) the need in particular circumstances to advance considerations of compensation and deterrence. *See id.* at 534 n.19.[30]

The district court, without explanation, just assumed that, if it erred, this court would fix the mistake. The order gives no reason why the court awarded fees. The hearing transcript contains only the following passage:

> I think [Harrah's has] a better side of the picture.... The Motion for Entitlement to Attorney's Fees is granted. The Fifth Circuit law, as I appreciate it, indicates that it's the rule rather than the exception that in cases of this nature fees be awarded. So, if my ruling is upheld by the Fifth Circuit, we'll schedule a hearing to quantify reasonable attorney's fees. So, the motion is granted.

We cannot review a district court's decision for abuse of discretion where that court effectively delegates the underlying issue to us without making a substantive ruling of its own. Although we view this suit to be far from frivolous—this is a close question of law—remand is appropriate. The district court should provide a *Fogerty* analysis in its ensuing opinion so that its ruling can, if needed, be reviewed on appeal.

In summary, we AFFIRM the summary judgment in favor of Harrah's on the infringement claim, DISMISS the appeal regarding the denial of summary judgment to Gianna on the counterclaim, and VACATE and REMAND the order awarding attorney's fees.[31]

---

[30] The Court elaborated that "[w]e agree that such factors *may* used to guide courts' discretion, so long as such factors are faithful to the purposes of the Copyright Act and are applied to prevailing plaintiffs and defendants in an even-handed manner." (Emphasis added.) See *Fogerty*, 510 U.S. at 535 n.19. We interpret this passage as directing lower courts to apply these factors symmetrically, but not in such a way that reduces them to an end-around to the British Rule.

[31] In the remanded proceedings, the trial court must (1) rule on the fraud on the Copyright Office claim such that it is appealable and (2) apply the *Fogerty* analysis to the attorney's fees question. It need not try the infringement claim, as we have upheld the denial of summary judgment.

13

# UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

# BILL OF COSTS

Jane Galiano and Gianna, Inc.            v.   Harrah's Operating Co., Inc., et al            No. 04-30521

NOTE: The Bill of Costs is due in this office *within 14 days from the date of the opinion,* See FED. R. APP. P. & 5TH CIR.R.39. Untimely bills of costs must be accompanied by a separate motion to file out of time, which the court may deny.

The Clerk is requested to tax the following costs against: Plaintiffs-Appellants, Jane Galiano and Gianna, Inc.

| COSTS TAXABLE UNDER Fed. R. App. P. & 5th Cir. R. 39 | REQUESTED | | | | ALLOWED (If different from amount requested) | | | |
|---|---|---|---|---|---|---|---|---|
| | No. of Copies | Pages Per Copy | Cost per Page* | Total Cost | No. of Documents | Pages per Document | Cost per Page* | Total Cost |
| Docket Fee ($250.00) | | | | | | | | |
| Appendix or Record Excerpts | 5 | 104 | .25 | 130.00 | 5 | 104 | .25 | 130.00 |
| Appellant's Brief | | | | | | | | |
| Appellee's Brief | 8 | 38 | .25 | 76.00 | 8 | 38 | .25 | 76.00 |
| Appellant's Reply Brief | | | | | | | | |
| Other: | | | | | | | | |
| | | | Total $ | 206.00 | | | | |

Costs are hereby taxed in the amount of $ 206.00 this 29th day of July 2005.

By _____
CHARLES R. FULBRUGE III, CLERK
Deputy Clerk

Costs are taxed in the amount of $ 206.00 _____ 2005.

State of Louisiana
County of Orleans

I, Joseph W. Looney, do hereby swear under penalty of perjury that the services for which fees have been charged were incurred in this action and that the services for which fees have been charged were actually and necessarily performed. A copy of this Bill of Costs was this day mailed to opposing counsel, with postage fully prepaid thereon. This 19th day of July, 2005.

_____
(Signature)

Attorney for Defendants-Appellees, Harrah's Operating Co., et al.

*SEE REVERSE SIDE FOR RULES GOVERNING TAXATION OF COSTS